1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  DAMON G. MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
3  MICHELLE DES JARDINS, State Bar No. 168079
   Supervising Deputy Attorney General
4   110 West A Street, Suite 1100
   San Diego, CA 92101
5  P.O. Box 85266
   San Diego, CA 92186-5266
6  Telephone:  (619) 645-2295
   Fax:  (619) 645-2581
7  E-mail:  Michelle.DesJardins@doj.ca.gov
   *Attorneys for Defendants M. Cate, S. Kernan, T.*
8  *McDonald, G. Giurbino, J. Tilton, T. Felker, M.*
   *Wright, F. Foulk, D. Vanderville, J. Owen, and*
9  *D. Hellwig*

10             IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

| | |
|---|---|
| 14 | |
| 15  **ROBERT MITCHELL, et al.,** | 2:08-CV-01196-TLN-EFB |
| 16                          Plaintiffs, | **DEFENDANTS' OPPOSITION TO** |
| 17          v. | **MOTION FOR PRELIMINARY INJUNCTION** |
| 18  **MATTHEW CATE, et al.,** | Date:          August 14, 2013 |
| 19                          Defendants. | Time:          10:00 a.m. |
| 20 | Dept:          Courtroom 8 |
| 21 | Judge:         Hon. Edmund F. Brennan<br>Trial Date:    March 3, 2014<br>Action Filed:  May 30, 2008 |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

Introduction ................................................................................................................. 1

Facts… .......................................................................................................................... 4

I.  Prison gangs have existed in California's prisons since the 1950s. ...................... 4

II.  Race-based STGs pose serious challenges to prison management. ...................... 7

III.  STGs have a huge impact on modified programs. ................................................. 10

IV.  CDCR has implemented a new program in its continuing efforts to better
address problems posed by STGs. ......................................................................... 11

V.  CDCR's policy is to allow modified programs and lockdowns that impact
specific races only when absolutely necessary to protect inmate and staff
safety or prison security. ......................................................................................... 13

VI.  CDCR Imposes Modified Programming Following Serious Violent Incidents Only
When Necessary to Protect the Safety and Security of Staff and Inmates ........... 14

Argument ..................................................................................................................... 15

I.  Plaintiffs have not shown that the extraordinary remedy of injunctive relief
is warranted in this case. ......................................................................................... 15

A.  Plaintiffs are unlikely to succeed on the merits of their equal
protection claim. ........................................................................................ 16

1.  CDCR's modified-program and lockdown protocols do not
violate the Equal Protection Clause. ............................................. 16

a.  Under CDCR's protocols, Wardens may only impose
modified programs and lockdowns if they are narrowly
tailored to achieve a legitimate correctional goal ............ 20

b.  CDCR's Wardens are not imposing excessive and lengthy
"lockdowns." ..................................................................... 21

c.  CDCR's protocols and regulations provide the least-
restrictive means to end race-based violence following a
race-based disturbance and to combat such violence in the
State's prisons ................................................................... 25

d.  Completely prohibiting CDCR from considering race when
making modified-programming decisions is not a less-
restrictive alternative to considering race following race-
based disturbances ............................................................ 28

B.  Plaintiffs cannot show that they would be irreparably harmed if an
injunction preventing CDCR from ever implementing a modified
program along racial lines were not issued. .............................................. 29

1.  Plaintiff Trujillo's claims are moot because he has been released
from prison ...................................................................................... 30

2.  Plaintiff Abdullah's claims are moot because CDCR is already
enjoined from imposing race-based modified programs at his
prison ............................................................................................... 31

3.  Plaintiff Mitchell cannot show that the Warden of Folsom State
Prison is likely to impose a modified program that violates
Mitchell's equal protection rights ................................................... 32

4.  Plaintiff Quezada cannot show that the Warden of SATF is likely to
impose a modified program that violates Quezada's equal

i

**TABLE OF CONTENTS**
(continued)

Page

protection rights…………………………………………......35

C.    The balance of equities favors allowing CDCR to safely manage its prisons, and the requested injunction would not be in the public interest because it would jeopardize the safety of inmates and staff and the security of the state's prisons. ....................................................... 43

II.    An injunction preventing CDCR from ever considering race in making modified-programming decisions would violate the PLRA because it is not the least intrusive means of correcting any perceived equal protection violations. ........................................................................................................ 45

Conclusion ...................................................................................................... 47

ii

Defs.' Opp'n Mot. Prelim. Inj. (2:08-CV-01196-TLN-EFB)

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Adarand Constructors, Inc. v. Pena*
    515 U.S. 200 (1995) ................................................................................................ 20, 30

5

6

*Anderson v. Marin*
    No. 1:09-cv-01547, 2012 WL 6697781 (E.D. Cal. Dec. 21, 2012) ....................................... 19

7

*City of Cleburn, Tex. v. Cleburne Living Ctr.*
    473 U.S. 432 (1985) ................................................................................................ 17

8

9

*City of Los Angeles v. Lyons*
    461 U.S. 95 (1983) ................................................................................................ 31

10

*Corona v. Knowles*
    No. 1:08-cv-00237, 2012 WL 4051966 (E.D. Cal. Sept. 14, 2012) ..................................... 19

11

12

*Cutter v. Wilkinson*
    544 U.S. 709 (2005) ................................................................................................ 25

13

14

*DeMoss v. Crain*
    636 F.3d 145 (5th Cir. 2011) ........................................................................................ 25

15

*Enrico's, Inc. v. Rice*
    730 F.2d 1250 (9th Cir. 1984) ....................................................................................... 30

16

17

*Escalera v. Terhune*
    No. A101614, 2004 WL 238763 (Feb. 10, 2004) ........................................................... 25

18

19

*Farmer v. Brennan*
    511 U.S. 825 (1970) ................................................................................................ 17

20

*Fischer v. Ellegood*
    No. 06-15167, 2007 WL 1624315 (11th Cir. June 6, 2007) ............................................. 18

21

22

*Gomez v. Vernon*
    255 F.3d 1118 (9th Cir. 2001) ............................................................................. 15, 16, 45

23

24

*Grutter v. Bollinger*
    539 U.S. 306 (2003) ................................................................................................ 18

25

*Hodgers-Durgin v. Lopez*
    199 F.3d 1037 (9th Cir. 1999) ....................................................................................... 31

26

*Hurd v. Garcia*
    2012 WL 862808 ................................................................................................ 18

27

28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Hurd v. Garcia*
No. 10-56453, 2007 WL 1623415 (9th Cir. March 15, 2012) .............................................. 17

*In re Morales*
212 Cal. App. 4th 1410 (1st Dist. 2003) ....................................................................... 25, 26

*Iron Arrow Honor Soc'y v. Heckler*
464 U.S. 67 (1983) (per curiam) ........................................................................................ 30

*Johnson v. California*
543 U.S. 499 (2005) ................................................................................................... passim

*Labranch v. Yates*
No. 1:09-cv-00048, 2012 WL 3838380 (E.D. Cal. Sept. 4, 2012) ....................................... 19

*Larry v. Tilton*
No. 09-CV-0950, 2011 WL 4501396 (S.D. Cal. March 3, 2011) ......................................... 19

*Mitchell v. Dupnik*
75 F.3d 517 (9th Cir. 1996) ................................................................................................ 30

*Murphy v. Hunt*
455 U.S. 478 (1982) ........................................................................................................... 31

*Pell v. Procunier*
417 U.S. 817 (1974) ........................................................................................................... 18

*Richardson v. Runnels*
594 F.3d 666 (9th Cir. 2010) .............................................................................................. 18

*Rizzo v. Goode*
423 U.S. 362 (1976)) .......................................................................................................... 16

*Robinson v. Prunty*
249 F.3d 862 (9th Cir. 2001) .............................................................................................. 17

*Thorns v. Shannon*
No. 2:11-cv-01826, 2013 WL 772509 (E.D. Cal. Feb. 28, 2013) ....................................... 19

*Thornton v. City of St. Helens*
425 F.3d 1158 (9th Cir. 2005) ............................................................................................ 17

*Weinstein v. Bradford*
423 U.S. 147 (1975) (per curiam) ................................................................................. 30, 31

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Winter v. Nat'l Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ............................................................................... 15, 16, 43

4

5

STATUTES

6

18 U.S.C. § 3626 ..................................................................................... 16
18 U.S.C. § 3626(a)(1) ............................................................................ 43
18 U.S.C. § 3626(a)(1)(A) ....................................................................... 45

7

8

CONSTITUTIONAL PROVISIONS

9

Eighth Amendment .......................................................................... 2, 17, 19

10

Fourteenth Amendment............................................................................ 16

11

U.S. Const. Article III ............................................................................. 30

12

COURT RULES

13

Federal Rule of Civil Procedure 65(c) ...................................................... 46

14

OTHER AUTHORITIES

15

California Code of Regulations Title 15, § 3000 .................................... 4, 21

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Opp'n Mot. Prelim. Inj. (2:08-CV-01196-TLN-EFB)

**INTRODUCTION**

On March 6, 2012, one hundred African American inmates violently rioted on the main yard at Folsom State Prison.  (Decl. Hill ¶ 10, Ex. A.)  Only African American inmates were involved in the riot.  (*Id.*)  As a result, Warden Hill ordered all African American inmates placed on modified program so that the Investigative Services Unit could investigate what had caused the riot and whether further violence among African American inmates was likely to occur.  (*Id.*)

The investigation quickly revealed that the inmates involved were those associated with race-based security-threat groups ("STGs") identified as the Bloods, the Bay Area Affiliates, and the Crips.  (*Id.*)  Therefore, on March 7, 2012, Warden Hill lifted the modified program for everyone but inmates associated with the warring STGs.  (*Id.*)  Warden Hill returned all inmates to normal program fourteen days later, after it was determined that no further tension existed among the involved STGs.  (Decl. Hill ¶ 11, Ex. A.)

Plaintiffs seek to enjoin Defendants from ever making such decisions that affect only certain racial groups, alleging that Defendants are violating the Equal Protection Clause and "punishing" Plaintiffs because of their race.  (Doc. 156 at 6.)  But if Wardens are precluded from separating racial groups following race-based violence, further violence, injury and death will occur.  (Decl. Marquez ¶ 36.)  Modified programs are not a "punishment" as Plaintiffs would have the Court believe.  (Decl. Tristan ¶ 52.)  They are initiated as security protocols in response to violent incidents or imminent threats of violence with the intent to keep inmates and staff safe and to maintain prison security while prison officials investigate the initiating incident as quickly and efficiently as possible.

The Supreme Court has stated that "[p]risons are dangerous places, and the special circumstances they present may justify racial classifications in some contexts" so long as they are narrowly tailored to address a compelling penological interest. *Johnson v. California,* 543 U.S. 499, 515 (2005).  CDCR faces such circumstances following violence among inmates that appears to be racially motivated and likely extends beyond the immediately identifiable participants.  (Decl. Beard ¶ 14.)  In such situations, Wardens might find it necessary to place the involved racial groups on modified program to protect inmates and staff while they investigate

1

1  the cause of the apparently racially motivated violence.  Because Plaintiffs' requested injunction

2  would deprive Wardens of the ability to do so in a narrowly tailored manner and under

3  circumstances in which such a measure is necessary to protect the safety of inmates and staff, it is

4  inconsistent with the law.

5       Plaintiffs also contend that a preliminary injunction is necessary because CDCR has a

6  policy and practice of unnecessarily imposing lengthy race-based lockdowns.  (Doc. 156 at 7.)

7  But this is also false.  CDCR has never had such a policy.  (Decl. Harrington ¶ 33, Exs. A, B.)

8       CDCR's policy has long required that modified programming based on race be narrowly

9  tailored to further a compelling penological interest, such as inmate and staff safety and prison

10  security.  Department Operations Manual ("DOM"), § 55015.8 (2007) (Decl. Harrington ¶ 33,

11  Ex. B.)  And CDCR's policy has long been "to return to full programming as soon as it is safe to

12  do so."  DOM, § 55015.14 (2007).  (*Id.*)  And as will be discussed, the Ninth Circuit and

13  California's district courts have upheld numerous such modified programs impacting specific

14  racial groups at California prisons against Equal Protection challenges.

15       And in its ongoing efforts to balance its obligations under the Equal Protection Clause with

16  its duty under the Eighth Amendment to protect inmates from harm from other inmates, CDCR

17  implemented revised protocols governing modified programs and lockdowns in October 2012, to

18  better ensure that Wardens continue to comply with the Equal Protection Clause when

19  implementing modified programs that factor in race.  (Decl. Harrington ¶ 34.)  These protocols

20  explicitly prohibit Wardens from targeting "a specific racial or ethnic group unless it is necessary

21  and narrowly tailored to further a compelling government interest, such as restoring security and

22  order after an incident or protecting the health and safety of the inmates and staff."  DOM, §

23  55015.5.  (Decl. Harrington, Ex. A.)  And these protocols also require Wardens to end any such

24  modified programs as soon as it is safe to do so and generally within fourteen days.  (Decl.

25  Harrington ¶ 42, Ex. A.)  CDCR has also implemented procedures in its continuing efforts to

26  better deal with race-based STGs, which cause violence that results in modified programs and

27  lockdowns.  (Decl. Beard ¶¶ 5-10; Decl. Giurbino ¶¶ 2-6, Ex. A.)

28

And while Plaintiffs make broad generalizations about the number and length of supposedly race-based modified programs that the State's prisons had in years past, a review of the data they rely on shows it is unreliable and distorted and therefore cannot support their position. (Defs.' Objections Pls.' Summaries Program Status Reports.) As set forth in Defendants' objections to this data, Plaintiffs improperly refer to modified programs affecting race-based STGs as race-based modified programs. (*Id.* at p. 3.) And the data does not accurately reflect the length of time particular racial groups remain on modified program or the length of time they were denied outdoor exercise. (*Id.* at pp. 4-5.) Nor does the data accurately reflect the difference between a modified program and a lockdown. This data therefore does not support Plaintiffs' position that CDCR has a policy of imposing lengthy race-based lockdowns.

Plaintiffs also ignore the fact that several California prisons initiate very few modified programs, which are typically short in duration. (Decl. Garza ¶¶ 16-52.) And more importantly, the Wardens where Plaintiffs are incarcerated are following CDCR's modified-programming protocols and are imposing modified programs that comport with the Equal Protection Clause and that last only as long as necessary to ensure inmate and staff safety. (Decl. Hill ¶ 8; Decl. Diaz ¶ 6.) In fact, Plaintiff Quezada admits that he has not been on any modified program since he has been incarcerated at the California Substance Abuse Treatment Facility and State Prison at Corcoran ("SATF"). (Decl. Des Jardins, Ex. A, 88:4-6.) And a review of program-status reports for modified programs and lockdowns at Folsom, where Plaintiff Mitchell is incarcerated, will show that his equal protection rights are also not being violated.[1] (Decl. Hill ¶¶ 7-17.)

Because Plaintiffs cannot show Defendants are violating their rights under the Equal Protection Clause such that they are likely to suffer irreparable harm, the Motion for Preliminary Injunction must be denied.[2]

---

[1] As will be discussed later in the brief, Plaintiff Trujillo has been released from prison, and his claims are therefore moot. Plaintiff Abdullah is incarcerated at a prison under a state-court order prohibiting CDCR from using race in modified programming decisions. Thus Abdullah's claims are also moot because he is already receiving the relief he requests in this motion.

[2] In accordance with Local Rule 231(d)(3), Defendants request thirty minutes of oral argument to present their opposition to Plaintiffs' motion for preliminary injunction.

3

**FACTS**

I.   **PRISON GANGS HAVE EXISTED IN CALIFORNIA'S PRISONS SINCE THE 1950S.**

Most modified programs and lockdowns result from race-based violence perpetuated by STGs. (Decl. Harrington ¶ 68; Decl. Tristan ¶ 58.)  Thus, to understand the challenges CDCR faces in dealing with STGs and the race-based violence they cause, it is necessary to understand the history of California's gang problems.  (*Id.*)  The phenomenon of prison gangs[3] began in the mid-1950s in the California state prison system at Deuel Vocational Institution with the formation of the EME prison gang, also known as the Mexican Mafia.  (Decl. Marquez ¶ 12.)  The EME was comprised of predominately Hispanic gang members from throughout California, and its intent was to provide these gang members with protection from their racial rivals.  (*Id.*)  Initially, one of the requirements for EME membership was to be of Hispanic origin, regardless of from where in California one hailed  (*Id.*)  Additionally, the EME sought to establish control not only of the illegal activities and daily life within the prison setting, but also of Hispanic gangs operating on the streets.  (*Id.*)  The original EME members believed that if they could control custodial settings through fear and intimidation, then they could control local street gangs and their members, since those who engaged in illegal activities on the streets would eventually end up incarcerated.  (*Id.*)

By the early to mid-1960s, the EME had firmly established control of different prison yards in the California state prison system through illegal activities, extorting other inmates, and dictating the daily prison life of its own members and others through fear, intimidation, and its shear ferocity.  (*Id.* ¶ 13.)  During this time, the EME began to prey on many of its own members whom it deemed weak, cowardly, or otherwise undesirable.  (*Id.*)  These actions seemed to violate the original purpose for the EME's formation, which was the protection of the Hispanic race in prisons.  (*Id.*)  And this turn of events resulted in two distinct and separate gangs defecting from the EME.  (*Id.*)

---

[3] A prison gang is any gang that originates and has its roots within California's prisons or any other prison system.  Cal. Code Regs. tit. 15, § 3000.  A disruptive group is any gang other than a prison gang.  *Id.*  CDCR now refers to all gangs collectively as security-threat groups. (Decl. Giurbino, Ex. A.)

4

The first of these gangs was the "Maraviosos" (the "Marvelous Ones"), which hailed from the Maravia gangs in East Los Angeles, and the second was "La Familia" ("The Family"), which was the precursor to the prison gang now known as "Nuestra Familia" ("NF"). (*Id.*) The founders and original members of the Nuestra Familia included some of the original and founding members of the EME. (*Id.*)

In September 1968, the rift between the EME and Nuestra Familia culminated in a violent conflict at San Quentin State Prison in what is referred to as the "Shoe Wars." (*Id.* ¶ 15.) This bloody conflict resulted in the deaths of both EME and Nuestra Familia members. (*Id.*) These deaths and the deaths and assaults that preceded and followed them resulted in a fissure within the Hispanic gang culture that continues to this day. (*Id.*)

Additionally, the conflict between the EME and the Nuestra Familia resulted in the creation of a recognizable geographical split. The EME and its subordinate affiliates, the Southern Hispanics, otherwise known as the Sureños (Spanish for "Ones from the South"), controlled all of California south of Kern and Tulare counties. (*Id.*) And the Nuestra Familia and their subordinate affiliates, the Northern Hispanics, also known as the Norteños (Spanish for "Ones from the North") controlled areas north of these counties. (*Id.*)

The EME has no official rank structure and every member has the same rights and authority. Status and influence are gained through various means such as business acumen, intellect, ferocity, loyalty, and numbers of street-gang members. (*Id.* ¶ 16.) The EME operates under ten general rules. (*Id.*) It considers White gang members to be allies and all Nuestra Familia, Black Guerilla Family, and their respective subordinates to be enemies. (*Id.*)

The Nuestra Familia operates under a formal constitution and has a formal rank structure comprised of new and entry-level Nuestra Familia members (Category I), experienced Nuestra Familia members responsible for instructing and teaching Category I members (Category II), leadership and management-level Nuestra Familia members, and General rank (Category III). (*Id.* ¶ 17.) The General positions oversee the following areas: Supreme-overall, Prisons, Street Regiments, and Administration and Advocacy. (*Id.*) The Nuestra Familia considers African

/ / /

5

1   American gang members to be allies and all EME, Aryan Brotherhood, and their respective

2   subordinates to be enemies.  (*Id.*)

3        In January 1984, in response to the CDCR policy of segregating prison-gang members and

4   associates from general-population inmates and the resulting loss of prison-gang presence on the

5   General Population (GP) yards, the Nuestra Familia formed the Nuestra Raza (Spanish for "Our

6   Race") prison gang at Folsom State Prison.  (*Id.* ¶ 18.)  This newly formed prison gang comprised

7   predominately of Hispanics from Northern California was created to fill the void left on the

8   prison yards by the absence of Nuestra Familia members and would operate at the direction and

9   for the benefit of the Nuestra Familia.  (*Id.*)  The Nuestra Raza became the recruitment pool for

10  the Nuestra Familia.  (*Id.*)  CDCR recognizes Nuestra Raza as a STG by the name "Northern

11  Structure."  (*Id.*)

12       The Northern Structure (NS), while operating under the authority of the Nuestra Familia,

13  does not use the same rank structure or constitution employed by the Nuestra Familia.  (*Id.* ¶ 19.)

14  Rather, the Northern Structure operates under rules, which are termed the "14 Bonds" and dictate

15  that all Northern Structure members are equal in rank, although certain members maintain

16  positions of leadership.  (*Id.*)

17       Similar to the Hispanic inmates, White and African American inmates also formed prison

18  gangs based along racial lines.  (*Id.* ¶ 20.)  White inmates formed the Aryan Brotherhood (AB)

19  and the Nazi Low Riders (NLR).  (*Id.*)  African American inmates formed the Black Guerilla

20  Family.  (*Id.*)

21       There is reason to believe that the Aryan Brotherhood may have begun as early as the late-

22  1950s at San Quentin as the "Diamond Tooth" gang.  (*Id.*)  It later changed its name to the "Blue

23  Birds" and then officially became the Aryan Brotherhood in 1968.  (*Id.*)

24       The Aryan Brotherhood's initial purpose was to provide its White members protection from

25  other racial groups and gangs.  (*Id.*)  Aryan Brotherhood membership is limited to Whites only

26  and has a formal link to the Nazi Low Rider prison gang and the disruptive group Public Enemy

27  Number 1 (PEN1), and an informal link to all other White inmates housed in California's jails

28  and prisons.  (*Id.*)  The Aryan Brotherhood has a rank structure wherein the gang is given

6

direction by a commission of three Aryan Brotherhood members and at times also utilizes a

council of up to seven other Aryan Brotherhood members to deal with the day-to-day activities of

the gang.  (*Id.* ¶ 23.)  The Aryan Brotherhood considers the EME and its subordinates to be allies.

(*Id.*)  It considers the Black Guerilla Family, Nuestra Familia, and their respective subordinates to

be enemies.  (*Id.*)

The Nazi Low Riders began in the 1970s in the California Youth Authority as a protection

group for White wards.  (*Id.* ¶ 24.)  The Nazi Low Riders gang is a predominately White gang,

which was officially recognized by CDCR as a STG in 1998.  (*Id.*)  The Nazi Low Riders gang

has no official rule other than the common gang rules or rank structure.  Individual members have

influence and gain stature in much the same ways as do members of the EME.  (*Id.*)  As of 2007,

it is known that the Nazi Low Riders gang is no longer recruiting and is in "bad standing" with

the Aryan Brotherhood as a result of the defection of three former Nazi Low Rider members who

were made Aryan Brotherhood members.  (*Id.*)

The Black Guerilla Family began in the 1960s at the California Training Facility.  (*Id.* ¶

25.)  This STG was originally called the "Black Family" and later changed its name to "Black

Guerilla Family."  (*Id.*)  The Black Guerilla Family is comprised of African American inmates.

(*Id.*)  The Black Guerilla Family has a formal rank structure of Supreme Commander, Generals,

Captains, and rank-and-file members.  (*Id.*)  The Black Guerilla Family also has a formal

constitution and other formalized rules by which it abides.  The Black Guerilla Family has a

formal link to the predominantly African American disruptive groups known as Crips and Bloods,

who fall under the purview of the Black Guerilla Family in the custodial setting.  (*Id.*)  This

relationship came about when the Black Guerilla Family made influential members of the Crips

and Bloods members of the Black Guerilla Family with the intention of controlling all the African

American gangs and bringing a level of solidarity among African Americans to ward off attacks

by the EME and its subordinates both in prison and in the communities.  (*Id.*)

## II.   RACE-BASED STGs POSE SERIOUS CHALLENGES TO PRISON MANAGEMENT.

As explained above, STGs primarily form along racial lines.  This is due in large part to

their original purpose as groups that offer protection from other race-based STGs.  (*Id.* ¶ 26.)

7

By observing inmates' behaviors on a daily basis, correctional officials attempt to determine which inmates are involved in STGs.  (Decl. Harrington ¶ 67.)  But CDCR's ability to accurately determine the numbers or identification of all members and affiliates of STGs is undermined by the fact that inmates typically hide their gang allegiance and involvement from corrections officials.  (*Id.*)  Unfortunately, the unidentified individuals associated with STGs perpetuate much of the violence and disruption in the prisons and in their communities.  (Decl. Marquez ¶ 26.)

As of March 28, 2013, CDCR has identified and validated 17,230 STG members.  (Decl. Marquez ¶ 27.)  This equates to less than ten percent of CDCR's total inmate population of approximately 118,000 inmates (www.cdcr.ca.gov), while it is estimated that more than seventy percent of inmates are involved in STGs.  (Decl. Marquez ¶ 27.)  There are several reasons for such a small percentage of validated STG members and an apparent lack of identification of inmates involved in STGs.  (*Id.*)

First, STGs act in secret when prospecting and recruiting inmates, and prison officials learn of such activities only when they receive confidential information or learn of an overt act warranting staff scrutiny.  (*Id.*)  The level of overt and covert participation can change due to an individual's status within the STG.  (*Id.*)  Also, many inmates who are not members, associates, or prospects of a STG can escape notice by staff when conducting covert activities for a STG. (*Id.*)  Such non-affiliated individuals are willing to facilitate or are coerced into STG activity based upon race, geographical area of commitment, friendships, and more commonly, the expectations and demands of STG members on these individuals.  (*Id.*)

A further challenge to CDCR's ability to manage STG activity is the dynamic of entire disruptive groups operating in allegiance and loyalty to the prison gangs.  (*Id.* ¶ 28.)  An example of this is the Sureños, who number in the tens of thousands, and operate as a whole under the authority and direction of the EME, a group documented to have less than two hundred "made" members.  (*Id.*)  The relationship between the EME and its subordinates is not an anomaly but rather the general rule for all the prison gangs and their respective subordinates.  (*Id.*)

/ / /

The EME members have automatic entitlement to control the gang neighborhoods from which they hail.  (*Id.*)  This means that the EME members have rights to control and direct street-gang activity and tax street gangs for twenty-five to thirty-three percent of all earnings derived from their illicit activities.  (*Id.*)  This entitlement carries over to the prison setting where one or more EME members often control a prison yard or jail and extort and tax any income their subordinates generate through illicit activities.  (*Id.*)

To control their subordinates, STGs have developed an expertise in various forms and ways of communications.  (*Id.* ¶ 29.)  These include, but are not limited to, face-to-face communications with subordinates; coded communications such as polyalphabetic, Baconian cipher, and substitution codes; ghost writing (indented writing); American Sign Language; use of other dialects such as Swahili, Nahuatl, and Spanish; mini writings; the use of third parties such as visitors, family members, sympathizers, gang members, and associates for direct communications or letters; the establishment of fictitious entities to direct communications, such as the use of the "George Jackson University" by the Black Guerilla Family to disseminate training materials statewide; and the use of legal mail and compromised attorneys.  (*Id.*)

STGs operate under various sets of rules.  (*Id.* ¶ 32.)  For example, the Northern Structure and Norteños' daily functions are regulated by the 14 Bonds and the House Hold Policies, the Black Guerilla Family and their subordinates operate under the Rules of Conduct and Code of Ethics, and the Sureños under the EME are governed by the Sureño Reglas (Spanish for "rules").  (*Id.*)  These rules set requirements for behavior and govern the minutiae of daily prison life.  (*Id.*)  They cover numerous activities such as daily roll call, with whom gang members can associate, with whom they are at war or peace, who must be attacked, and when attacks must happen, the use, sales, and purchases of narcotics and alcohol, interactions with other races, when inmates must be out of bed in the morning and when they can go to bed at night, what they are to wear, behavior on the recreation yard and in the dining room, interactions with staff and investigators, and expected rates of taxation.  (*Id.*)

While these rules apply to those involved with STGs, there are general expectations placed upon those who are not necessarily STG members, associates, or prospects.  (*Id.* ¶ 33.)  STGs

9

Defs.' Opp'n Mot. Prelim. Inj.  (2:08-CV-01196-TLN-EFB)

impose these expectations upon non-affiliated inmates of their own race or who are from the communities from which they originate.  (*Id.*)  A non-affiliated inmate's refusal to cooperate with the STG that controls his racial group or the community he originated from will often result in his assault by the STG-affiliated inmates.  (*Id.*)  If a non-affiliated inmate declares to the STG that he is not affiliated and wishes to remain so, the gang will advise him of the parameters within which he is allowed to operate if he wants to avoid drawing the ire of the STG.  (*Id.*)  Such parameters may include a requirement to participate in large-scale race-related riots and assaults, to introduce narcotics and other contraband into the prison, to pay a tax on the purchase and sale of narcotics and prescribed medication and other illicit activities that generate monies, and to secure contraband, such as materials for making weapons from work areas.  (*Id.*)

Thus, self-avowed non-affiliated inmates are not their own sovereigns but are influenced by the STGs that operate on and control the day-to-day activities on a given prison yard or facility. As inmates like to say, "everybody minds somebody."  (*Id.* ¶ 34.)

## III.   STGs HAVE A HUGE IMPACT ON MODIFIED PROGRAMS.

Because STGs in the general population are race-based, when a riot occurs between two racial groups, it is often difficult to determine whether it occurred because of a STG conflict, a racial conflict, or both.  (Decl. Harrington ¶ 64; Decl. Ruff ¶ 14.)  And because of the level of influence and control that STGs exert over non-affiliated inmates, it would be a very short-sighted and dangerous policy to place only those inmates immediately identifiable as participants in a violent disturbance on modified program.  (Decl. Marquez ¶ 36.)  There are several reasons for this.

First, during a large-scale group or racial disturbance, the movement and chaotic nature of the disturbance coupled with the participants wearing the same or similar clothing, make it nearly impossible for staff to positively identify every single participant and his specific actions.  (*Id.*) Thus, until staff conducts a thorough investigation and reviews all available resources, the risk remains that not all participants in the disturbance will be immediately identified.  (*Id.*)  And if these inmates were released back to program without being identified, they would have an opportunity, and even an obligation under their STG rules to continue to attack others.  (*Id.*)

10

Second, even during modified programs that resulted from race-based violence, when corrections officials are hyper-vigilant in their efforts to prevent additional violence, additional race-motivated attacks can still occur.  (*Id.*)  Therefore, if a Warden could not impose a modified program on anyone other than the immediately identified participants in a disturbance, he would be unable to prevent further acts of violence from those unidentified inmates who are either intent on harming others or are coerced to participate in the violence.  (*Id.*)

Third, because STGs exert a high level of control over the daily life and programming of their members and non-affiliated inmates, they will use the non-affiliated inmates to continue their illicit activities when the STG is locked down.  (*Id.*)  Thus, a locked-down STG will cause seemingly non-affiliated inmates to move contraband, messages, and narcotics, and commit assaults on its behalf.  (*Id.*)

Also, inmates can be disciplinary free and still be involved in STG activity or operate under the influence and control of the gangs.  (*Id.* ¶ 38.)  This fact has been proven many times during the gang-debriefing process when officials interview STG members who divulge the identities of other inmates involved in STG-related activities, many of whom are disciplinary free.  (*Id.*)

## IV.   CDCR HAS IMPLEMENTED A NEW PROGRAM IN ITS CONTINUING EFFORTS TO BETTER ADDRESS PROBLEMS POSED BY STGS.

In its continuing efforts to address evolving trends in STG activities in state prisons and provide inmates with alternate procedures to disassociate from or avoid STG activity, CDCR recently implemented the "Security Threat Group Prevention, Identification, and Management" pilot program (STG Pilot Program).  (Decl. Giurbino ¶ 2.)  This program was approved and certified by the Office of Administrative Law and filed with the Secretary of State on October 18, 2012.  (*Id.*)

The policy changes set forth in the STG pilot program were based on recommendations of corrections experts and in consideration of strategies and best practices used by CDCR and other correctional agencies.  (*Id.* ¶ 3.)  CDCR also relied on a 2007 study sponsored by the California Legislature entitled, "Security Threat Group Identification and Management," conducted by

/ / /

11

1    California State University, Sacramento, which incorporated ideas generated by five national

2    gang experts who served as consultants to CDCR.  (*Id.*)

3          Under the STG Pilot Program, CDCR prohibits inmates from creating, promoting, or

4    participating in STGs, and maintains a zero-tolerance policy for STG-related behavior.  (*Id.* ¶ 4.)

5    Any inmate engaging in STG-related behavior may be subject to criminal prosecution in addition

6    to administrative sanctions.  (*Id.*)  Minimizing STG behavior and effectively managing high-

7    security populations are significant components of this program.  (*Id.*)

8          This program is also expected to 1) accomplish uniform certification of STGs and identify

9    those that pose the greatest threat to the safety and security of the prisons and public safety; 2)

10   provide for identification and validation of STG affiliates; 3) provide a Step Down Program for

11   offenders placed in segregated housing to afford enhanced program and privilege incentives to

12   promote positive behavior; and 4) debriefing for offenders who choose to disassociate themselves

13   from a STG and STG behavior.  (*Id.*)

14         Also, upon arrival to a prison, each inmate is now served an Advisement of Expectations

15   outlining CDCR's STG policy, including the consequences of STG involvement and support for

16   those desiring to abandon the STG lifestyle.  (*Id.* ¶ 6.)  A comprehensive STG-diversion video is

17   now made available for viewing during the inmate orientation and periodically thereafter, and

18   STG-diversion literature is available to inmates in an effort to prevent STG involvement.  (*Id.*)

19   CDCR is also incorporating innovative programming, such as violence prevention, anger

20   management, self-help, and diversion programs to provide inmates with alternatives to

21   participating in security-threat-group behavior.  (*Id.*)

22         Additionally, CDCR's new Secretary, Jeffrey Beard, Ph.D., is committed to CDCR's

23   ongoing goal of reducing STG behavior and influence in the State's prisons.  (Decl. Beard ¶¶ 5-

24   10.)  Dr. Beard was appointed on December 27, 2012, and has made it a priority to reduce the

25   STG-related "commerce" that empowers STGs and often motivates their violent behavior.  (*Id.* ¶

26   9.)  Dr. Beard has therefore begun implementing additional measures to prevent the influx of

27   contraband such as drugs, cell phones, and tobacco into the State's prisons.  (*Id.*)  These measures

28   include improving search techniques and expanding and improving searches of inmates, visitors,

12

1  and staff.  (*Id.*)  The more expansive and varied search techniques include, among other things,

2  placing drug-sniffing dogs in prisons and cameras in visiting rooms.  (*Id.*)

3       Another area CDCR is focusing on under Dr. Beard's leadership is drug interdiction.  (*Id.* ¶

4  10.)  A high percentage of inmates have substance-abuse problems and many entering CDCR test

5  positive for drugs, particularly methamphetamine.  (*Id.*)  CDCR is expanding its drug-treatment

6  programs for inmates.  (*Id.*)  Helping inmates stay off drugs makes them more able to program

7  and less susceptible to STG influence, since it is the STGs that typically control the illicit drug

8  supply in prisons and in communities.  (*Id.*)

9       CDCR has also expanded on other measures to better deal with gangs.  (*Id.* ¶¶ 5-10.)  To

10  prevent non-STG-affiliated inmates from getting involved in gangs in the first place, CDCR

11  continues to increase its use of sensitive-needs yards to house inmates who want to program in an

12  environment where they can be free of STG-coercion and influence.  (*Id.* ¶ 8.)  About twenty-

13  eight percent of CDCR's inmates are now in sensitive-needs yards.  (Decl. Halverson ¶ 32; Decl.

14  Harrington ¶ 59.)  Thus, such yards have become fairly main-stream.  (Decl. Harrington ¶ 59.)

15       Dr. Beard is also studying how to expand such safe havens—programming yards—where

16  inmates who want to program can do so without worrying about STGs.  (Decl. Beard ¶ 8.)  He is

17  also committed to educating new inmate arrivals about STGs and providing support for inmates

18  who wish to avoid becoming involved in such groups.  (*Id.* ¶ 6.)

19  **V.   CDCR'S POLICY IS TO ALLOW MODIFIED PROGRAMS AND LOCKDOWNS THAT
      IMPACT SPECIFIC RACES ONLY WHEN ABSOLUTELY NECESSARY TO PROTECT
20      INMATE AND STAFF SAFETY OR PRISON SECURITY.**

21       CDCR's regulations and policies ensure that Wardens are not improperly using race in

22  managing the State's prisons.  (Decl. Beard ¶ 12-14; Decl. Tristan ¶¶ 67-68.)  While CDCR, like

23  all prison systems, keeps track of inmate demographics, such as race, CDCR does not use race or

24  ethnicity in classification decisions or as a general mode of managing prison inmates.  (Decl.

25  Tristan ¶¶ 67-68.)   Nor does CDCR segregate inmates by race in housing or program

26  assignments.  (*Id.*)  To the contrary, CDCR's regulations specifically prohibit this.  (*Id.*)

27       And CDCR's policy has never been to place inmates on a modified program or lockdown

28  along racial lines, but to place on modified program STGs that caused an incident or disruption,

13

1  as well as the inmates they control, in order to stop them from perpetuating further violence.

2  (Decl. Beard ¶¶ 12-14; Decl. Harrington ¶ 71; Decl. Foston ¶ 9.)  This is often easier said than

3  done because inmates not officially associated with STGs often participate in STG behavior either

4  willingly or through coercion by STGs.  (Decl. Beard ¶ 14.)  Thus, CDCR's protocols allow

5  Wardens to use race as a factor in implementing modified programs and lockdowns only when

6  race-based dynamics make it absolutely necessary to protect inmates, staff, and the security of the

7  institution.  (*Id.* ¶¶ 12-14.)  Such a situation might occur when a group of a certain race requires

8  everybody of that race, whether they are in the STG or not, to assault everyone else of another

9  race.  (*Id.* ¶ 14.)  In such a situation, if the inmates under the STG's influence do not obey, then

10  they are subject to assault from their own group.  (*Id.*)

11      The revised lockdown and modified-program protocols and threat-assessment process were

12  implemented to deal with this problem by helping Wardens better identify those inmates who are

13  involved in STGs or who participate in STG behavior.  (*Id.*)  And these protocols, combined with

14  steps CDCR is taking to reduce gang influence in prisons, are expected to minimize the need for

15  CDCR to consider race when implementing modified programs to protect inmates from STG-

16  based racial violence.  (*Id.*)

17  **VI.   CDCR IMPOSES MODIFIED PROGRAMMING FOLLOWING SERIOUS VIOLENT
        INCIDENTS ONLY WHEN NECESSARY TO PROTECT THE SAFETY AND SECURITY OF
18      STAFF AND INMATES.**

19      Plaintiffs criticize the number of modified programs that CDCR implements in its prisons,

20  but the total number of modified programs initiated at any particular prison is meaningless unless

21  it is considered along with the number of serious violent incidents at the prison.  (Decl. Tristan ¶¶

22  24-26, Ex. J.)  This is because modified programs are typically in response to such incidents.  (*Id.*)

23  There is a miniscule number of modified programs compared to the large number of serious

24  incidents that occur at many of the prisons.  (*Id.*)  In other words, Wardens do not implement

25  modified programs in response to the vast majority of serious violent incidents that occur in their

26  prisons.  (*Id.*)

27      For example, at nine of CDCR's high-security prisons there were a total of 3,881 violence-

28  related incidents (including possession of weapons) in 2012.  (*Id.*)  And 3,613 of those violence-

14

1   related incidents were serious enough that force had to be used by officials in response to them.

2   (*Id.*)  But despite such a huge number of serious incidents, those nine prisons initiated only 187

3   security-related modified programs in 2012.  (Decl. Tristan ¶¶ 24-26, Ex. J; Decl. Grealish Ex. D.)

4   Therefore, those nine high-security prisons initiated a modified program in response to less than

5   five percent of the serious violence-related incidents at those prisons.  (*Id.*)

6          As a further example, in 2012 there were 304 violence-related incidents at Corcoran State

7   Prison, including seventy-four batteries on staff and 122 batteries on inmates.  (*Id.*)  But Corcoran

8   initiated only nine security-related modified programs in 2012.  (*Id.*)  And in 2012, there were

9   580 violence-related incidents at High Desert State Prison, including eighty batteries on staff and

10  290 batteries on inmates.  (*Id.*)  But High Desert initiated only twenty-three modified programs in

11  2012.  (*Id.*)

12         These numbers demonstrate that CDCR's prisons do not implement modified programs in

13  response to the vast majority of serious incidents and that the prisons do not implement modified

14  programs or lockdowns for minor or unnecessary reasons.  (*Id.*)

**ARGUMENT**

**I.     PLAINTIFFS HAVE NOT SHOWN THAT THE EXTRAORDINARY REMEDY OF
        INJUNCTIVE RELIEF IS WARRANTED IN THIS CASE.**

18         A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

19  clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat'l Res. Def. Council, Inc.*,

20  555 U.S. 7, 22 (2008).  It is never awarded "as of right," but in each case, "'courts must balance

21  the competing claims of injury and must consider the effect on each party of the granting or

22  withholding of the requested relief.'"  *Id.* at 24 (quoting *Amoco Prod. Co. v. Village of Gambell,

23  AK*, 480 U.S. 531, 542 (1987)).

24         "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

25  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

26  balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555

27  U.S. at 20.  Courts are cautioned that "injunctive relief is 'to be used sparingly, and only in a clear

28  and plain case,'" especially when the court is enjoining the conduct of a state agency.  *Gomez v.*

15

1    *Vernon*, 255 F.3d 1118, 1128 (9th Cir. 2001) (quoting *Rizzo v. Goode*, 423 U.S. 362, 378 (1976)).

2    When a government agency is involved, the courts must grant it "'the widest latitude in the

3    dispatch of its own internal affairs.'"  *Id*.  And courts "should pay particular regard for the public

4    consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.

5          As the Ninth Circuit has noted, these concerns have been codified in the Prison Litigation

6    Reform Act, 18 U.S.C. § 3626 (PLRA).  *See Gomez*, 225 F.3d at 1129.  "Under the PLRA, the

7    court must find that the prospective relief is 'narrowly drawn, extends no further than necessary

8    to correct the violation of the federal right, and is the least intrusive means necessary to correct

9    the violation of the Federal right' before granting injunctive relief."  *Gomez,* 225 F.3d at 1128-29

10   (quoting 18 U.S.C. § 3626(a)(1)).  And, the court must "give substantial weight to any adverse

11   impact on public safety or the operation of a criminal justice system caused by the relief."  *Id.* at

12   1129 (citing 18 U.S.C. § 3626(a)(1)).

13         Plaintiffs cannot meet this heavy burden under the four-part test because CDCR has

14   protocols and procedures in place to ensure that Wardens comply with equal protection rights

15   while also ensuring the safety of inmates and staff when imposing modified programming.  (Decl.

16   Harrington ¶¶ 33-50, Ex. A; Decl. Beard ¶¶ 11-14.)  CDCR has also implemented additional

17   procedures to reduce the STG-driven race-based violence that leads to modified programs.  (Decl.

18   Giurbino ¶¶ 1-6; Decl. Beard ¶¶ 5-11.)  These additional protocols and procedures have resulted

19   in a reduction in the number and length of modified programs and lockdowns.  (Decl. Beard ¶

20   11.)  Consequently, Plaintiffs cannot show they have been denied equal protection or are likely to

21   be denied equal protection as a result of modified programs or lockdowns under the CDCR's

22   policies or practices.  The Court must therefore deny Plaintiffs' motion for preliminary injunction.

23         **A.    Plaintiffs are unlikely to succeed on the merits of their equal protection
               claim.**

24

25              **1.   CDCR's modified-program and lockdown protocols do not violate
                    the Equal Protection Clause.**

26

27         "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

28   'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

                                        16

1   direction that all persons similarly situated should be treated alike.'" *City of Cleburn, Tex. v.*

2   *Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)).

3   "To state a § 1983 claim for violation of the Equal Protection Clause 'a plaintiff must show that

4   the defendants acted with the intent or purpose to discriminate against the plaintiff based upon

5   membership in a protected class.'" *Thornton v. City of St. Helens,* 425 F.3d 1158, 1166 (9th Cir.

6   2005) (quoting *Lee v. City of Los Angeles,* 250 F.3d 668, 686 (9th Cir. 2001)).

7          Plaintiffs want the Court to enjoin the State's prison officials from ever considering race

8   when making decisions to modify programming under any circumstance including after a

9   significant racially motivated violent disturbance.  (Doc. 156 at 6.)  But such an injunction would

10  be contrary to the law because prisons may take actions based on racial classifications when such

11  actions are narrowly tailored to further a compelling governmental interest.  *Johnson v. California,*

12  543 U.S. 499, 505, 512 (2005).

13         "Prisons are dangerous places, and the special circumstances they present may justify racial

14  classifications in some contexts." *Id.* at 515.  Thus, the Supreme Court has recognized "'that

15  prison authorities have the right, acting in good faith and in *particularized circumstances,* to take

16  into account racial tensions in maintaining security, discipline, and good order in prisons and

17  jails.'" *Id.* at 507 (quoting *Lee v. Washington,* 390 U.S. 333, 334 (1968)).  In fact, the Supreme

18  Court has recognized that "'protecting prisoners from violence might justify narrowly tailored

19  racial discrimination.'" *Johnson,* 543 U.S. at 512 (quoting *Grutter v. Bollinger,* 539 U.S. 306,

20  353 (2003)).

21         Indeed, under some circumstances, officials might violate inmates' rights under the Eighth

22  Amendment by failing to separate a racial group to protect inmates' safety.  *Farmer v. Brennan,*

23  511 U.S. 825, 833 (1970) (officials have a duty to protect prisoners from other prisoners);

24  *Robinson v. Prunty,* 249 F.3d 862, 867 (9th Cir. 2001) (no reasonable official could believe that it

25  is lawful to place inmates of two different races on the recreation yard at a time when there is a

26  serious risk of violence between the two racial groups); *see Hurd v. Garcia,* No. 10-56453, 2007

27  WL 1623415, *1 (9th Cir. March 15, 2012) (triable dispute on Eighth Amendment claim as to

28  / / /

17

1   why prison did not use racial segregation as a means for safely providing outdoor exercise to

2   warring racial groups).

3         But prisons officials' use of racial classifications is subject to strict scrutiny by the courts.

4   *Johnson,* 543 U.S. at 505.  Under strict scrutiny, the government has the burden of proving that

5   racial classifications are narrowly tailored measures that further compelling government interests.

6   *Id.*; *see also Richardson v. Runnels,* 594 F.3d 666, 671 (9th Cir. 2010).  Narrow tailoring requires

7   that the means chosen to accomplish the government's asserted purpose must be specifically and

8   narrowly framed to accomplish that purpose.  *Grutter v. Bollinger,* 539 U.S. at 333.  The courts

9   employ this strict-scrutiny standard to all racial classifications to "smoke out" illegitimate uses of

10  race by assuring that the government is pursuing a goal important enough to warrant use of a

11  highly suspect tool.  *Johnson v. California,* 543 U.S. at 506 (citing *Richmond v. J.A. Croson Co.,*

12  488 U.S. 469, 493 (1989)).

13        Prison security and discipline are compelling government interests that can justify narrowly

14  tailored racial classifications.  *Id.* at 512.  "Central to all other corrections goals is the institutional

15  consideration of internal security within the corrections facilities themselves."  *Pell v. Procunier,*

16  417 U.S. 817, 823 (1974).  Thus, prisons may make decisions based on race, but only if such

17  decisions are "narrowly tailored" to address the prison's compelling needs.  *Johnson,* 543 U.S. at

18  512.  "When race-based action is necessary to further a compelling governmental interest, such

19  action does not violate the constitutional guarantee of equal protection so long as the narrow-

20  tailoring requirement is also satisfied."  *Grutter v. Bollinger,* 539 U.S. at 327.

21        Applying the strict-scrutiny test, the Ninth Circuit, several district courts in California, and

22  at least one other circuit court have found that modified programs and lockdowns implemented to

23  separate racial groups for safety reasons comply with the Equal Protection Clause.  *See Hurd v.*

24  *Garcia,* 2012 WL 862808 at *1 (finding plaintiff failed to raise a triable dispute as to whether the

25  race-based security measures at California prison were narrowly tailored and implemented to

26  accomplish the compelling government interest of restoring prison security and discipline

27  following race-based riots and violence); *Fischer v. Ellegood,* No. 06-15167, 2007 WL 1624315,

28  at *5 (11th Cir. June 6, 2007) (finding that racial segregation of inmates following racial conflict

18

1   did not violate Equal Protection Clause because it was narrowly tailored to compelling interest of

2   neutralizing threat of racial violence); *Thorns v. Shannon,* No. 2:11-cv-01826, 2013 WL 772509,

3   at \*14 (E.D. Cal. Feb. 28, 2013) (modified program "was narrowly tailored and limited in its

4   impact to a subset of African American inmates who were housed where the precipitating inmate

5   assault occurred and were individually considered to present a high-risk of violence"); *Anderson v.*

6   *Marin,* No. 1:09-cv-01547, 2012 WL 6697781, at \*11 (E.D. Cal. Dec. 21, 2012) ("The

7   programming changes described by defendants for this lockdown amply demonstrate that the

8   race-based security measures complained of by plaintiff were narrowly tailored and were

9   implemented to resolve the compelling government interest of restoring prison security and

10  discipline."); *Labranch v. Yates,* No. 1:09-cv-00048, 2012 WL 3838380, at \*11 (E.D. Cal. Sept. 4,

11  2012) ("The programming changes described by defendants for this  lockdown amply

12  demonstrate that the race-based security measures complained of by plaintiff were narrowly

13  tailored and were implemented to resolve the compelling government interest of restoring prison

14  security and discipline."); *Larry v. Tilton,* No. 09-CV-0950, 2011 WL 4501396, at \*14 (S.D. Cal.

15  March 3, 2011) (finding it "unimaginable how officials could have more narrowly tailored their

16  response" to threats to prison officials' safety posed by African American inmates other than by

17  placing all African American inmates in the facility on modified program); *see also Corona v.*

18  *Knowles,* No. 1:08-cv-00237, 2012 WL 4051966, \*8 (E.D. Cal. Sept. 14, 2012) (finding in the

19  context of an Eighth Amendment challenge to a race-based modified program that race-based

20  violence against prison staff justified imposing race-based modified programming).

21       These cases demonstrate that CDCR's policy and practice is to impose modified programs

22  affecting race only when to do so would be the least restrictive means of achieving a compelling

23  penological interest.  Thus, a preliminary injunction precluding State prison officials from ever

24  considering race in making modified-programming decisions is directly contrary to the law and

25  would restrict officials from taking necessary measures to protect the lives of inmates and staff in

26  CDCR's prisons.

27  / / /

28  / / /

**a. Under CDCR's protocols, Wardens may only impose modified programs and lockdowns if they are narrowly tailored to achieve a legitimate correctional goal.**

Plaintiffs complain about modified programs and lockdowns that occurred in years past at different prisons than where they are currently incarcerated and point to them in an attempt to justify their request for a preliminary injunction.  (Doc. 156 at 6-7.)  But a past injury "does nothing to establish a real and immediate threat that [a plaintiff] would again suffer similar injury in the future."  *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 210-11 (1995).  Thus, modified programs that happened years ago are irrelevant to Plaintiffs' request because they do not show that Defendants are currently violating their equal protection rights.  Nor can they.

CDCR does not have a policy or practice of imposing lengthy race-based lockdowns that violate the Equal Protection Clause.  (Decl. Beard ¶ 12 Decl. Harrington ¶ 33.)  Rather, CDCR's protocols ensure that lockdowns that affect specific racial groups are narrowly tailored to further a compelling penological need.  DOM, §§ 55015.5, 55015.8.  (Decl. Beard ¶ 12; Decl. Harrington ¶¶ 33, 42, 45, Ex. A.)  This will ensure that all modified programs comply with the Equal Protection Clause.

Under the protocols, "[m]odified programming . . . shall not target a specific racial or ethnic group unless it is necessary and narrowly tailored to further a compelling government interest, such as restoring security and order after an incident or protecting the health and safety of the inmates and staff."  DOM, § 55015.5.  (Decl. Harrington ¶ 42, Ex. A.)  To ensure Wardens are complying with equal protection rights, when Wardens find it necessary to separate inmates on the basis of race during a modified program, they must clearly articulate why race is a factor.  DOM, § 55015.8.  (Decl. Harrington, Ex. A.)  "A thorough description of the incident, including a detailed explanation of why prison security requires that all inmates of a particular racial or ethnic group or groups be placed on modified program, shall be documented."  (*Id.*)  Such decisions are subject to review by CDCR's Associate Directors.  (*Id.*)

And contrary to Plaintiffs' contention that race-based lockdowns can go on for years, under CDCR's protocols, Wardens are expected to lift any such modified programs or lockdowns

/ / /

20

1   within fourteen days or adequately explain why they cannot do so.  DOM, § 55015.8.  (Decl.

2   Harrington ¶¶ 42, 45, 72, Ex. A.)

3                          **b.  CDCR's Wardens are not imposing excessive and lengthy
                               "lockdowns."**

4

5         Another falsehood Plaintiffs assert to support their Motion and which their expert, Eldon

6   Vail, appears to adopt is their contention that a modified program is a lockdown of all inmates in

7   their cells twenty-four hours a day, with no outdoor exercise or access to any prison programs.

8   (Doc. 156 at 8; Doc. 188 at 3.)  But prison regulations show this is false and that true lockdowns

9   are rare and generally last only a few days.  (Decl. Harrington ¶¶ 7-8.)

10  Instead, prison regulations define a lockdown as follows:

11          Lockdown means the restriction of all inmates to their cells/dormitory beds
            encompassing no less than a Facility.  True lockdowns are rare occasions, generally
12          following very serious threats to institutional security and the safety of staff and
            inmates.  The movement of any inmate to an assignment or resumption of any
13          program would change the lockdown status of the program, returning the
            institution/facility to a diminished level of modified program or to normal program.

14

15  Cal. Code Regs. tit. 15, § 3000.

16        Prison regulations define a modified program as follows:

17          Modified Program means the suspension or restriction of inmate program activities
            and/or movement that impacts less than all programs or less than all inmates.  A
18          Modified Program may either occur independently in response to an incident or
            unusual occurrence or may occur as a facility transitions from a lockdown to regular
19          programming.  Imposed restrictions may fluctuate as circumstances dictate with the
            goal of resuming regular programming as soon as it is practical.  Modified
20          programming will last no longer than necessary to restore institutional safety and
            security or to investigate the triggering event, and shall not target a specific racial or
21          ethnic group unless it is necessary and narrowly tailored to further a compelling
            government interest.  For those inmates whose movement has been restricted,
22          movement may be authorized such as medical, dental, mental health or law library
            visits.  The routine and/or temporary restrictions on inmate movement or yard
23          activities, which do not last longer than 24 hours, are not considered a program
            modification.

24

25  Cal. Code Regs. tit. 15, 3000.

26        And the statistics Plaintiffs use to support their Motion are also flawed and irrelevant and

27  do not support their contention that CDCR imposed excessive and lengthy race-based lockdowns.

28  They are flawed because they fail to account for the difference between modified programs and

                                        21

1    lockdowns discussed above and they fail to account for changes to programming, which often

2    occur during the course of a modified program.  (Defs.' Objections Pls.' Summaries Program

3    Status Reports at p. 4.)  Modified programs are fluid, often beginning with a complete restriction

4    of inmate movement and then after further investigation, a gradual return to normal program.

5    DOM, § 55015.5 ("Imposed restrictions may fluctuate as circumstances dictate with the goal of

6    resuming regular programming as soon as it is safe and practical.")  (Decl. Harrington, Ex. A.)

7         But Plaintiffs do not recognize this and therefore incorrectly calculate the duration of

8    modified programs impacting a particular racial group.  (Defs.' Objection Pls.' Summaries

9    Program Status Reports at p. 4.)  For example, Plaintiffs' reports incorrectly show that a modified

10   program initiated by California State Prison, Sacramento, on February 8, 2011, affected African

11   American inmates for twenty-one days.  (*Id.*)  But that modified program affected African

12   American inmates for only twenty-four hours while an investigation into the disturbance leading

13   to the modified program was pending.  (*Id.*)  After that, it was modified to only affect inmates

14   who were members or associates of the Crips.  (*Id.*)  Thus, as demonstrated by this example,

15   Plaintiffs' calculation of the length of modified programs is inaccurate and therefore cannot

16   support their contention that Defendants have a practice and policy of imposing lengthy race-

17   based lockdowns.

18        Plaintiffs' statistics are also fundamentally flawed because they mischaracterize modified

19   programs impacting STGs as "race-based lockdowns."  (Defs. Objection Pls.' Summaries

20   Program Status Reports at p. 3.)  For example, Plaintiffs characterized a modified program that

21   impacted the Bulldogs STG as race-based when the program status report for that modified

22   program clearly indicated that it only affected the Bulldogs and not any racial group.  (*Id.*)

23        Actual current data shows that CDCR is not imposing excessive or lengthy race-based

24   lockdowns or modified programs.  The State's thirty-one prisons had a total of 150 security-based

25   modified programs from October 15, 2012 (when CDCR amended protocols and procedures

26   impacting modified programs) through March 13, 2013 (the date agreed upon by the parties as a

27   cut-off for data concerning modified programs and lockdowns), for an average of only about five

28   modified programs per prison in a five-month time frame.  (Decl. Grealish ¶ 16, Ex. E.)  This is

22

1   significant because most modified programs impact only a single facility or even less than a

2   facility within a prison.  (Decl. Harrington ¶ 15.)  And there are 153 different facilities throughout

3   CDCR's adult male prisons.  (Decl. Halverson ¶¶ 10-11, Ex. A.)  The average duration of

4   modified programs has been 14.9 days with a median duration of only 8 days.  (Decl. Grealish ¶

5   16, Ex. E.)  For an inmate population of approximately 118,000 male inmates, seventy percent of

6   whom are involved in STGs, this is not so excessive as to demonstrate a constitutional violation.

7       And a number of prisons implement very few and very short modified programs, further

8   demonstrating that Plaintiffs' contention that CDCR has a "practice" of imposing unnecessary

9   and lengthy modified programs is utterly false.  For example, Chuckawalla Valley State Prison

10  contains four Level II facilities and a Level I minimum-support facility.  (Decl. Garza ¶ 26; Decl.

11  Halverson Ex. A.)  In 2012, Chuckawalla Valley initiated no security-related modified programs

12  whatsoever.  (Decl. Garza ¶ 27; Decl. Crandall ¶¶ 10-11, Ex. C1.)  In 2011, Chuckawalla Valley

13  initiated only five security-related modified programs that ranged in duration from three to eight

14  days.  (Decl. Garza ¶ 28; Decl. Crandall ¶¶ 8-9, Exs. B1-B6.)  And each of those five modified

15  programs affected only one of Chuckawalla Valley's five separate facilities.  (Decl. Garza ¶ 28.)

16  In 2010, Chuckawalla Valley initiated only four security-related modified programs that ranged in

17  duration from three to eight days.  (Decl. Garza ¶ 29; Decl. Crandall ¶¶ 6-7, Exs. A1-A4.)  And

18  each of those four modified programs affected only one of Chuckawalla Valley's five separate

19  facilities.  (Decl. Garza ¶ 29.)

20      Avenal State Prison presents another salient example.  Avenal contains six Level II

21  facilities.  (Decl. Garza ¶ 16; Decl. Halverson Ex. A.)  In 2012, Avenal State Prison initiated only

22  three security-related modified programs that ranged in duration from two to seven days.  (Decl.

23  Garza ¶ 17; Decl. Carpentiari ¶¶ 9-10, Exs. C1-C3.)  And each of those three modified programs

24  affected only one of Avenal's six separate facilities.  (Decl. Garza ¶ 17.)  In fact, two of the three

25  modified programs affected only one housing unit in a facility.  (Decl. Garza ¶ 17.)  Three of

26  Avenal's six facilities (half of the prison) experienced no security-related modified programs in

27  2012.  (Decl. Garza ¶ 17.)  In 2011, Avenal initiated only nine security-related modified programs

28  that ranged in duration from three to eleven days, and averaged only about 6.8 days.  (Decl. Garza

23

1   ¶ 18; Decl. Carpentiari ¶¶ 7-8, Exs. B1-B13.)  And each of those nine modified programs affected

2   only one of Avenal's six separate facilities.  (Decl. Garza ¶ 18.)  In 2010, Avenal initiated only

3   ten security-related modified programs that ranged in duration from five to eighteen days, and

4   averaged only about 7.2 days.  (Decl. Garza ¶ 19; Decl. Carpentiari ¶¶ 5-6, Exs. A1-A14.)  And

5   each of those ten modified programs affected only one of Avenal's six separate facilities.  (Decl.

6   Garza ¶ 19.)

7        California Rehabilitation Center presents yet another example.  California Rehabilitation

8   Center contains four Level II facilities.  (Decl. Garza ¶ 34; Decl. Halverson Ex. A.)  In 2012,

9   California Rehabilitation Center initiated only nine new security-related modified programs.

10  (Decl. Garza ¶ 35; Decl. Kent ¶¶ 9-10, Exs. C1-C10.)  Those modified programs ranged from two

11  to eight days and their average duration was only about 4.9 days.  (Decl. Garza ¶ 35.)  And eight

12  of those nine modified programs affected only a single facility.  (*Id.*)  In 2011, California

13  Rehabilitation Center initiated only five new security-related modified programs.  (Decl. Garza ¶

14  36; Decl. Kent ¶¶ 7-8, Exs. B1-B15.)  Those modified programs ranged from three to six days,

15  and their average duration was only 5.2 days.  (Decl. Garza ¶ 36.)  And each of those five

16  modified programs affected only one facility.  (*Id.*)  And in 2010, California Rehabilitation Center

17  initiated thirteen new security-related modified programs that ranged in duration from one to ten

18  days, and averaged only about 4.8 days.  (Decl. Garza ¶ 37; Decl. Kent ¶¶ 5-6, Exs. A1-A15.)

19  And eleven of those thirteen modified programs affected only a single facility.  (Decl. Garza ¶ 37.)

20       California Medical Facility is yet another example.  California Medical Facility is an older

21  prison and is divided into numerous wings instead of different Facilities.  (Decl. Garza ¶ 44; Decl.

22  Halverson Ex. A.)  In 2012, California Medical Facility initiated only four new security-related

23  modified programs.  (Decl. Garza ¶ 45; Decl. Gonzales ¶¶ 5-6, Exs. A1-A7.)  Those modified

24  programs ranged from three to eight days, and their average duration was only about 5.3 days.

25  (Decl. Garza ¶ 45.)

26       And Centinela State Prison, which is a high-security Level III and Level IV prison, presents

27  yet another example. (Decl. Garza ¶ 51; Decl. Halverson Ex. A.)  In 2012, Centinela initiated

28  only four new security-related modified programs.  (Decl. Garza ¶ 52; Decl. Valencia ¶¶ 6-7, Exs.

24

1   A1-A8.)  Those modified programs ranged from four to nine days, and their average duration was

2   only about 6.8 days.  (Decl. Garza ¶ 52.)  And each of those four modified programs affected only

3   one facility at Centinela.  (*Id.*)

4        These facts simply cannot be reconciled with Plaintiffs' claims that all inmates across all of

5   CDCR's prisons are subjected to a huge number of excessively long modified programs because

6   of CDCR's alleged statewide policies and practices.

7        Nor do Plaintiffs' flawed statistics show what is actually happening to Plaintiffs at the

8   prisons where they are currently incarcerated.  As will be explained in detail in section B below in

9   detail, modified programs imposed since October 2012 show that the Wardens at Plaintiffs'

10  prisons are following CDCR's protocols and using race as a factor in making modified-program

11  decisions only when strictly necessary to maintain inmate and staff safety and prison security.

12  And they are also following the mandate under DOM, § 55015.8, that they are to return to normal

13  program as soon as it is safe to do so (Decl. Harrington, ¶ 33, Ex. A).

14           **c.  CDCR's protocols and regulations provide the least-restrictive
                 means to end race-based violence following a race-based disturbance
15               and to combat such violence in the State's prisons.**

16       In determining whether the government has met its burden of proof under the strict-scrutiny

17  standard regarding whether its action is the least restrictive way to meet a compelling interest, the

18  court must give "'due deference to the experience and expertise of prison and jail administrators

19  in establishing necessary regulations and procedures to maintain good order, security and

20  discipline, consistent with consideration of costs and limited resources.'"  *DeMoss v. Crain,* 636

21  F.3d 145, 150 (5th Cir. 2011) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)).  Here, as

22  in *DeMoss*, the corrections officials have met their burden of proof.

23       CDCR's revised protocols were specifically implemented to ensure compliance with the

24  order in *In re Morales*, 212 Cal. App. 4th 1410, 1415 (1st Dist. 2003) (Decl. Harrington ¶ 34),

25  which Plaintiffs tout as a less restrictive manner to deal with race-based violence and which they

26  contend CDCR should follow in order to comply with the Equal Protection Clause (Doc. 156 at

27  15).  The *Escalera* order at issue in *Morales* (*Escalera v. Terhune*, No. A101614, 2004 WL

28  238763 (Feb. 10, 2004)), which the California Court of Appeal upheld, directed prison officials

                                          25

"'to refrain from affording preferential treatment to inmates on the basis of ethnicity.'" *Morales,*

212 Cal. App. 4th at 1428.  But it also permitted prison staff "'[i]n their discretion . . . [t]o lock

down the prison' and '[o]n a short-term emergency basis, . . . [to] separate inmates on the basis of

ethnicity, if prison security requires it, so long as it is not done preferentially.'" *Id.* at 1428-29

(quoting *Escalera* order).  The *Morales* court found the trial court's order "fully consistent with

*Johnson* [*v. California*]," because the order would allow the prison to implement a narrowly

tailored modified program that restricted racial groups in emergency situations.  *In re Morales,*

212 Cal. App. 4th at 1429.  Apparently, so do Plaintiffs, since they contend that CDCR should

follow this order as a less-restrictive way to deal with race-based violence.  (Doc. 156 at 16.)

And yet, Plaintiffs' requested injunction goes far beyond *Johnson* and *Morales* by flatly

prohibiting any modified program that separates a racial group regardless of underlying

circumstances.  (Doc. 156 at 7.)

Because CDCR's revised protocols were drafted to comply with *Morales*, they use much of

the same language as the *Morales* order: "[in] emergency situations (e.g. for the safety of staff

and/or inmates or to maintain secure and orderly operations, etc.), and on an initial short-term

basis, a modified program or lockdown that separates inmates on the basis of race or ethnicity

may be implemented."  DOM, § 55015.8.  (Decl. Harrington, Ex. A.)  But modified programming

"shall not target a specific racial or ethnic group unless it is necessary and narrowly tailored to

further a compelling government interest, such as restoring security and order after an incident or

protecting the health and safety of the inmates and staff."  DOM, § 55015.5.  (Decl. Harrington,

Ex. A.)  Because CDCR is following what Plaintiffs themselves tout as a narrowly tailored use of

race in modified program decisions, Plaintiffs cannot show CDCR has a policy that violates the

Equal Protection Clause.

CDCR is also employing other measures that Plaintiffs tout as less-restrictive alternatives to

dealing with race-based violence.  Referencing *Morales* again, Plaintiffs' other suggested

narrowly tailored means of controlling violence is "1) the post-*Escalera* process of evaluating

inmates 'based upon an individual threat assessment score' rather than race; and 2) complying

/ / /

26

1  with regulations governing identification of gang members, and separating 'inmates who are

2  prone to racially-based gang violence.'"  (Doc. 156 at 16.)

3       But again, Plaintiffs ignore the fact that CDCR has already implemented those measures.

4  Under CDCR's protocols, "[d]ecisions concerning who should be subject to a modified program

5  must be based on individual documented case factors, individual inmate behavior or identified

6  group behavior."  DOM, § 55015.8.  (Decl. Harrington ¶ 73, Ex. A.)  And "[d]eterminations that

7  particular inmates are affiliated with an STG must be based on their behavior or documented case

8  factors, which indicate the inmate would likely participate with the STG to disrupt the orderly

9  operation of the institution and/or endanger staff and inmate security."  (*Id.*)

10      CDCR now uses a detailed threat-assessment process to accomplish this case-by-case

11  evaluation.  (*Id.* ¶¶ 74-75.)  And Wardens are instructed that "all groups receive fair consistent

12  treatment commensurate with their involvement as well as the overall circumstances of events

13  causing the lockdown or modified program."  (*Id.* ¶ 75.)

14      A detailed behavior-based system for managing STGs is also found in CDCR's STG Pilot

15  Program.  (Decl. Giurbino ¶ 2, Ex. A.)  Its purpose is to ensure that those inmates actively

16  engaged in STG behavior are identified, segregated, and disciplined for their behavior.  (*Id.* ¶¶ 4-

17  5, Ex. A.)  Thus, again, CDCR is already using what Plaintiffs admit are narrowly tailored

18  methods of controlling race-based violence.

19      Plaintiffs also suggest that a less-restrictive alternative to imposing modified programming

20  on specific racial groups following race-based disturbances would be to better manage gangs to

21  reduce the racial violence that leads to modified programs.  (Doc. 156 at 16-17, 22.)  But again,

22  Plaintiffs fail to acknowledge that CDCR is already doing this as well.  As discussed earlier,

23  CDCR has continued to improve the way it deals with STGs to reduce the influence of STGs in

24  the State's prisons to reduce the violence and resulting need for modified programming that it

25  causes.  (Decl. Giurbino ¶¶ 2-6, Ex. A.)  A detailed description of such recent measures is found

26  in the STG pilot program.  (*Id.*)  And the risk-assessment instruments CDCR uses to identify

27  which inmates are at risk of perpetuating violence is exactly what Plaintiffs' own expert asserts is

28  a less-restrictive means of dealing with race-based violence.  (Doc. 188 at 22, ¶ 88.)

27

1    CDCR is also already employing the other methods that Plaintiffs' expert, Mr. Vail, touts as

2    less-restrictive alternatives to considering race in modified-program decisions.  Mr. Vail contends

3    that to combat race-based violence, CDCR should develop strategies to stem the flow of

4    contraband.  (Doc. 188 at 23.)  But again, CDCR is doing just that and more to combat problems

5    caused by race-based STGs.  Since Dr. Beard has taken over leadership of CDCR, he has made

6    reducing the influence of STGs and the violence and resulting modified programs they cause a

7    top priority.  (Decl. Beard ¶ 4.)  To achieve these goals, he is implementing improved measures

8    designed to reduce the commerce of contraband, reduce drug use, and divert inmates from STGs

9    and into programs.  (Decl. Beard ¶¶ 5-11.)  Because CDCR is already employing what Plaintiffs

10   contend are the least restrictive means of handling race-based violence caused by STGs, Plaintiffs

11   cannot show CDCR is violating the Equal Protection Clause.

12               **d.  Completely prohibiting CDCR from considering race when making
                     modified-programming decisions is not a less-restrictive alternative
13                   to considering race following race-based disturbances.**

14   Plaintiffs appear to argue that no modified-programming decision that targets inmates of a

15   specific race can ever be narrowly tailored because according to Mr. Vail, CDCR is the only state

16   in the Nation that uses race as a factor in making modified-programming decisions.  (Doc. 156 at

17   17.)  But this argument is flawed for two reasons.

18   First, Mr. Vail's contention is false.  Mr. Vail does not reveal with which state penal

19   systems he is familiar.  (Doc. 188.)  But at least three other states—Arizona, Texas, and Ohio—

20   have populations and race-based gang problems similar to CDCR's and find it necessary on

21   occasion to use race as a factor in making modified-programming decisions.  (Decl. Tristan ¶ 59.)

22   And Mr. Vail has no qualifications to testify to problems presented by race-based STGs in

23   large prison populations because he spent his entire correctional career in Washington's

24   corrections system, which has a fraction of CDCR's inmate population.  Washington has about

25   15,000 male inmates in its prisons while CDCR houses about 118,000 male inmates in its

26   California prisons.  (Decl. Tristan ¶ 64; Doc. 188 at 2.)  And Washington's prison system is

27   largely homogenous with a predominantly (72%) White inmate population.  (Decl. Tristan ¶ 64.)

28   As a result, powerful race-based STGs, such as the EME and the Sureños are largely absent from

                                                28

1   Washington's prison system.  (*Id.*)  Thus, Washington's prison system simply has never had the

2   type of inmate population or race-based STGs with which CDCR has to contend.  (*Id.*)  Therefore,

3   Mr. Vail's assumptions concerning the necessity to consider race in making modified

4   programming decisions in response to race-based conflicts are unsupported.

5          Second, placing *all* inmates on modified programming following a race-based disturbance

6   is not a less-restrictive alternative to placing only members of the involved races on modified

7   programming.  If CDCR were restricted from ever using race when making modified

8   programming decisions even when confronted with a race-based disturbance such as a race riot, it

9   would have to place inmates who it had no reason to believe were at risk of becoming involved or

10  of being victimized in a race-based disturbance on modified program.  (Decl. Tristan ¶ 47.)

11         This is actually what CDCR used to do until the 1990s, when CDCR began to more

12  narrowly tailor modified programs to allow inmates who appeared to have no involvement in a

13  race-based disturbance to return to normal program while staff investigated the cause and possible

14  consequences of the racial disturbance.  (Decl. Tristan ¶¶ 62-63.)  But CDCR learned that not

15  narrowly tailoring modified programs to inmates who are potentially involved in a race-based

16  disturbance results in more, not fewer inmates being placed on modified program, and in

17  lengthier modified programs.  (*Id.*)  Plaintiffs contend that such unfair treatment of uninvolved

18  inmates angers inmates and causes more violence.  (Doc. 156 at 23-24.)  Thus, if inmates who

19  CDCR has no reason to believe might become involved in a violent race-based conflict were also

20  placed on modified programming along with racial groups who were clearly involved, then

21  according to Plaintiffs, more inmate anger and violence would result.  Thus, by Plaintiffs' own

22  admission, this is not a less-restrictive alternative to imposing modified programs on specific

23  ethnic groups involved in racially motivated disturbances.

24         **B.     Plaintiffs cannot show that they would be irreparably harmed if an
               injunction preventing CDCR from ever implementing a modified
25             program along racial lines were not issued.**

26         Plaintiffs complain that they will suffer irreparable harm if the Court does not enjoin CDCR

27  from ever implementing a modified program that separates a racial group, because all such

28  decisions must be a violation of their equal protection rights.  (Doc. 156 at 23.)  But as discussed

29

1  at length above, CDCR's modified program and lockdown protocols were drafted to ensure their

2  compliance with the Equal Protection Clause and are the least-restrictive means of protecting

3  inmate and staff safety following a race-based disturbance.  And the evidence shows that the

4  Wardens at Mitchell and Quezada's prisons are properly following these protocols and have not

5  imposed any modified program that violates equal protection since they were revised in October

6  2012.  (Decl. Hill ¶¶ 8-16; Decl. Diaz ¶¶ 6-29.)  Concerning Trujillo and Abdullah, Trujillo has

7  been released from prison (Decl. Cortez ¶ 4) and Abdullah's prison is under a court order

8  prohibiting the use of race in modified-program decisions.  (Doc. 157-5.)  Therefore, they cannot

9  show any likelihood of irreparable harm

10           **1.  Plaintiff Trujillo's claims are moot because he has been released
                  from prison.**

12          The question of whether modified programs and lockdowns at inmate Trujillo's former

13  prison violate equal protection rights is moot because he has been released from prison (Decl.

14  Cortez ¶ 4) and therefore faces no likelihood that he will suffer irreparable harm stemming from

15  CDCR's modified program and lockdown protocols.  *Weinstein v. Bradford*, 423 U.S. 147 (1975)

16  (per curiam) (when an inmate seeks injunctive relief concerning conditions related to his

17  incarceration, his claims for such relief become moot when he is no longer subjected to those

18  conditions).  To invoke the jurisdiction of the federal courts, Article III of the Constitution

19  requires the existence of a pending "case or controversy."  U.S. Const. art. III.  To satisfy the

20  case-or-controversy requirement, a litigant must have suffered an injury that can be redressed by a

21  favorable judicial decision.  *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (per

22  curiam).  Where the court can no longer grant effective relief, the court lacks jurisdiction and

23  must dismiss the case as moot.  *See Enrico's, Inc. v. Rice*, 730 F.2d 1250, 1254 (9th Cir. 1984).

24          Questions of mootness are determined in light of the present circumstances.  *Mitchell v.

25  Dupnik*, 75 F.3d 517, 528 (9th Cir. 1996).  Although a past injury may afford a plaintiff standing

26  to claim damages, it "does nothing to establish a real and immediate threat that he would again

27  suffer similar injury in the future."  *Adarand Constructors, Inc. v. Pena*, 515 U.S. at 210-11.  And

28  "absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to

30

1   conduct its business in a particular way." *Hodgers-Durgin v. Lopez*, 199 F.3d 1037, 1042 (9th
2   Cir. 1999).

3       An exception to this mootness rule is a situation where the alleged violation is capable of
4   repetition, yet evading review. *Weinstein v. Bradford,* 423 U.S. at 149. The exception applies
5   only where: (1) the challenged action was too short in duration to be fully litigated before its
6   cessation or expiration, or (2) there is a reasonable expectation that the same complaining party
7   would be subject to the same action again. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). A
8   plaintiff must demonstrate that the threat of reoccurrence is a real, rather than a speculative,
9   possibility. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

10      Here, Plaintiff Trujillo has been paroled from prison after a lengthy sentence. (Decl. Cortez
11  ¶ 4.) The challenged procedures were not of such short duration that Plaintiff had no time to fully
12  litigate them. In fact, he complains about modified programs that occurred in 2009 and 2010.
13  (Doc. 164 at 2-3.) And there is no reasonable expectation that now that Plaintiff Trujillo has been
14  paroled, he will reoffend and be returned to prison. And even if he did, CDCR is following
15  modified-program protocols that fully comport with equal protection. DOM, § 55015.5-55015.18.
16  (Decl. Thus, there is no exception to the mootness doctrine here. And Plaintiff Trujillo cannot
17  show a *likelihood* that he will suffer irreparable harm if the preliminary injunction is not granted.

18              **2.  Plaintiff Abdullah's claims are moot because CDCR is already**
19                  **enjoined from imposing race-based modified programs at his prison.**

20      Likewise, inmate Abdullah's claims are also moot because the prison where he is
21  incarcerated—California State Prison, Solano—is under a court order that prevents CDCR from
22  imposing race-based lockdowns at that prison (Doc. 157-5):

23          Respondent [CDCR] shall refrain from affording preferential treatment to inmates on
            the basis of ethnicity. Specifically, respondent shall not subject *any inmate*, including
24          petitioner, to its 'modified program' or any other version of 'lockdown' based on that
            inmate's race or ethnic background alone. While respondent it [sic] its discretion,
25          may lockdown all or part of the prison, and may release inmates from lockdown
            based upon individual behavior and upon informed predictions of individual
26          behavior, *it may not do so on the basis of ethnicity*. Specifically, any assumption
            about affiliation with, support of, or adherence to gang leadership used as a basis for
27          imposition of a modified program must be based on the specific history, conduct and
            relationships of that inmate.
28

31

1   (Doc 157-5 at 21, emphasis added.)

2       Because the Solano County Superior Court has already granted Plaintiff Abdullah the relief

3   he seeks, his claims are moot.  And if for some reason Solano's warden failed to comply with the

4   state-court order prohibiting CDCR from imposing modified programs on the basis of race,

5   Plaintiff Abdullah's remedy would be to return to state court and seek enforcement of its order.

6   He can therefore show no likelihood of irreparable harm if the motion for preliminary injunction

7   is not granted.

8           **3.   Plaintiff Mitchell cannot show that the Warden of Folsom State
                   Prison is likely to impose a modified program that violates Mitchell's
9                  equal protection rights.**

10      Plaintiff Mitchell is an inmate at Folsom State Prison.  In support of the Motion for

11  Preliminary Injunction, he submitted a declaration complaining of lockdowns at High Desert

12  State Prison in 2006 and 2007.  (Doc. 161 at 2-4.)  But he is no longer at High Desert where he

13  would be subject to such modified programming.  Thus, any complaints about High Desert are

14  moot.

15      Mitchell also complains that High Desert placed color-coded signs outside his cell to

16  indicate his ethnicity.  But it is unclear what relevance High Desert's use of color-coded "signs"

17  has to Plaintiffs' motion for a preliminary injunction, because Plaintiff Mitchell has not been

18  confined at High Desert for years and he makes no claim that Folsom uses such color-coded

19  signs.  (Doc. 161.)  But for the sake of thoroughness, Defendants will explain the purpose of these

20  so-called "signs."

21      Some prisons use color-coded placards posted outside inmates' cells to provide officers

22  with basic identifying information of the cell's occupants, such as CDCR number, AKAs, race,

23  and STG affiliation.  (Decl. Harrington ¶¶ 95-96.)  The purpose of color-coding these placards is

24  to provide building officers a visual aid to quickly identify which inmates are subject to a

25  modified program.  (*Id.*)  There is nothing racist about using color-coded placards during a

26  program modification caused by racial conflict.  (*Id.*)  They are a tool used during such modified

27  programs to avoid accidentally opening the wrong cell door and either releasing an inmate who is

28

32

1    intent on attacking other inmates because of their race, or inadvertently opening the cell door of

2    an inmate who might be attacked by other inmates because of his race. (*Id.*)

3         There have been times when a housing unit was on modified program because of a race-

4    based conflict among inmates and the control-booth officer inadvertently opened the wrong cell

5    door. (*Id.*) In those instances, the inmate rushed out of his cell and attacked any inmate he could

6    reach who was associated with another race-based group. (*Id.*) Thus, some prisons have found it

7    helpful as an additional security measure to use the color-coded placards to ensure that inmates

8    who have been separated because of a racial conflict are not inadvertently released at the same

9    time. (*Id.*) But as stated earlier, Plaintiff Mitchell does not contend that Folsom uses these color-

10   coded placards. (*Id.*)

11        Plaintiff Mitchell is also not entitled to injunctive relief, because Folsom's Warden is

12   following CDCR's modified-program protocols in compliance with the Equal Protection Clause.

13   (Decl. Hill ¶¶ 8-9.) Since CDCR amended its protocols to further ensure that Wardens use race

14   as a factor in modified-program decisions only when strictly necessary, Folsom's modified

15   programs have all comported with the Equal Protection Clause. (Decl. Hill, ¶¶ 9-16.) In fact,

16   since the implementation of the revised protocols, Folsom's Warden, Rick Hill, has not placed

17   any inmate on modified program based on his race. (*Id.*) And he will not do so except on a short-

18   term basis in emergency situations when (1) it is evident that the incident causing the modified

19   program is racially motivated and (2) further investigation is needed to determine which STGs or

20   individuals were involved and whether inmates from the involved racial groups can safely be

21   released from the modified program. (*Id.*¶ 12.)

22        Also, under the new protocols, once a modified program is in place, Folsom will use the

23   revised threat-assessment form (CDCR Form 128 B) to determine which individuals should be

24   released to normal program based on an individual assessment of the threat that they pose to the

25   safety and security of the facility. (*Id.* ¶ 13.) This assessment includes a review of the inmate's

26   central file, face-to-face interviews, and other information the Investigative Services Unit may

27   have on the inmate's gang affiliation. (*Id.*) An inmate is assessed a threat score of low, medium

28   or high. When the prison begins an incremental release of inmates back to normal programming,

33

1    those inmates with a low score will be released first.  (*Id.*)  This procedure conforms to Plaintiffs'

2    own description of a narrowly tailored method to address race-based violence.  (Doc. 156 at 15-

3    16.)

4         Also, during modified programs at Folsom, inmates are never confined to their cells

5    twenty-four hours a day because the physical structure of Folsom's buildings does not permit it.

6    (Decl. Hill ¶ 14.)  Inmates are allowed out of their cells for showering, feeding, and health-care

7    appointments.  (*Id.*)  Following implementation of a modified program, Warden Hill's goal is to

8    return the prison to normal program as soon as it is safe to do so.  (*Id.*)  It is also his goal to allow

9    inmates outdoor exercise as soon as possible.  (*Id.*)  It would be highly unusual for an inmate at

10   Folsom to not be permitted outdoor exercise for an entire month because of a modified program.

11   (*Id.*)

12        Folsom has experienced only one modified program since CDCR revised its protocols in

13   October 2012.  (*Id.* ¶ 15.)  Concerning that one modified program, Warden Hill imposed it on all

14   housing units on October 16, 2012, after staff discovered a large quantity of uncontrolled

15   weapons and weapon stock in a common area of the prison.  (*Id.*)  Warden Hill modified

16   programming so that staff could search the facility and determine whether the large quantity of

17   weapons and weapon stock indicated unrest among the inmate population such that rioting or

18   other widespread violence was imminent.  (*Id.*)  Six days later, after searches and interviews were

19   completed, Warden Hill determined that it was safe to return to normal program because it did not

20   appear that there was unrest among the general-population inmates.  (*Id.*)

21        There have been no other modified programs at Folsom since CDCR implemented the

22   revised lockdown and modified-program protocols.  (*Id.*)  There have been no modified programs

23   affecting only specific races, nor will there be except in emergency situations following serious

24   incidents of racially motivated violence.  (*Id.* ¶ 12.)

25        The other most recent modified program at Folsom occurred on October 10, 2012, shortly

26   before the implementation of the revised protocols.  (*Id.* ¶ 16.)  Warden Hill ordered that

27   modified program following a riot among nine African American inmates on the main exercise

28   yard.  (*Id.*)  The initial investigation revealed that all nine inmates were affiliated with the Bloods

34

1    STG. (*Id.*)  Therefore, Warden Hill ordered all inmates affiliated with the Bloods and their cell

2    partners placed on modified program pending an investigation.  (*Id.*)  It was necessary to place

3    the cellmates of the Bloods on modified program because they will act—either willingly or under

4    coercion—in accordance with the directives of their Blood cellmate.  (*Id.*)  This modified

5    program lasted six days.  (*Id.*)  When Warden Hill determined through inmate interviews,

6    searches, and other intelligence that no further violence was likely, Warden Hill ordered the

7    affected inmates and their cell partners returned to normal program immediately.  (*Id.*)  This

8    modified program demonstrates that even before CDCR revised its protocols, Folsom was already

9    implementing modified programs that complied with the Equal Protection Clause.

10        Because Folsom is following modified-program directives that permit Wardens to consider

11   race as a factor only when narrowly tailored to meet a compelling need, Plaintiff Mitchell can

12   show no likelihood that he will prevail on his equal protection claim concerning lockdowns and

13   modified programs at Folsom.

14                    **4.  Plaintiff Quezada cannot show that the Warden of SATF is likely to
                          impose a modified program that violates Quezada's equal protection
15                        rights.**

16        Like Mitchell, Plaintiff Quezada cannot show that Defendants are violating his right to

17   equal protection.  Instead, Quezada reaches back several years to discuss modified programs that

18   he claims he was subjected to at Kern Valley State Prison.  (Doc. 163 at 2-3.)  But Quezada has

19   been incarcerated at SATF since September 2012 and does not claim that he has been subjected to

20   any race-based modified programs since he transferred there.  (Doc. 163 at 1-4.)  In fact, he has

21   admitted that since he transferred to SATF, he has not been subjected to any modified programs

22   or lockdowns at all.  (Decl. Des Jardins, Ex. A, 88:4-6.)  He therefore cannot demonstrate that

23   Defendants are violating his equal protection rights.  Nor can he show that he is likely to be

24   subjected to any race-based modified programs that violate the Equal Protection Clause, because

25   the warden at SATF, Ralph Diaz, is properly following CDCR's modified-program and lockdown

26   protocols.  (Decl. Diaz ¶ 6.)

27        SATF began implementing the revised protocols in November 2012.  (*Id.*)  Between the

28   date that CDCR changed its lockdown and modified-program protocols until March 13, 2013,

                                              35

Warden Diaz found it necessary to modify programming in response to a disturbance (not including medical quarantines) on ten occasions. (*Id.* ¶ 7.) None of these modified programs was imposed to punish or discriminate against inmates because of their race or to punish inmates for creating a disturbance. (*Id.*) In each case, Warden Diaz implemented a modified program to isolate and contain a dangerous situation while staff investigated the cause, the participants, and the potential for further problems, and lifted it as soon as safely possible. (*Id.*) The following is a description of the modified programs initiated at SATF from October 15, 2012, through March 13, 2013.

On November 2, 2012, a riot broke out among Hispanic inmates in Facility F, building 2, resulting in injuries to five inmates. (*Id.* ¶ 8, Ex. A.) Therefore, Warden Diaz placed all Hispanic inmates in Facility F on modified program while staff interviewed inmates and conducted searches. (*Id.*) Three days later, staff had completed their investigation and threat assessment and it was deemed safe to return Facility F to normal program. Warden Diaz therefore ended the modified program at that time. (*Id.*)

On November 8, 2012, a battery on staff occurred on Facility E resulting in a serious injury to a peace officer. (*Id.* at ¶ 9, Ex. B.) In response, Warden Diaz ordered the entire Facility E placed on modified program. (*Id.*) Staff conducted 120 interviews on the day of the incident, and searched housing units, yards, and common areas. (*Id.*) Warden Diaz implemented the modified program for the safety of the staff and inmates because he needed to determine whether the battery on staff was an isolated incident or whether the inmate population or some group was intent on attacking staff for some reason. (*Id.*) While the facility was on modified program, staff also reviewed staff complaints, inmate grievances, and inmate mail to see if inmates had some type of dissatisfaction that would lead to systemic violence against staff. (*Id.*) Warden Diaz concluded the modified program five days later after the investigation revealed that the staff assault was an isolated event. (*Id.*)

On November 16, 2012, prison staff discovered that a dough cutter from the central kitchen and metal stock from the Prison Industries Authority were missing. (*Id.* ¶ 10, Ex. C.) Because inmates use these items to fashion weapons, Warden Diaz ordered all inmates on Facility D

36

1  placed on modified program in order to search for the missing metal stock and possible weapons.

2  (*Id.*)  Staff conducted interviews and searches.  (*Id.*)  Warden Diaz also scrutinized the prison's

3  inventory process to determine whether staff was adequately monitoring dangerous inventory,

4  because allowing inmates to obtain metal poses an extreme risk to the safety of everyone in the

5  prison.  (*Id.*)  During the searches, only minor contraband was found.  (*Id.*)  On November 28,

6  2012, staff concluded its investigation, and it was determined that Facility D could safely return

7  to normal program.  (*Id.*)  The modified program concluded on November 29, 2012, after fourteen

8  days.

9      On November 18, 2012, a riot occurred in the Facility-D pill line between six inmates

10  belonging to the Zapatista/Rebels STG and four African American inmates.  (*Id.* ¶ 11, Ex. D.)  As

11  a result, Warden Diaz ordered all inmates in Facility D placed on modified program, which lasted

12  for about five days.  (*Id.*)  The ten involved inmates who were immediately identified were placed

13  in administrative segregation.  (*Id.*)  Staff conducted interviews and searches in Facility D.  (*Id.*)

14  After the investigation and threat assessment were completed, Warden Diaz ordered Facility D

15  returned to normal program on November 29, 2012.  (*Id.*)

16      On December 6, 2012, an African American inmate affiliated with a STG attacked a

17  correctional officer in Facility C, repeatedly punching him in the face and knocking him

18  unconscious.  (*Id.* ¶ 12, Ex. E.)  The officer suffered serious bodily injury and was hospitalized.

19  (*Id.*)  As a result, Warden Diaz ordered all African American inmates in Facility C placed on

20  modified program, which lasted for about four days while staff investigated whether this was an

21  isolated event or whether African American inmates associated with or influenced by African

22  American STGs including the Crips, the Bloods and the Black Bay Area 415s were intent on

23  assaulting staff.  (*Id.*)  After staff interviewed all 331 African American inmates in Facility C,

24  staff concluded that the assault was an isolated incident and returned Facility C to normal

25  program on December 10, 2012.  (*Id.*)

26      On January 17, 2013, staff received information that a Facility-E staff member was going to

27  be assaulted.  (*Id.* ¶ 13, Ex. F.)  To investigate and prevent this potential assault, Warden Diaz

28  ordered Facility E placed on modified program.  (*Id.*)  The investigation included searches,

37

1    interviews of inmates, and a review of inmate grievances, staff complaints, and mail to determine

2    the credibility and extent of the threat.  (*Id.*)  Warden Diaz concluded the modified program five

3    days later after the investigation revealed that the threat to staff was unsubstantiated.  (*Id.*)

4         On January 26, 2013, an African American inmate battered two Hispanic inmates with a

5    weapon in Facility G.  (*Id.* ¶ 14, Ex. G.)  For this reason, Warden Diaz ordered all inmates on

6    Facility G placed on modified program, which lasted for about two days while staff investigated

7    the threat posed by this incident.  (*Id.*)  Staff completed the investigation of the incident and

8    returned Facility G to normal program on January 28, 2013.  (*Id.*)

9         It bears mentioning that although all inmates in Facility G were on modified program

10   following the battery, Warden Diaz allowed White and Other inmates in that facility to attend

11   religious services during this time because staff had no evidence that they were involved in the

12   incident or reason to believe that any further violence would occur if they were allowed to go to

13   chapel.  (*Id.*)  Also, by allowing these inmates to leave their cells, staff had an opportunity to

14   question them about the incident and whether retaliation by the Hispanic inmate population could

15   be expected.  (*Id.*)  The African American and Hispanic inmates on the other hand, were not

16   afforded this privilege because incidents like this that occur between members of different races

17   sometimes evolve into broad race-based conflicts between the racial groups of the involved

18   inmates, and Warden Diaz was concerned that this would occur if African American and Hispanic

19   inmates were allowed less restrictive movement during the investigation into the conflict.  (*Id.*)

20        On January 29, 2013, staff received an anonymous note threatening great bodily injury

21   against a peace officer.  (*Id.* ¶ 15, Ex. H.)  Also, staff found that weapons stock was missing from

22   a Facility E vocational classroom.  (*Id.*)  For these reasons Warden Diaz ordered all inmates on

23   Facility E placed on modified program, which lasted for about fifteen days while the Investigative

24   Services Unit conducted an investigation and Warden Diaz looked into whether the prison's

25   vocational program was adequately monitoring tools and materials that could be converted into

26   weapons.  (*Id.*)  Five days into the investigation into the threat on staff and the missing metal

27   stock, intelligence gathered found the threat against staff unsubstantiated.  (*Id.*)  However,

28   modified programming continued so that staff could complete searches for the missing metal

                                          38

1 stock.  (*Id.*)  By February 13, 2013, the searches and investigation concluded, and Facility E was

2 returned to normal program.  (*Id.*)

3      On March 5, 2013, staff discovered an anonymous note in the Facility D medical drop box

4 indicating an inmate in that facility was in possession of a weapon and intended to assault an

5 officer.  (*Id.* ¶ 18, Ex. J.)  Warden Diaz therefore placed all inmates on Facility D on modified

6 program, which lasted for about ten days while staff conducted a threat assessment and

7 investigation.  (*Id.*)  By March 6, 2013, it was determined that the threat was not credible.  (*Id.*)

8 But Warden Diaz continued the modified program to search for metal that was discovered

9 missing.  (*Id.*)  At the conclusion of the searches and investigation, it was determined that Facility

10 D could safely return to normal program on March 15, 2013.  (*Id.*)

11      Also, prior to the implementation of the revised DOM protocols for lockdowns and

12 modified programs on October 15, 2012, Facility C was already on modified program after

13 inmates affiliated with a Northern Hispanic STG murdered one Southern Hispanic inmate and

14 seriously injured another on July 11, 2012.  (*Id.* ¶ 19, Exs. K, L.)  Specifically, two Northern

15 Hispanic inmates, Chavez and Romero, who were members of the Inmate Advisory Council

16 ("IAC"), attacked Juarez, a Southern Hispanic member of the IAC, after the groups had just

17 finished their weekly meeting and were conducting rounds in the building.  (*Id.*)  Another

18 Southern Hispanic inmate porter, Silva, saw the attack, retrieved a weapon, and joined in the

19 attack.  (*Id.*)  Another Northern Hispanic inmate, Bautista, was found in the area with injuries

20 consistent with having been involved in the attack.  (*Id.*)  Juarez died from his wounds and Silva

21 suffered partial paralysis to his legs and a collapsed lung due to his injuries.  (*Id.*)

22      Warden Diaz considered this an extremely serious incident because it involved a deadly

23 conflict between two violent and powerful STGs—the Northern Hispanics and the Southern

24 Hispanics.  (Decl. Diaz ¶ 20.)  Members of these competing STGs have been sworn enemies for

25 decades and the threat of violence between these rival groups is ever present.  (*Id.*)  Because the

26 Northern Hispanic STG murdered a member of the rival Southern Hispanic STG and seriously

27 injured another of its members, it was fairly certain that the Southern Hispanics would violently

28 retaliate if given a chance.  (*Id.*)  Additionally, because these STGs often force inmates of their

39

own race and from their geographic region to obey directives to retaliate in situations such as these, it was fairly certain that any inmate who was Hispanic and from Southern California would participate in perpetuating violence against Hispanic inmates from Southern California. (*Id.*) This was confirmed by intelligence staff was receiving at the time. (*Id.*)

Because of the seriousness of the attack, Warden Diaz ordered all inmates in Facility C placed on modified program while staff began searching inmates using the Rapi-Scan x-ray machine and hand-held metal detectors and interviewing all inmates in Facility C. (*Id.* ¶ 21, Ex. L.) Numerous inmate-manufactured weapons were found during this search. (*Id.*) Warden Diaz also ordered all Northern Hispanic and Southern Hispanic inmates to be escorted separately at all times so that they would not have contact with one another. (*Id.*)

On July 30, 2012, Warden Diaz ordered all inmates other than Hispanics on Facility C returned to normal program because the threat assessment indicated no threat from groups other than the Hispanics, who were at war according to the intelligence staff received. (*Id.*) Because of gang dynamics between Northern Hispanic and Southern Hispanic inmates, Warden Diaz ordered all Hispanic inmates to remain on modified program while the Investigative Services Unit and Institutional Gang Investigator completed their investigation into the homicide of the Southern Hispanic inmate. (*Id.*)

On August 7, 2012, in an effort to restore normal program, Warden Diaz began restoring some programs such as canteen, packages, and visiting to the Southern Hispanic inmates. (*Id.* ¶ 23.) On August 26, 2012, he ordered that movement for Southern Hispanic inmates to appointments, the library, showers, visits, etc. be allowed without restraints (i.e. handcuffs, etc.). (*Id.*) On September 11, 2102, he ordered that Southern Hispanic inmates be allowed outdoor exercise on a tier-rotation basis. (*Id.*) On September 17, 2012, he allowed Northern Hispanics to begin receiving quarterly packages. (*Id.*)

On September 23, 2012, staff discovered deadly weapons in the cells of Southern Hispanic inmates. (*Id.* ¶ 24.) Staff also discovered an inmate note indicating that the Southerners were at war with the Northerners and would attack the Northerners at any opportunity, whether in handcuffs or not. (*Id.*) Following this, the Southern Hispanics were placed on modified program

40

1    pending an administrative review.  Following an investigation into the note, Warden Diaz

2    restored outdoor exercise on a tier-rotation basis to the Southern Hispanic inmates.  (*Id.*)  On

3    October 22, 2102, he ordered dayroom privileges restored to the Southern Hispanic inmates.  (*Id.*)

4        On November 5, 2012, two Southern Hispanic inmates attacked another Southern Hispanic

5    inmate with a deadly weapon.  (*Id.* ¶ 25.)  The victim received serious stab wounds to the torso

6    area and was flown to an outside hospital.  (*Id.*)  As a result of this incident, Warden Diaz ordered

7    all Southern Hispanic inmates placed on modified program pending an investigation.  (*Id.*)

8        In November 2012, Warden Diaz began transferring Northern Hispanic inmates out of

9    Facility C to other prisons.  (*Id.* at ¶ 26.)  New Northern Hispanic inmates began arriving from

10   other prisons.  (*Id.*)  Warden Diaz intended to begin the reintegration process between the

11   Northerners and Southerners after the transfers occurred.  (*Id.*)

12       Staff continued to conduct interviews of the Southerner and Northerners in December 2012

13   to determine whether they could peacefully program together.  (*Id.*)  Intelligence gained from

14   these interviews indicated there was a peace treaty between the STG factions and that they could

15   program safely together.  (*Id.*)  As Warden Diaz continued to try to return Facility C to normal

16   program, he authorized a meeting between the two Southern Hispanic and two Northern Hispanic

17   IAC representatives to occur on December 18, 2012.  (*Id.*)  The inmates were required to remain

18   in handcuffs, and the meeting was recorded by the Investigative Services Unit.  (*Id.*)  The meeting

19   was successful.  (*Id.*)

20       Thus, Warden Diaz scheduled another meeting for December 21, 2012, to discuss the next

21   step in the unlock process.  (*Id.*)  On December 27, 2012, facility staff searched all inmates

22   housed in building C7, and on December 29 and December 30, building staff interviewed all

23   Hispanic inmates in Facility C.  (*Id.*)  On January 2, 2013, in a further effort to resume normal

24   programming, Warden Diaz authorized the Northern Hispanic and Southern Hispanic IAC

25   representatives to meet with the IAC Executive Body and to tour the buildings unrestrained.  (*Id.*)

26   The purpose of this was to allow representatives from each inmate group to talk to their members

27   to determine whether they could be peacefully reintegrated.  (*Id.*)

28

On January 7, 2013, in a continuing effort to restore the Northern Hispanic inmates to normal programming, Warden Diaz authorized two C7 Northern Hispanic Facility IAC representatives and two Southern Hispanic Facility IAC representatives to attend yard together during building C7 scheduled yard time.  (*Id.* ¶ 28.)  He also ordered all Northern Hispanic and Southern Hispanic inmates to be escorted in restraints across the upper yard during the Building C7 scheduled yard time when the IAC representatives were on the yard together.  (*Id.*)  He felt this was necessary to avoid a riot or another murder among the Northerners and Southerners.  (*Id.*)

On January 22, 2013, he authorized the Northerners in C7 to have dayroom on Wednesdays from 8:15 a.m. to 10:15 a.m., with phone privileges.  (*Id.*)  On January 28, 2013, he authorized Northerners and Southerners in C7 to have yard together on a tier-rotation basis.  (*Id.*)  All Northern and Southern Hispanic inmates were allowed unrestrained movement and were escorted without restraints.  (*Id.*)

On February 5, 2013, Warden Diaz authorized the restoration of visiting for the Northern Hispanic inmates with the restriction that the Northern Hispanic and Southern Hispanic inmates were to walk to and from the Facility-C patio area to the visiting room separately.  (*Id.*)  Religious services were also restored to the Northerners.  (*Id.*)  And both Northern and Southern Hispanic inmate workers were allowed to return to work in the buildings and program area.  (*Id.*)  On February 13, 2013, all inmates in C7 were returned to normal program after the Investigative Services Unit and the Institutional Gang Investigator received intelligence confirming that there was no longer tension between the Northern Hispanic and Southern Hispanic inmates.  (*Id.*)  Thus, this modified program affecting two notorious STGs was returned to normal as soon as it was safe to do so.  (*Id.*)

The above summary of modified programs at SATF that took place or were in place between October 15, 2012 and March 2013 indicates Warden Diaz is implementing modified programs that affect certain races at SATF only when there is a compelling reason to do so and no less restrictive alternative exists.  In each situation where he ordered only inmates of specific racial groups placed on modified program, not placing those inmates on modified program posed

42

1  a serious risk to inmate and staff safety because the conflict leading to the modified program

2  appeared race based.  This indicated possible racial strife between inmate groups requiring further

3  investigation to avoid further violence among the inmates.

4       The only safe alternative to separating the involved races was to place all inmates on

5  modified program regardless of race.  (Decl. Tristan ¶ 47.)  But under the circumstances

6  described above, because the Warden would have had no reason to believe that non-involved

7  racial groups posed any threat, placing them on modified programming would not have been a

8  less-restrictive alternative to placing only the inmate groups that might become involved in a

9  race-based conflict on modified program.

10      **C.**    **The balance of equities favors allowing CDCR to safely manage its**
         **prisons, and the requested injunction would not be in the public interest**

11          **because it would jeopardize the safety of inmates and staff and the**
         **security of the State's prisons.**

12

13      CDCR's need to protect the public and the safety and security of its prisons, staff, and

14 inmates outweighs Plaintiffs' desire to preclude CDCR from ever considering race in making

15 modified-program decisions following race-based disturbances.  As the Supreme Court

16 emphasized in *Winter,* the courts must pay particular regard to the public consequences of an

17 injunction. *Winter,* 555 U.S. at 24.  And the PLRA requires the Court to "give substantial weight

18 to any adverse impact on public safety or the operation of a criminal justice system caused by the

19 relief." 18 U.S.C. § 3626(a)(1).

20      Enjoining CDCR from ever using race in modified-program decisions, even in emergency

21 situations following race-based disturbances, will result in greater harm and possibly death to

22 inmates, staff, and even to Plaintiffs.  If Wardens are prevented from narrowly tailoring modified

23 programs to specific races involved in racial conflicts, they will have only two remaining options:

24 (1) place all inmates on modified program pending an investigation into the disturbance even

25 though it is apparent only certain racial groups are at war, or (2) place on modified program only

26 those inmates who were immediately identified as being involved in a disturbance even though

27 many more inmates were likely involved or are likely to perpetuate the violence.  (Decl. Tristan ¶

28 47.)

43

1    The first option would result in more, not fewer, modified programs affecting Plaintiffs

2    because they would be subject to a modified program in any situation where a serious disturbance

3    indicated further violence was imminent among warring racial groups—even though Plaintiffs

4    were not members of the warring groups.  (*Id.* ¶ 48.)  Plaintiffs themselves contend that this

5    would be unfair and result in more race-based violence among inmates.  (Doc. 156 at 24.)

6    And the second option would result in further violence and injuries and death to inmates

7    and staff.  (Decl. Tristan ¶ 49.)  This is because an estimated seventy percent of all inmates within

8    CDCR are involved in race-based STGs.  (*Id.*; Decl. Marquez ¶ 27.)  But only a small percentage

9    of the inmates are validated as STG members.  (Decl. Marquez ¶ 27.)  And the race-based STGs

10   control most of the remaining inmates in the general population—even those who choose not to

11   be involved in gangs.  (Decl. Tristan ¶ 49; Decl. Marquez ¶¶ 33-35.)  These race-based STGs

12   cause most racial conflicts in the prisons and force the inmates within their racial group who are

13   not in STGs to participate in these conflicts or suffer violent retribution.  (Decl. Tristan ¶ 49;

14   Decl. Harrington ¶ 66.)

15   Thus, if only the immediately identified participants in a disturbance are placed on modified

16   program following a race-based disturbance, the violence will almost certainly continue, and

17   inmates and staff will die or suffer injuries as a result.  (*Id.*)  Thus, an injunction preventing

18   Defendants from ever considering race in making modified-programming decisions will

19   irreparably harm both Plaintiffs and all other California inmates as well as CDCR's ability to

20   keep its prisons safe.

21   An injunction preventing CDCR's prisons from taking measures necessary to protect the

22   lives of inmates and staff is not in the public interest, nor is it in Plaintiffs' or any other inmate's

23   interest.  Inmates under CDCR's jurisdiction will be subjected to more modified programs or

24   more race-based violence if the Court enjoins CDCR from ever considering race in making

25   modified program decisions following racial disturbances.

26   **II.    AN INJUNCTION PREVENTING CDCR FROM EVER CONSIDERING RACE IN MAKING MODIFIED-PROGRAMMING DECISIONS WOULD VIOLATE THE PLRA BECAUSE IT IS NOT THE LEAST INTRUSIVE MEANS OF CORRECTING ANY PERCEIVED EQUAL PROTECTION VIOLATIONS.**

44

1    Even if Plaintiffs had succeeded in demonstrating an equal protection violation, the relief

2    they request, an injunction precluding CDCR from "imposing prison lockdowns on entire racial

3    or ethnic groups" (Doc. 156 at 6) is overbroad.  Under the PLRA, any injunction against prison

4    officials must be "narrowly drawn" and extend "no further than necessary to correct the violation

5    of the Federal right."  *Gomez v. Vernon,* 255 F.3d at 1129.  The PLRA provides, in relevant part:

6        Prospective relief in any civil action with respect to prison conditions shall extend no
         further than necessary to correct the violation of the Federal right of *a particular*

7        *plaintiff or plaintiffs.*  The court shall not grant or approve any prospective relief
         unless the court finds that such relief is narrowly drawn, extends no further than

8        necessary to correct the violation of the Federal right, and is the least intrusive means
         necessary to correct the violation of the Federal right.  The court shall give substantial

9        weight to any adverse impact on public safety or the operation of a criminal justice
         system caused by the relief.

10

11   18 U.S.C. § 3626(a)(1)(A) (emphasis added).

12   Plaintiffs' requested relief would violate the PLRA because it is not narrowly drawn.  The

13   requested injunction is so broad as to preclude prison officials from considering race even when

14   doing so would not violate equal protection.  As explained earlier, the Supreme Court has stated

15   that in some circumstances, prison officials may consider race in making decisions to maintain

16   safety and security in its prisons so long as it is the least restrictive means of achieving this goal.

17   *Johnson v. California,* 543 U.S. at 515.  Thus, precluding CDCR from ever considering race

18   when making decisions concerning modified programs, even when it is the least restrictive means

19   of achieving inmate and staff safety, is not narrowly drawn prospective relief.

20   If Plaintiffs had demonstrated a violation of their equal protection rights, a more narrowly

21   tailored remedy would be to prevent the Wardens at Plaintiffs' respective prisons from subjecting

22   them to modified programming based on race in violation of their equal protection rights.  The

23   PLRA requires that the injunctive relief extend no further than necessary to correct a violation of

24   the rights of "*particular plaintiffs.*"  18 U.S.C. § 3626(a)(1)(A) (emphasis added).  Here, there

25   would be no reason to enjoin anyone other than the Plaintiffs' wardens from violating their equal

26   protection rights because CDCR's protocols already comply with the Equal Protection Clause.

27   As explained earlier, these protocols prohibit Wardens from using race as a factor in modified-

28

45

1    programming decisions unless such use is narrowly tailored to address inmate and staff safety and

2    prison security.  And as discussed earlier, the data concerning modified program decisions

3    statewide shows that there is also no practice of imposing modified programs that violate the

4    Equal Protection Clause.  Thus, if the Court were to find that the Wardens at Plaintiffs' prisons

5    were nonetheless ignoring CDCR's directives and violating Plaintiffs' equal protection rights, the

6    most narrowly drawn remedy would be an order requiring those Wardens to use race in modified-

7    programming decisions only when narrowly tailored to protect inmate and staff safety and prison

8    security.

9         An injunction preventing all of CDCR's Wardens from ever using race is not necessary to

10   correct the alleged violation of Plaintiffs' rights, and is therefore not narrowly tailored.

11   Accordingly, the Court should deny Plaintiffs' request for an order precluding Defendants from

12   ever considering race in modified-programming decisions.[4]

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23

24

25      [4] In the event that the Court were to issue the requested preliminary injunction,
      Defendants request that under Federal Rule of Civil Procedure 65(c), Plaintiffs be ordered to post

26   security in an amount sufficient to compensate Defendants for the cost of additional staffing that
      would be required if Wardens were required to place all inmates on modified program following a

27   race-based incident instead of only those racial groups who are involved.  Defendants would
      request an opportunity to provide the Court with an estimate of such costs.

28

46

1

**CONCLUSION**

2        This is not the type of clear and plain case justifying an injunction preventing CDCR from

3    enforcing regulations governing modified programs and lockdowns, which by Plaintiffs' own

4    definition are narrowly tailored to protect the safety and security of the State's prisons, the

5    inmates and staff therein, and the public.  Nor is the requested relief narrowly drawn to correct the

6    alleged violation of Plaintiffs' equal protection rights.  Thus, the Court should deny the Motion

7    for Preliminary Injunction.

8    Dated:  July 1, 2013                           Respectfully Submitted,

9                                                   KAMALA D. HARRIS
                                                    Attorney General of California
10                                                  DAMON G. MCCLAIN
                                                    Supervising Deputy Attorney General
11

12                                                  /s/MICHELLE DES JARDINS

13

                                                    MICHELLE DES JARDINS
14                                                  Supervising Deputy Attorney General
                                                    *Attorneys for Defendants*
15                                                  *M. Cate, S. Kernan, T. McDonald, G.*
                                                    *Giurbino, J. Tilton, T. Felker, M. Wright,*
16                                                  *F. Foulk, D. Vanderville, J. Owen, and*
                                                    *D. Hellwig*
17

18   MAD:JW
     SA2011300596
19   80786720.doc

20

21

22

23

24

25

26

27

28