1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   DAMON G. MCCLAIN, State Bar No. 209508
    Supervising Deputy Attorney General
3   ERIN SULLIVAN, State Bar No. 242757
    Deputy Attorney General
4     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
5     Telephone:  (415) 703-5716
      Fax:  (415) 703-5843
6     E-mail:  Erin.Sullivan@doj.ca.gov
    *Attorneys for Defendants M. Cate, S. Kernan, T.*
7   *McDonald, G. Giurbino, J. Tilton, T. Felker, M.*
    *Wright, F. Foulk, D. Vanderville, J. Owen, and*
8   *D. Hellwig*

9                 IN THE UNITED STATES DISTRICT COURT

10             FOR THE EASTERN DISTRICT OF CALIFORNIA

11                       SACRAMENTO DIVISION

12

13
     **ROBERT MITCHELL, et al.,**            Case No. 2:08-CV-01196-TLN-EFB
14
                              Plaintiffs,    **REPLY IN SUPPORT OF**
15                                           **DEFENDANTS' MOTION FOR**
                                             **SUMMARY JUDGMENT**
16        v.
                                             Date:         October 17, 2013
17   **MATTHEW CATE, et al.,**               Time:         2:00 p.m.
                                             Dept:         Courtroom 2
18                            Defendants.    Judge:        The Honorable Troy L. Nunley
                                             Action Filed: May 30, 2008
19

20

21

22

23

24

25

26

27

28

---
Defs.' Reply in Support of Mot. for Summ. J                *R. Mitchell v. Cate, et. al.*
                                             Case No. 2:08-CV-01196-TLN-EFB

# TABLE OF CONTENTS

**Page**

Argument ......................................................................................................... 1

I.     Defendants' motion for summary judgment substantially complies with
       local rule 260(a). ............................................................................... 1

II.    Defendants did not act with an intent or purpose to discriminate. ......................... 3

III.   This Court has discretion to rule on defendants' summary-judgment motion
       before considering the class certification issue. ......................................... 5

IV.    Plaintiffs' claims for injunctive relief are moot. ........................................ 6

       A.    Quezada's claims for injunctive relief are moot. ................................... 7

       B.    Trujillo's claims for injunctive relief are moot. ................................. 7

       C.    Abdullah's claims for injunctive relief are moot. ................................. 8

       D.    Mitchell's claims for injunctive relief are moot. .................................. 9

             1.    Mitchell's Eighth Amendment claim for injunctive relief is
                   moot. ..................................................................... 10

             2.    Mitchell's Fourteenth Amendment claim for injunctive
                   relief is moot. ........................................................... 11

V.     Defendants Tilton, Owen, Hellwig, and Vanderville did not "implement,
       ratify, and approve race-based and excessively lengthy lockdowns." .................... 13

VI.    Defendants Foulk and Wright did not "implement, ratify, and approve race-
       based and excessively lengthy lockdowns." ........................................... 14

VII.   Defendants did not violate Mitchell's Eighth Amendment rights. ....................... 15

       A.    Mitchell was not deprived of outdoor exercise for eight continuous
             months. ................................................................... 16

       B.    Defendants did not act with deliberate indifference. ............................ 17

VIII.  Defendants did not violate Mitchell's rights under the Equal Protection
       clause. ........................................................................ 21

IX.    Qualified immunity .............................................................. 27

       A.    Defendants are entitled to qualified immunity on Mitchell's Eighth
             Amendment claim. .......................................................... 27

       B.    Defendants are entitled to qualified immunity on Mitchell's
             Fourteenth Amendment claim. ............................................... 29

X.     Defendants did not engage in conduct that was "negligent," "reckless,"
       "outrageous," "atrocious," or "utterly intolerable." ................................ 30

       A.    Defendants never intended to cause emotional injury to Mitchell. ................. 30

       B.    Defendants did not act negligently. ........................................... 32

             1.    Mitchell fails to state a cause of action against Defendants
                   Wright, Owen, and Hellwig. ................................................ 32

             2.    Defendants Tilton, Felker, Foulk, and Vanderville did not
                   breach a duty of care. .................................................... 32

i

**TABLE OF CONTENTS**
(continued)

Page

       3.     Mitchell fails to show requisite causation. .................................... 33

XI.   Defendants Felker, Wright and Foulk are entitled to discretionary act immunity because they engage in the conscious balancing of risks and advantages when making decisions regarding modified programs and lockdowns. ........................................................................................................ 34

Conclusion ........................................................................................................................ 36

1

**TABLE OF AUTHORITIES**

2

**Page**

3

CASES

4

5

*Abbott Laboratories v. Gardner*
    387 U.S. 136 (1967) ............................................................................................... 10, 12

6

*Adarand Constructors, Inc. v. Pena*
    515 U.S. 200 (1995) ............................................................................................... 13, 22

7

8

*Alcorn v. Anbro Eng., Inc.*
    2 Cal.3d 493 (1970) ...................................................................................................... 32

9

10

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ............................................................................................... 15, 17

11

*Aoki v. Gilbert*
    No. 2:11-cv-02797-MCE-CKD, 2013 WL 1284335 (E.D. Cal. Mar. 28, 2013) ...................... 1

12

13

*Arizona v. California*
    460 U.S. 605 (1983) ............................................................................................... 34, 35

14

15

*Arrington v. Helms*
    438 F.3d 1336 (11th Cir. 2006) ..................................................................................... 6

16

*Ashcroft v. al-Kidd*
    131 S. Ct. 2074 (2011) ................................................................................................. 27

17

18

*Barren v. Harrington*
    152 F.3d 1193 (9th Cir. 1998) ................................................................................. 3, 23

19

20

*Bell v. Wolfish*
    441 U.S. 520 (1979) ..................................................................................................... 12

21

*Brown v. Critchfield*
    100 Cal.App.3d 858 (1980) ........................................................................................... 34

22

23

*Caldwell v. Montoya*
    10 Cal.4th 972 (1995) .................................................................................................. 35

24

25

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ............................................................................................... 23, 27

26

*City of Los Angeles v. Lyons*
    461 U.S. 95 (1983) ......................................................................................................... 7

27

28

*Columbus Bd. of Educ. v. Penick*
    443 U.S. 449 (1979) ....................................................................................................... 3

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Corona v. Knowles*
   No. 1:08-cv-00237-LJO-BAM, 2012 WL 4051966 (E.D. Cal. Sept. 14, 2012)......... 18, 19, 20

4

5

*Cowen v. Bank United of Texas, FSB*
   70 F.3d 937 (7th Cir. 1995)................................................................................................. 5

6

*Cruz v. Beto*
   405 U.S. 319 (1972) ................................................................................................... 11, 26

7

8

*Cutter v. Wilkinson*
   544 U.S. 709 (2005) ................................................................................................... 22, 23

9

10

*Davidson v. City of Westminster*
   32 Cal.3d 197 (1982) ................................................................................................. 30, 31

11

*Dilley v. Gunn*
   64 F.3d 1365 (9th Cir. 1995).................................................................................... 7, 8, 9

12

13

*Dixon v. City of Livermore*
   127 Cal.App.4th 32 (2005)........................................................................................... 33

14

15

*Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital
   Advisors*
   498 F.3d 920 (9th Cir. 2007)....................................................................................... 6, 7

16

17

*Enrico's, Inc. v. Rice*
   730 F.2d 1250 (9th Cir. 1984)......................................................................................... 8

18

19

*Falcon Enterprises, Inc. v. Publishers Service, Inc.*
   438 Fed.Appx. 579 (9th Cir. 2011) ................................................................................ 1

20

*Fayle v. Stapley*
   607 F.2d 858 (9th Cir. 1979)......................................................................................... 14

21

22

*Figueroa v. United States*
   466 F.3d 1023 (1st Cir. 2007) ........................................................................................ 5

23

24

*Fisher v. University of Texas at Austin*
   ___ U.S. ___, 133 S. Ct. 2411 (2013)................................................................. 21, 22, 23

25

*George v. Potter*
   No. 1:03-cv-06052-DLB, 2010 WL 1404346 (E.D. Cal. Apr. 6, 2010) ................................ 2

26

27

*Girarldo v. Dept. of Corrections and Rehabilitation*
   168 Cal.App.4th 231 (2008)........................................................................................ 32

28

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Gomillion v. Lightfoot*
    364 U.S. 339 (1960) ................................................................................................ 22

*Greene v. Solano County Jail*
    513 F.3d 982 (9th Cir. 2008) ................................................................................... 23

*Grutter v. Bollinger*
    539 U.S. 306 (2003) .......................................................................................... 22, 23

*Guerra v. Sutton*
    783 F.2d 1371 (9th Cir. 1986) ................................................................................. 29

*Hartmann v. California Dept. of Corrections and Rehabilitation*
    707 F.3d 1114 (9th Cir. 2013) ............................................................................ 23, 26

*Hayes v. Garcia*
    461 F. Supp. 2d 1198 (S.D. Cal. 2006) .............................................................. 17, 28

*Hayward v. Procunier*
    629 F.2d 599 (9th Cir. 1980) ............................................................................. 10, 11

*Hodgers-Durgin v. Lopez*
    199 F.3d 1037 (9th Cir. 1999) ................................................................................... 7

*Hoptowit v. Ray*
    682 F.2d 1237 (9th Cir. 1982) ................................................................................. 31

*Hurd v. Garcia*
    454 F. Supp. 2d 1032 (S.D. Cal. Sept. 28, 2006) .................................................... 28

*Johnson v. California*
    543 U.S. 499 (2005) ........................................................................................... 9, 12

*Jones v. Garcia*
    430 F. Supp. 2d 1095 (S.D. Cal. Mar. 30, 2006) ..................................................... 28

*Lawson v. Superior Court*
    180 Cal.App.4th 1372 (2010) .................................................................................. 32

*Lee v. City of Los Angeles*
    205 F.3d 668 (9th Cir. 2001) ..................................................................... 4, 5, 24, 26

*Leslie G. v. Perry & Associates*
    43 Cal.App.4th 472 (1996) ...................................................................................... 34

Defs.' Reply in Support of Mot. for Summ. J

*R. Mitchell v. Cate, et. al.*
Case No. 2:08-CV-01196-TLN-EFB

1

### TABLE OF AUTHORITIES
**(continued)**

2

Page

3

*Lucas v. City of Visalia*
    No. 1:09–CV–1015 AWI DLB, 2010 WL 1444667 (E.D. Cal. April 12, 2010) ................... 30

4

5

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ......................................................................................................... 10, 12

6

*McCorkle v. City of Los Angeles*
    70 Cal. 2d 252 (1969) ............................................................................................................ 36

7

8

*Michael v. Ghee*
    498 F.3d 372 (6th Cir. 2007) .................................................................................................... 5

9

10

*Mitchell v. Adams*
    No. CIV-S-06-2321 GEB GGH, 2010 WL 2976073 (E.D. Cal. July 27, 2010) ...................... 2

11

*Mitchell v. Dupnik*
    75 F.3d 517 (9th Cir. 1996) ............................................................................................... 10, 12

12

13

*Mitchell v. Felker*
    No. 2:08-cv-1196 TLN EFB P, 2012 WL 2521827 (E.D. Cal., June 28, 2012) ................... 35

14

*Morgan v. County of Yuba*
    230 Cal. App. 2d 938 (1964) .................................................................................................. 36

15

16

*Mosher v. Saalfeld*
    589 F.2d 438 (9th Cir. 1978) .................................................................................................. 14

17

18

*Navajo Nation v. U.S. Forest Serv.*
    535 F.3d 1058 (9th Cir. 2008) ........................................................................................... 13, 15

19

*Noble v. Adams*
    636 F.3d 525 (9th Cir. 2011) .................................................................................................. 28

20

21

*Noble v. Adams*
    646 F.3d 1138 (9th Cir. 2011) ........................................................................................... 35, 36

22

23

*Noble v. Los Angeles Dodgers, Inc.*
    168 Cal.App.3d 912 (1985) .................................................................................................... 33

24

25

*Norwood v. Vance*
    591 F.3d 1062 (9th Cir. 2010) ................................................................................... 27, 28, 35, 36

26

*Pell v. Procunier*
    417 U.S. 817 (1974) ..................................................................................... 12, 22, 25, 26

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

<u>Page</u>

3

*Personnel Adm. of Mass. v. Feeney*
   442 U.S. 256 (1979) ............................................................................. 3, 4, 24

4

5

*Pickern v. Pier 1 Imports, Inc.*
   457 F.3d 963 (9th Cir. 2006) ....................................................................... 13

6

*Pitts v. Terrible Herbst, Inc.*
   653 F.3d 1081 (9th Cir. 2011) ....................................................................... 6

7

8

*Quinn v. Fresno Co. Sheriff*
   No. 1:10-cv-01617-LJO-BAM, 2012 WL 2052162 (E.D. Cal. June 6, 2012) ......................... 2

9

*Rakestraw v. Cal. Physicians' Service*
   81 Cal. App. 4th 39 (2000) ........................................................................... 32

10

11

*Reimers v. Oregon*
   863 F.2d 630 (9th Cir. 1988) ......................................................................... 7

12

13

*Richardson v. Runnels*
   594 F.3d 666 (9th Cir. 2010) .................................................................... 11, 26

14

*Rodriguez v. Hayes*
   591 F.3d 1105 (9th Cir. 2009) ....................................................................... 8

15

16

*Soremekun v. Thrifty Payless, Inc.*
   509 F.3d 978 (9th Cir. 2007) ....................................................................... 23

17

18

*Susman v. City of Los Angeles*
   269 Cal.App.2d 803 (1969) .......................................................................... 35

19

*Taylor v. List*
   880 F.2d 1040 (9th Cir. 1989) ...................................................................... 14

20

21

*U.S. for Use and Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*
   857 F.2d 600 (9th Cir. 1988.) ........................................................................ 2

22

23

*U.S. Parole Comm'n v. Geraghty*
   445 U.S. 338 (1980) .................................................................................. 6

24

*U.S. v. Burrell*
   No. 2:11-cv-03079-GEB, 2013 WL 1858424 (E.D. Cal. May 2, 2013) ............................. 1

25

26

*United States v. Detroit Timber & Lumber Co.*
   200 U.S. 321 ......................................................................................... 23

27

28

vii

# TABLE OF AUTHORITIES
## (continued)

Page

*Varshock v. Calif. Dept. of Forestry and Fire Protection*
  194 Cal. App. 4th 635, 2011 WL 1486086 (4th Dist. 2011) .................................... 2

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*
  429 U.S. 252 (1977)................................................................................................. 3

*Villiarimo v. Aloha Island Air, Inc.*
  281 F.3d 1054 (9th Cir. 2002)......................................................................... 15, 17

*Washington v. Davis*
  426 U.S. 229 (1976)...................................................................................... 3, 24, 31

*White v. Murtha*
  377 F.2d 428 (5th Cir. 1967)................................................................................. 35

*Wiesmueller v. Kosobucki*
  513 F.3d 874 (7th Cir. 2008) ................................................................................. 5

*Wright v. Schock*
  742 F.2d 541 (9th Cir. 1984)................................................................................. 5

STATUTES

Government Code
  § 820.2.............................................................................................................. 35, 36

United States Code, Title 42
  § 1983................................................................................................................. 3, 14

CONSTITUTIONAL PROVISIONS

United States Constitution
  Eighth Amendment ...................................................................................... passim
  Fourteenth Amendment............................................................................... passim

COURT RULES

Federal Rule of Civil Procedure
  rule 16(b)(4) ........................................................................................................ 32
  rule 56.................................................................................................................... 1
  rule 56(c)(1)(A).................................................................................................... 1
  rule 56(c)(3) ......................................................................................................... 1
  rule 68 ................................................................................................................... 6

Local Rule 260(a)................................................................................................. 1, 3

1   Defendants M. Cate, S. Kernan, T. McDonald, G. Giurbino, J. Tilton, T. Felker, M. Wright,

2   F. Foulk, D. Vanderville, J. Owen, and D. Hellwig submit this reply in support of Defendants'

3   Motion for Summary Judgment.

**ARGUMENT**

5   I.   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SUBSTANTIALLY COMPLIES**
     **WITH LOCAL RULE 260(A).**

6

7        Throughout their opposition, Plaintiffs argue that Defendants' summary-judgment motion

8   should be denied outright because it does not fully adhere to Local Rule 260(a) which provides, in

9   part, that summary judgment motions "shall be accompanied by a 'Statement of Undisputed

10  Facts' that shall enumerate discretely each of the specific material facts relied upon in support of

11  the motion." E.D. Cal. R. 260(a).  Contrary to Plaintiffs' allegations, Defendants substantially

12  complied with Local Rule 260(a) by filing a separate "Statement of Undisputed Facts in Support

13  of Defendants' Motion for Summary Judgment." (Court Docket (CD) 255.)  Furthermore, Rule

14  56 of the Federal Rules of Civil Procedure does not authorize denial of a summary judgment

15  motion simply because a separate statement of facts is partially deficient.  Fed. R. Civ. P.

16  56(c)(1)(A); Fed. R. Civ. P. 56(c)(3).  Accordingly, the Court should reject Plaintiffs' invitation

17  to simply deny Defendants' summary-judgment motion "in its entirety."

18       In asking the Court to deny Defendants' summary-judgment motion for failure to comply

19  with Local Rule 260(a), Plaintiffs cite to various cases—all of which are inapposite.  In those

20  cases, the moving parties failed to include a separate statement of undisputed facts altogether.

21  *Aoki v. Gilbert,* No. 2:11-cv-02797-MCE-CKD, 2013 WL 1284335, at *1 (E.D. Cal. Mar. 28,

22  2013); *U.S. v. Burrell,* No. 2:11-cv-03079-GEB, 2013 WL 1858424, at *1  (E.D. Cal. May 2,

23  2013), and *Falcon Enterprises, Inc. v. Publishers Service, Inc.,* 438 Fed.Appx. 579, 582 (9th Cir.

24  2011).  Here, Plaintiffs do not dispute that Defendants filed a separate statement of facts.  Indeed,

25  Defendants' separate statement is referenced countless times in Plaintiffs' opposition.  And to the

26  extent that Defendants rely on evidence not referenced or included in their separate statement,

27  Defendants meticulously cite to particular evidence they rely on to establish their undisputed facts

28  in the summary-judgment motion itself.  (*See, generally* CD 254.)  Each claim on which

1

1  Defendants seek summary judgment is clearly identified and supported by declarations, exhibits,

2  and other documents filed in support of Defendants' summary-judgment motion.  (CDs 253 to

3  268.)

4      The Court may consider evidence that is not contained in the separate statement of facts and

5  is not required to deny a motion simply because the evidence is not referenced in the moving

6  party's separate statement.  *See Quinn v. Fresno Co. Sheriff,* No. 1:10-cv-01617-LJO-BAM, 2012

7  WL 2052162, at *5 (E.D. Cal. June 6, 2012) ("Plaintiff's opposition substantially complies with

8  Local Rule 260(b) and therefore declines Defendants' invitation to simply disregard Plaintiff's

9  evidence to the extent that it is not listed in Plaintiff's response to Defendants' Statement of

10  Undisputed Facts"); *see also George v. Potter,* No. 1:03-cv-06052-DLB, 2010 WL 1404346 (E.D.

11  Cal. Apr. 6, 2010) (the Court ordered the plaintiff to file a response in compliance with the local

12  rules); *see also Varshock v. Calif. Dept. of Forestry and Fire Protection,* 194 Cal. App. 4th 635,

13  2011 WL 1486086 (4th Dist. 2011) (a trial court is not required to deny a motion simply because

14  the moving party has not included a separate statement that sets forth the material facts it

15  contends are undisputed, and may consider evidence contained elsewhere in the motion.)  In fact,

16  even Plaintiff Robert Mitchell has benefitted from this lenient standard.  In *Mitchell v. Adams,* the

17  Court considered evidence Mr. Mitchell included in his declaration(s) but did not set forth in his

18  separate statement.  *Mitchell v. Adams,* No. CIV-S-06-2321 GEB GGH, 2010 WL 2976073, at

19  *6-7 (E.D. Cal. July 27, 2010).

20      Defendants have provided proper evidence in support of their motion, the evidence relied

21  upon is not hidden in voluminous papers, and the motion does not require the Court to "comb

22  through the record to ascertain additional facts," as Plaintiffs suggest.  Lastly, the fact that

23  Plaintiffs' opposition to Defendants' summary-judgment motion is ninety-three pages (five pages

24  longer than the summary-judgment motion itself) demonstrates that Plaintiffs had sufficient

25  notice of the factual disputes and supporting evidence upon which Defendants' motion was based.

26      There is a strong policy favoring disposition of cases on their merits.  *U.S. for Use and Ben.*

27  *of Wiltec Guam, Inc. v. Kahaluu Const. Co.*, 857 F.2d 600, 605 (9th Cir. 1988.)  Accordingly, the

28  Court should exercise its discretion and refuse Plaintiffs' request to deny the motion in its entirety

2

1    because, as stated above, Defendants substantially complied with Local Rule 260(a) and their

2    motion is supported by competent evidence in the record.

3    **II.     DEFENDANTS DID NOT ACT WITH AN INTENT OR PURPOSE TO DISCRIMINATE.**

4           Seeking injunctive relief, the Plaintiffs claim that Defendants have violated their Equal

5    Protection rights by implementing and maintaining a "policy and practice of imposing lengthy

6    race-based prison lockdowns."  (CD 280 at 13:2-3.)  Without ever citing to or referencing the

7    California Department of Corrections and Rehabilitation's (CDCR) policy, Plaintiffs claim that

8    inmates of a "targeted race or ethnicity are regularly locked in their cells essentially twenty-four

9    hours a day, and prohibited from going outside, attending religious services, receiving visits or

10   telephone calls from family members, attending classes, or accessing other prison programs."

11   (CD 280 at 14:24-27, 15:1.)

12          The Equal Protection Clause of the Fourteenth Amendment to the United States

13   Constitution provides, in relevant part, "[n]o State shall ... deny to any person within its

14   jurisdiction the equal protection of the laws."  U.S. Const., Amend. XIV.  Discrimination on the

15   basis of race and sex is forbidden by the Equal Protection Clause.  *See Personnel Adm. of Mass.*

16   *v. Feeney*, 442 U.S. 256, 272–73 (1979).  In order to prove a violation of the Equal Protection

17   Clause, the Plaintiffs must prove that Defendants acted with discriminatory intent or purpose.

18   *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977);

19   *Washington v. Davis*, 426 U.S. 229, 239 (1976).  "[O]fficial action will not be held

20   unconstitutional solely because it results in a racially [or sexually] disproportionate impact."

21   *Village of Arlington Heights*, 429 U.S. at 264–65.  "[D]isparate impact and foreseeable

22   consequences, without more, do not establish a constitutional violation."  *Columbus Bd. of Educ.*

23   *v. Penick*, 443 U.S. 449, 464 (1979).  "[T]he Fourteenth Amendment guarantees equal laws, not

24   equal results."  *Feeney*, 442 U.S. at 273.

25          To state a claim under 42 U.S.C § 1983 for a violation of the Equal Protection clause, "a

26   plaintiff must show that the defendant[] acted with an intent or purpose to discriminate against the

27   plaintiff based on membership within a protected class."  *Barren v. Harrington*, 152 F.3d 1193,

28   1194 (9th Cir. 1998).  "'Discriminatory purpose' . . . implies more than intent as a volition or

1   intent as awareness of consequences.  It implies that the decision maker . . .selected or reaffirmed

2   a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse

3   effects upon an identifiable group.'"  *Lee v. City of Los Angeles*, 205 F.3d 668, 687 (9th Cir.

4   2001) (quoting *Feeney*, 442 U.S. at 279).

5        CDCR's lockdown and modified program policy is facially neutral.  According to the

6   policy, CDCR's "Secretary, through the individual Wardens and the Division of Adult

7   Institutions (DAI), shall establish and maintain unlock procedural guidelines for the

8   implementation of lockdowns and modified programs, and the return to normal programming."

9   (CD 238, Ex. A.)  Because Plaintiffs have never claimed that CDCR's policy is discriminatory on

10  its face, they must demonstrate that the policy is based upon some "invidious or discriminatory

11  purpose." *Lee,* 250 F.3d at 687.

12       Plaintiffs would like the Court to believe that the Plaintiffs are "subjected to the lockdowns

13  solely by virtue of their ethnic or racial heritage, and where they live."  (CD 280 at 37:8-10.)  But

14  the evidence in this case reveals just the opposite.  Many things can trigger lockdowns and

15  modified programs including, but not limited to, medical quarantines, staff training, facility

16  maintenance problems, power outages, and facility conversions.  (CD 238 at ¶ 25.)  But inmate

17  behaviors that raise serious safety and security concerns are by far the most common cause of

18  modified programs and lockdowns.  (*Id*.)  Lockdowns and modified programs are only

19  implemented in response to such behaviors when prison officials have good reasons to believe

20  that ongoing serious threats to inmate and staff safety or institutional safety exist.  (*Id*.)

21       In emergency situations, for the safety of staff and inmates or to maintain secure and

22  orderly operations, the Warden may implement, on a short-term basis, a modified program or

23  lockdown that separates inmates on the basis of race or ethnicity.  (*Id.* at ¶ 42.)  The 2012

24  amendments to the DOM emphasize that prison officials "shall not target a specific racial or

25  ethnic group unless it is necessary and narrowly tailored to further a compelling government

26  interest, such as restoring security and order after an incident or protecting the health and safety

27  of the inmates and staff."  (CD 238, Ex. A.)  Apart from conclusory allegations, Plaintiffs have

28  not demonstrated that Defendants took a particular course of action "because of" and not merely

4

1   "in spite of" its adverse effects upon the Plaintiffs.  *Lee,* 205 F.3d at 687.  In fact, CDCR's policy

2   communicates that race and ethnicity is anything <u>but</u> a motivating factor in the Warden's decision

3   or action to implement a lockdown or modified program.  It is inmates' behavior, and not a

4   discriminatory statewide policy or practice, that necessitates security-based lockdowns and

5   modified programs.  (CD 238 ¶ 42, Ex. A.)

6          Because CDCR's lockdown and modified program policy is facially neutral and because

7   Plaintiffs have not and cannot demonstrate that Defendants' actions in implementing the policy

8   were motivated by discriminatory animus towards the Plaintiffs, their Equal Protection claim fails

9   and Defendants are entitled to summary judgment.

10  **III.    THIS COURT HAS DISCRETION TO RULE ON DEFENDANTS' SUMMARY-JUDGMENT
          MOTION BEFORE CONSIDERING THE CLASS CERTIFICATION ISSUE.**

11

12          According to Plaintiffs, the Court "must decide the pending class certification motion"

13  before ruling on a dispositive motion and any other course of action is "utterly lacking in legal or

14  factual support."  (CD 280 at 34:6-7, 12-14.)  This is not true.  As the Ninth Circuit held in

15  *Wright v. Schock,* "[t]he timing provision of Rule 23 is not absolute.  Under the proper

16  circumstances—where it is more practicable to do so and where the parties will not suffer

17  significant prejudice— the district court has discretion to rule on a motion for summary judgment

18  before it decides the certification issue."  *Wright v. Schock,* 742 F.2d 541, 543 (9th Cir. 1984).

19          Many other circuits agree that the trial judge should be afforded discretion in determining

20  whether to consider summary judgment before class certification.  *See Wiesmueller v. Kosobucki*,

21  513 F.3d 874, 878 (7th Cir. 2008) ("'It is true that Rule 23(c)(1) of the civil rules requires

22  certification as soon as practicable, which will usually be before the case is ripe for summary

23  judgment.  But 'usually' is not 'always,' and 'practicable' allows for wiggle room." (quoting

24  *Cowen v. Bank United of Texas, FSB,* 70 F.3d 937, 941–42 (7th Cir. 1995)); *see also Michael v.*

25  *Ghee,* 498 F.3d 372, 374 n.1 (6th Cir. 2007) (affirming summary judgment and dismissal when

26  the motion for class certification was still pending); *Figueroa v. United States*, 466 F.3d 1023,

27  1028 (1st Cir. 2007) (affirming summary judgment when the Court of Federal Claims had "stayed

28  the class certification issue pending resolution of dispositive motions" and then denied the class

5

1   certification motion as moot after summary judgment was granted); *Arrington v. Helms*, 438 F.3d

2   1336, 1340 n.2 (11th Cir. 2006) (affirming summary judgment when the "district court ruled on

3   the summary judgment motions before it considered the class certification issue").

4        Plaintiffs cite to *Pitts v. Terrible Herbst, Inc.,* 653 F.3d 1081, 1090 (9th Cir. 2011) for the

5   proposition that the Court should rule on the class certification issue before ruling on Defendants'

6   summary-judgment motion because "mooting the class representatives' claims will not

7   necessarily moot the class action."  (CD 280 at 35:13-16.)  Plaintiffs' reliance on *Pitts* is

8   misplaced.  In *Pitts,* the Ninth Circuit held that an unaccepted Rule 68 offer of judgment does not

9   moot a class action.  Defendants have not made a Rule 68 offer here.  If anything, *Pitts* serves as a

10  reminder that courts do not have constitutional authority to decide moot cases.  *Pitts,* 653 F.3d at

11  1087.

12       Plaintiffs also cite *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 338, 404 (1980).  (CD 280 at

13  34:28, 35:1-5.)  Plaintiffs' reliance on this case is also misleading.  *Geraghty* establishes that once

14  a ruling has been made on class certification, mooting of the purported class representative's

15  claim would not moot the class action as a whole.  *See Geraghty,* 445 U.S. at 388.  Unlike in

16  *Geraghty*, the class determination in this case has not yet been made.

17       As described below and in Defendants' summary-judgment motion, the Plaintiffs' claims

18  are moot.  And mooting of the Named Plaintiff's claims before a ruling on class certification

19  generally moots the class action itself.  *Employers-Teamsters Local Nos. 175 & 505 Pension*

20  *Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 924 (9th Cir. 2007) (a "suit brought as a

21  class action must as a general rule be dismissed for mootness when the personal claims of all

22  named plaintiffs are satisfied and no class has been properly certified").

23  ## IV.   PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF ARE MOOT.

24       Plaintiffs allege that this case presents a "classic 'live' controversy" because "[e]ach of the

25  Plaintiffs have been and continue to be impacted by Defendants' policy and practice of

26  implementing lengthy race-based lockdowns."  (CD 280 at 36:23, 37:5-7.)  Plaintiffs further

27  claim that the Plaintiffs "are subjected to the lockdowns solely by virtue of their ethnic or racial

28  heritage, and where they live."  (*Id.* at 37:8-10.)
                                                    6

1    The evidence, however, tells a remarkably different story.

2    **A.    Quezada's Claims for Injunctive Relief are Moot.**

3    Plaintiffs contend that Defendants "locked down Mr. Quezada several times because of his

4    ethnicity." (*Id.* at 24:19-20.)  Since January 2012, Alvaro Quezada has been subjected to <u>one</u>

5    modified program.  (CD 254 at 31:19-23; CD 258; CD 266; Defendants' Statement of Undisputed

6    Facts (DUF) 46-47.)  It lasted four days and affected <u>all</u> Security Housing Unit (SHU) inmates

7    assigned to Facilities 4A1, 4A2, and 4B at Corcoran.  (CD 258 at ¶¶ 2, 6-7; CD 258-1.)  An

8    inspection of the prison's Small Management Yards revealed that pieces of metal stock were

9    missing or had been manipulated.  (DUF 42.)  The modified program was implemented solely to

10   ensure the safety and security of the prison's inmates and staff and it only affected recreational

11   yard.  (CD 258 at ¶ 7.)  All other programs afforded to SHU inmates remained normal.  (*Id.* at ¶4;

12   CD 258-1.)  Quezada's situation is in stark contrast to Plaintiffs' allegation that even under the

13   current policy, Defendants implement race-based "lockdowns lasting months, years, and even a

14   decade." (CD 280 at 44:12-14, 17, 45:1.)

15   "Absent a threat of immediate and irreparable harm, federal courts should not enjoin a state

16   to conduct its business in a particular way." *Hodgers-Durgin v. Lopez*, 199 F.3d 1037, 1042 (9th

17   Cir. 1999).  Any claim for injunctive relief by Quezada is moot and should be dismissed because

18   it "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur

19   at all.'" *Id.* at 1044.

20   **B.    Trujillo's Claims for Injunctive Relief are Moot.**

21   Tony Trujillo was paroled on April 30, 2013.  (DUF 3.)  An inmate's release from prison

22   renders his claim for injunctive relief moot.  *Dilley v. Gunn,* 64 F.3d 1365, 1368 (9th Cir. 1995).

23   Courts are reluctant to find an exception to this well-established rule, particularly when any

24   possibility of recurrence hinges on the plaintiff's own misconduct (*i.e.,* violation of parole), as it

25   would here.  *Reimers v. Oregon,* 863 F.2d 630, 632 (9th Cir. 1988).  It is nothing more than

26   speculation for Plaintiffs to allege that Trujillo will return to prison and be subjected to the same

27   conditions described in the Second Amended Complaint.  Such speculation is insufficient to

28   establish the existence of a present, live controversy. *See City of Los Angeles v. Lyons*, 461 U.S.

7

1  95, 109 (1983).

2      In *Rodriguez v. Hayes* (the case Plaintiffs rely on for their contention that Trujillo's claim is

3  not moot), the Ninth Circuit reversed a district court's denial of class certification and held that

4  the class met the requirements of Rule 23.  *Rodriguez v. Hayes,* 591 F.3d 1105 (9th Cir. 2009).

5  Specifically, the Court held that "mootness of the Petitioner's claim is not a basis for denial of

6  class certification, but rather is a basis for dismissal of Petitioner's action."  *Id.* at 1117-18.  Here,

7  the Court has not yet ruled on class certification.  Defendants contend, and have demonstrated,

8  that Trujillo's recent parole moots his <u>individual claims</u> for injunctive relief.

9      **C.    Abdullah's Claims for Injunctive Relief are Moot.**

10      Abdullah's claims are moot because the prison where he is incarcerated—California State

11  Prison, Solano—is presently under a court order prohibiting CDCR from imposing race-based

12  lockdowns at that prison.  (CD 157-5).  Because the Solano County Superior Court already

13  granted Abdullah the equitable relief he seeks, his claims are moot.  Any relief the court could

14  now grant would be ineffectual.  *See Enrico's, Inc. v. Rice*, 730 F.2d 1250, 1254 (9th Cir. 1984)

15  (Where the court can no longer grant effective relief, the court lacks jurisdiction and must dismiss

16  the case as moot.).  Moreover, if the Court were to grant Abdullah injunctive relief directed at

17  CSP-Solano, it would necessarily interfere with the Superior Court's ordered remedial plan,

18  which CSP-Solano has already implemented.  (*See* CD 280 at 20:18-25, 21:2-3.)

19      In their opposition, Plaintiffs identify three problems with this argument.  Specifically,

20  Plaintiffs claim that:  (1) Abdullah is "unlikely to remain at CSP Solano" (CD 280 at 39:17-18);

21  (2) Defendants' appeal of *In re Haro* is pending (*Id.* at 39:18-19); and (3) CSP Solano is still

22  imposing race-based lockdowns (*Id.* at 39:19-20).

23      According to Plaintiffs, "Defendants make no attempt to show that Mr. Abdullah will not

24  be transferred in the future." (*Id.* at 39:25.)  Notably, Plaintiffs make no attempt to show that Mr.

25  Abdullah <u>will</u> be transferred.  There is no reasonable expectation or demonstrated probability that

26  Abdullah will be transferred.  Accordingly, the Court should dismiss Abdullah's claim for

27  injunctive relief as moot.  *Dilley*, 64 F.3d at 1368 (inmate's "claim that he might be transferred . .

28  . some time in the future [was] 'too speculative' to prevent mootness").

8

1   Plaintiffs further contend that there is "substantial factual dispute about whether Defendants

2   will actually comply with the *Haro* decision." (*Id.* at 40:16-17.)  As evidence, Plaintiffs refer to

3   five CSP-Solano modified programs identified in Defendants' summary-judgment motion. (*Id.* at

4   41:17-24.)  What Plaintiffs fail to mention is that each of the modified programs occurred before

5   the issuance of the January 18, 2013 *Haro* order.  Again, there is no reasonable expectation or

6   demonstrated probability that CSP-Solano will not comply with the *Haro* order.  Indeed,

7   Plaintiffs admit that "[t]here is no evidence suggesting that either Pelican Bay or Solano has

8   experienced anything other than success with court-ordered race-neutral lockdown policies." (*Id.*

9   at 21:2-3.)

10   Based on the above, Abdullah's claims for injunctive relief are moot.

11   **D.   Mitchell's Claims for Injunctive Relief are Moot.**

12   In their opposition, Plaintiffs repeatedly allege that Defendants implement lengthy, race-

13   based lockdowns and modified programs.  (CD 280 at 44:12-13) ("Under Defendants' lockdown

14   policy, the prisons may continue to implement lockdowns of indefinite length."); (CD 280 at

15   44:13-14) ("In the past three years, Defendants implemented lockdowns lasting months, years,

16   and even a decade."); (CD 280 at 45:12-13) ("Plaintiffs continue to be at risk of excessively

17   lengthy race-based lockdowns."); (CD 280 at 37:9-10) ("the Plaintiffs are subjected to the

18   lockdowns solely by virtue of their ethnic or racial heritage, and where they live.").  In an effort

19   to defeat mootness, Plaintiffs further claim that "Defendants' past practice, coupled with their

20   ongoing policy demonstrates the likelihood that Plaintiffs will suffer lengthy and race-based

21   lockdowns in the future." (CD 280 at 44, n.12.)

22   Defendants do not submit that Mitchell will never be subject to a modified program or

23   lockdown in the future.  Prisons are extremely dangerous places. *Johnson v. California*, 543 U.S.

24   499, 515 (2005).  And implementing a lockdown or modified program may be necessary when

25   prison officials have good reasons to believe that ongoing serious threats to inmate and staff

26   safety or institutional security exist.  (CD 238 at ¶ 25.)  Rather, it is Defendants' position that

27   Mitchell's claims for injunctive relief are moot because he is not subject to any of the conditions

28   about which he complains in his Second Amended Complaint.

9

**1.   Mitchell's Eighth Amendment Claim for Injunctive Relief is Moot.**

Mitchell is classified as a Level II inmate at Folsom State Prison.  (DUF 9).  Since January 2012, Mitchell has been subjected to five modified programs, the longest of which lasted two weeks.  (CD 254 at 1-2; CD 260 at ¶¶ 5-15, 18-19; CD 267 at ¶ 9; CD 267-1 at 65-68.)  Plaintiffs do not dispute the circumstances surrounding these five modified programs, or their duration.  (*See* CD 280 at 42-45.)  Instead, Plaintiffs attempt to distract the Court with specious and wholly conjectural claims that the prisons "*may* continue to implement lockdowns of indefinite length."  (CD 280 at 44:12-13) (emphasis added).

In determining mootness, the underlying concern is whether the potential injury is too speculative in light of the present circumstances.  *Mitchell v. Dupnik*, 75 F.3d 517, 527-28 (9th Cir. 1996); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992).  Here, Defendants have uncontrovertibly demonstrated that the five modified programs Mitchell experienced since January 2012 came nowhere close to "cross[ing] the eighth amendment line."  *Hayward v. Procunier,* 629 F.2d 599, 603 (9th Cir. 1980) (finding denial of yard time for a month not unconstitutional).  Moreover, in their oppositions to Plaintiffs' motions for class certification and preliminary injunction, Defendants established that of the 431 new security-related modified programs implemented across all male prisons in 2012, 80% lasted one month or less.  (CD 231-3.)  Of the security-related modified programs that lasted more than 30 days in 2012, almost 90% were implemented in only fourteen of CDCR's adult male prisons.  (CD 249 at ¶ 30; CD 231-3.)  Not surprisingly, those fourteen prisons each contained Level III or Level IV general-population facilities, where the most violent and disruptive inmates are housed.  (CD 249 at ¶ 30.)  This is hardly a "temporary downtick in lockdowns," as Plaintiffs allege.  (CD 280 at 45:11-13.)

Based on the present circumstances, there is no reason to believe that Mitchell is "in imminent danger of being subjected to excessively lengthy lockdowns in the immediate future" as he claims to be.  (CD 84 at ¶ 86.)  Since January 2012, Mitchell's outdoor exercise privileges were suspended on only five occasions, and never for longer than two weeks.  And apart from Plaintiffs' conclusory and speculative hypotheticals, there is no reasonable expectation that

10

1    Mitchell will again be subjected to the same allegedly unconstitutional conditions (*i.e.,*

2    "excessively lengthy lockdowns" (*Id.* at 10:10-11)).  As a result, Mitchell's individual Eighth

3    Amendment claim for injunctive relief is moot and must be dismissed.

4              **2.    Mitchell's Fourteenth Amendment Claim for Injunctive Relief is
                       Moot.**

5

6         Mitchell's claim for injunctive relief under the Fourteenth Amendment's Equal Protection

7    Clause is also moot.  As demonstrated in Defendants' summary-judgment motion, and again

8    below, there is no reasonable expectation that the alleged "wrong" (*i.e.,* alleged discriminatory

9    lockdowns and modified programs) will be repeated.  Mitchell claims that he is "in imminent

10   danger of being subjected to discriminatory race-based lockdowns in the immediate future

11   because Defendants continue to impose race-based lockdowns pursuant to their discriminatory

12   policies and practices."  (CD 84 at ¶ 79.)  Mitchell further alleges that "Defendants have imposed

13   race-based lockdowns very frequently (approximately one per day) at prisons across the State."

14   (CD 84 at ¶ 79.)  This is not a fair or accurate characterization of Mitchell's current situation, or

15   of CDCR's policy or practices.  Modified programs and lockdowns that happened years ago do

16   not show that Defendants are currently violating Mitchell's equal protection rights.  Nor can they.

17        Race-based decisions made in response to the "necessities of prison security and discipline"

18   do not violate the Fourteenth Amendment when they are narrowly tailored to legitimate prison

19   goals.  *Cruz v. Beto*, 405 U.S. 319, 321 (1972); *Richardson v. Runnels*, 594 F.3d 666, 671 -672

20   (9th Cir. 2010).   Since January 2012, Mitchell has experienced two modified programs that

21   impacted a particular racial group.  Both survive strict scrutiny and should inform the Court's

22   determination that there is no reasonable expectation that Mitchell's Fourteenth Amendment

23   rights will be violated by lockdowns and modified programs in the future.

24        The first modified program (#FSP-11-12-019) lasted one week and was in response to a

25   race riot involving more than fifty Black and White inmates at Folsom State Prison.  (DUF 17;

26   CD 260 at ¶ 7; CD 260-1 at 2-4.)  In an effort to save lives and increase safety, prison officials

27   placed all Black and White inmates (and their cell partners) throughout the institution on

28   modified program pending an investigation.  (CD 260 at ¶ 7; CD 260-1 at 2-4.)  Narrowing the

                                                11

1    scope of the modified program to only the involved races is preferable to locking down all

2    inmates in the affected area when the incident appears to be between specific racial groups

3    because it allows inmates who are not at risk to continue programming.  (CD 238 at ¶ 46.)

4         The second modified program (#FSP-12-03-003) lasted two weeks and was in response to a

5    violent riot involving 100 Black inmates on the recreational yard.  (CD 260 at ¶ 11; CD 260-1 at

6    13-20.)  Although this modified program initially affected all Black inmates, within twenty-four

7    hours, it was narrowed to affect only the three involved disruptive groups:  the Crips, the Bloods,

8    and the Bay Area affiliates.  (*Id.*)  The inmates associated with the three specific race-based

9    security threat groups were then released incrementally, by housing unit, to gauge whether further

10   violence would ensue between the warring gangs if they were given the opportunity.  (*Id; see also*

11   CD 244 at ¶ 11.)

12        Prison officials have a responsibility to ensure the safety and security of the institution.

13   *Bell v. Wolfish,* 441 U.S. 520, 540 (1979) (citing *Pell v. Procunier,* 417 U.S. 817, 827 (1974)).

14   Following these riots, it was crucial for staff to identify which inmates or disruptive groups were

15   involved and whether future violence between the warring racial groups would continue if the

16   modified programs were lifted.  (CD 260 at ¶¶ 7, 11.)  Both of these modified programs were

17   implemented in the narrowest degree possible to re-establish prison security and to ensure the

18   safety of inmates and staff.  *See Johnson,* 543 U.S. at 505-07.

19        For purposes of mootness, the relevant inquiry is whether the potential injury is too

20   speculative in light of the present circumstances.  *Mitchell v. Dupnik*, 75 F.3d 517, 527-28 (9th

21   Cir. 1996); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967); *Lujan v. Defenders of*

22   *Wildlife,* 504 U.S. 555, 564 n.2 (1992).  As demonstrated above, Mitchell has been subjected to

23   two modified programs since January 2012 that impacted a particular racial group.  But they did

24   not violate Mitchell's Equal Protection rights.  Moreover, CDCR's current policy explicitly builds

25   in safeguards to protect inmates' rights under the Equal Protection Clause.  The policy states that

26   officials "shall not target a specific racial or ethnic group unless it is necessary and narrowly

27   tailored to further a compelling government interest, such as restoring security and order after an

28   incident or protecting the health and safety of the inmates and staff."  (CD 238, Ex. A.)

1    By referring to lockdowns and modified programs that happened years ago, Plaintiffs are

2    only painting a picture of the past.  But a past injury "does nothing to establish a real and

3    immediate threat that [a plaintiff] would again suffer similar injury in the future."  *Adarand*

4    *Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995).  Because there is no reasonable

5    expectation that Mitchell will be subjected to the same allegedly unconstitutional conditions again,

6    his Equal Protection claim for injunctive relief is moot.

7    **V.    DEFENDANTS TILTON, OWEN, HELLWIG, AND VANDERVILLE DID NOT
         "IMPLEMENT, RATIFY, AND APPROVE RACE-BASED AND EXCESSIVELY LENGTHY
8        LOCKDOWNS."**

9        In the Second Amended Complaint, Mitchell alleges that Defendants Tilton, Owen, Hellwig,

10   and Vanderville "implemented, ratified and approved race-based and excessively lengthy

11   lockdowns in violation [of his] Fourteenth Amendment right to Equal Protection of the Laws and

12   Eighth Amendment Right to be free from cruel and unusual punishment."  (CD 84 at ¶ 89.)  And

13   Mitchell's other causes of action are also based solely on his allegations that Defendants Tilton,

14   Owen, Hellwig, and Vanderville were directly responsible for implementing the modified

15   programs about which Mitchell complains.  (CD 84 at ¶¶ 95, 100 .)  Mitchell's allegations are

16   baseless.

17       In their opposition, Plaintiffs improperly convert their original allegations into new

18   assertions.  For the first time, Plaintiffs now claim that Defendant Tilton, the former Secretary of

19   CDCR, "is liable for overseeing implementation of an unconstitutional policy."  (CD 280 at

20   76:16-17.)  Similarly, Plaintiffs now contend that Defendants Owen, Hellwig, and Vanderville are

21   liable "regardless whether they had ultimate authority to implement or end lockdowns."  (*Id.* at

22   76:25-27.)  The Court should disregard any new assertions not raised in Plaintiffs' current

23   complaint.  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (disallowing

24   new claims during summary judgment); *Pickern v. Pier 1 Imports, Inc.*, 457 F.3d 963, 968-69

25   (9th Cir. 2006) (same); *see also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and

26   Procedure § 1183, at 23 n. 9 (3d ed. 2004) ("An opposition to a summary judgment motion is not

27   the place for a plaintiff to raise new claims.").

28       Mitchell's argument against Defendant Tilton— as alleged in the Second Amended

13

1    Complaint—rests solely on his supervisory status, which is insufficient to show the personal

2    involvement for a 42 U.S.C. § 1983 claim, especially when the plaintiff seeks monetary relief.

3    *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989); *Fayle v. Stapley,* 607 F.2d 858, 862 (9th Cir.

4    1979); *Mosher v. Saalfeld,* 589 F.2d 438, 441 (9th Cir. 1978).  Even if Defendant Tilton was

5    responsible for "overseeing implementation" of CDCR's lockdown and modified program policy,

6    Plaintiffs have not demonstrated the causal link necessary between the supervisory defendant and

7    the claimed violation: the allegedly unconstitutional implementation, ratification, and

8    authorization of lockdowns and modified programs at High Desert State Prison in 2006 and 2007.

9         In Mitchell's opposition, he claims for the first time that Defendants Owen, Hellwig, and

10   Vanderville "set acts into motion that they knew, or should have known, would have resulted in

11   harm to Mr. Mitchell."  (CD 280 at 77:20-22.)  Defendants did not address this allegation in their

12   summary-judgment motion because Mitchell never asserted it in his Second Amended Complaint.

13   Defendants did, however, demonstrate through declarations and deposition testimony that

14   Defendants Owen, Hellwig, and Vanderville did not "implement," "ratify," or "approve"

15   modified programs or lockdowns at High Desert State Prison in 2006 or 2007, as Plaintiffs

16   alleged in the Second Amended Complaint.  (CD 259 at ¶¶ 2-5; CD 264 at ¶¶ 2-5; CD 268 at ¶¶

17   2-8.)

18        Because Defendants Tilton, Owen, Hellwig, and Vanderville were not involved in the

19   implementation, ratification, or authorization of the modified programs that form the basis of

20   Mitchell's complaint, they are entitled to summary judgment as a matter of law.

21   **VI.   DEFENDANTS FOULK AND WRIGHT DID NOT "IMPLEMENT, RATIFY, AND APPROVE
22        RACE-BASED AND EXCESSIVELY LENGTHY LOCKDOWNS."**

23        According to Mitchell's opposition, Defendants Foulk and/or Wright were responsible for:

24   "planning, organizing, and directing program from inmates in Facility C;" "making sure

25   lockdowns followed departmental procedures;" meeting with the warden to "assess the facility

26   conditions and determine whether inmates can be safely returned to normal program;" making

27   "recommendations for changes in programming;" preparing program-status reports; and even

28   editing High Desert State Prison's internal lockdown procedures.  (CD 280 at 79-80.)

14

1    Because these are not the same allegations raised in Mitchell's complaint, the Court should

2    disregard them.  *See Navajo Nation*, 535 F.3d at 1080.  In the Second Amended Complaint,

3    Mitchell claims that Defendants Foulk and Wright "*implemented, ratified and approved* race-

4    based and excessively lengthy lockdowns in violation [of his] Fourteenth Amendment right to

5    Equal Protection of the Laws and Eighth Amendment Right to be free from cruel and unusual

6    punishment."  (CD 84 at ¶ 89) (emphasis added).  This simply is not true.

7    While Defendants Foulk and Wright may have been involved in some aspects of program

8    modification at High Desert State Prison in 2006 and 2007, Defendants have undeniably

9    demonstrated through declarations and deposition testimony that Defendants Foulk and Wright

10   did not have authority to implement, ratify, or approve lockdowns or modified programs in their

11   roles as facility captains or associate warden.  (CD 263 at ¶¶ 8, 13.)  They are entitled to summary

12   judgment.

13   **VII.  DEFENDANTS DID NOT VIOLATE MITCHELL'S EIGHTH AMENDMENT RIGHTS.**

14   Defendants do not deny that Mitchell was placed on modified programs at various times

15   during the relevant time period, from September 12, 2006 to December 5, 2007.  The longest of

16   these modified programs lasted less than four months.  (CD 254 at 48-56; CD 263 at ¶¶ 15-16,

17   20-56; CD 263-1 at 6-28; CD 263-2 at 2-23; Corrected Ex. B (Foulk Decl.).)  In his opposition,

18   Mitchell claims that he was deprived of any outdoor exercise for *eight* continuous months.  (CD

19   280 at 51:18, 53:11, 56:21-22, 57:1, 57:14-17, 62:10.)  To prove this, Mitchell relies only on his

20   self-serving declaration.  (CD 285 at ¶¶ 6-14.)  He fails to provide a single program-status report

21   or other official document to substantiate his assertion.  This evidence, in and of itself, is

22   insufficient to raise a triable issue of fact.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

23   248-49 (1986); *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1061 (9th Cir. 2002).

24   Moreover, any action taken by Defendants was not the product of any "deliberate

25   indifference" towards Mitchell.  In other words, Defendants did not deprive Mitchell of outdoor

26   exercise with the deliberate indifference to his health or safety necessary to support an Eighth

27   Amendment violation.

28   ///

15

1

**A.    Mitchell Was Not Deprived of Outdoor Exercise for Eight Continuous
       Months.**

2

3        In a previous order, the Court limited Mitchell's damages claims to modified programs and

4   lockdowns that occurred between September 12, 2006 and December 5, 2007.  (CD 107 at 9:20-

5   22.)  Yet, Mitchell seems astounded that Defendants do not "even mention" an alleged modified

6   program that lasted from March 21, 2006 to May 10, 2006.  (CD 280 at 57, n.21.)  Defendants did

7   not describe or mention this modified program because it is outside the scope of this lawsuit and,

8   therefore, should not be considered by the Court.  Moreover, it is unclear why Plaintiffs included

9   a two-page calendar dating back to March 2006 when the Court has already clarified the

10  boundaries of Mitchell's damages claim.  (*See* CD 280 at 54-55.)

11       Defendants have identified nine modified programs that may have affected Mitchell during

12  the relevant time period.  (CD 254 at 48-56; CD 263 at ¶¶ 15-16, 20-56; CD 263-1 at 6-28; CD

13  263-2 at 2-23; Corrected Ex. B (Foulk Decl).)  Plaintiffs accuse Defendants of "try[ing] to cast

14  their lockdowns as discrete, separate events that do not overlap when they have made different

15  representations to the California Supreme Court."  (CD 280 at 60:4-6.)  In an informal response to

16  the California Supreme Court, the Attorney General's Office represented that Mitchell was "on

17  lockdown for various reasons from November 24, 2006 to April 24, 2007."  (CD 284-3 at 9.)

18  This is not inconsistent with the representation Defendants make in their summary-judgment

19  motion.  (*See* CD 254 at 50-54.)  Indeed, Defendants previously acknowledged that "what may

20  have seemed like one continuous modified program affecting only the Black inmate population

21  on Facility C was, in reality, a series of modified programs, investigations, and interviews

22  conducted in an effort to protect all inmates and staff from recurring violent incidents and threats

23  of serious harm."  (CD 254 at 53:26-27, 54:1-2; CD 263 at ¶ 40.)

24       Admittedly, the November 24, 2006 modified program lifted on December 13, 2006—the

25  same day the December 13, 2006 modified program was implemented.  (CD 263 at ¶ 28; CD 284-

26  3 at 4.)  And the December 13, 2006 modified program lifted on January 3, 2007—a day before

27  the January 4, 2007 modified program was implemented.  (CD 263 at ¶34; CD 263-1 at 22; CD

28  284-3 at 6.)  Even assuming, *arguendo*, that Mitchell was on modified program continuously

16

1  from November 24, 2006 to April 25, 2007[1], this does not amount to eight consecutive months, as

2  Mitchell alleges.

3      As previously stated, Mitchell claims that he was on modified program for eight

4  consecutive months, from August 30, 2006 until May 9, 2007.  (CD 280 at 56:21-22, 57:1.)

5  Apart from his self-serving declaration that contradicts his own prior testimony[2], there is nothing

6  to substantiate this assertion.  Defendants have shown through declarations and official prison

7  records that the September 13, 2006 modified program affected Mitchell for nine days:  inmates

8  were returned to normal program on September 21, 2006.  (CD 263 at ¶¶ 20-21; CD 284-3 at 6.)

9  Defendants have further demonstrated through declarations and official prison records that the

10  October 5, 2006 modified program affected Mitchell until it lifted on November 21, 2006.  (CD

11  263 at ¶¶ 23-26; CD 263-1 at 6-13; CD 284-3 at 3.)  Accordingly, Mitchell was <u>not</u> on modified

12  program from September 21, 2006 to October 5, 2006, or from November 21, 2006 to November

13  24, 2006.  Mitchell's declaration—in and of itself—is both inaccurate and insufficient to raise a

14  triable issue of fact because: (1) it is uncorroborated by other testimony or other persuasive

15  evidence; and (2) a reasonable jury could not return a verdict for Mitchell.  *See Anderson*, 477

16  U.S. at 248-49; *Villiarimo*, 281 F.3d at 1061.  In short, Mitchell was not on modified program for

17  eight consecutive months, as he alleges in his opposition.

18      **B.    Defendants Did Not Act With Deliberate Indifference.**

19      A successful Eighth Amendment challenge to conditions of confinement requires a showing

20  of an objective component, concerning the seriousness of the deprivation, and a subjective

21  component, concerning the culpable state of mind of prison officials.  *Hayes v. Garcia,* 461 F.

22  Supp. 2d 1198, 1205 (S.D. Cal. 2006).

23      Mitchell claims that his Eighth Amendment rights were violated because he was denied

24

25      [1] In *In re Robert Mitchell,* an earlier state-habeas action involving the same modified
programs and lockdowns at High Desert State Prison in 2006 and 2007, Mitchell filed a
declaration and a reply brief admitting that the January 4, 2007 modified program (#HDP-C-07-
26  003) lifted on April 25, 2007.  (Defs.' Req. Jud. Not. Exs. A & B.)

27      [2] In *In re Robert Mitchell*, Mitchell claims he "remained on full lockdown for
approximately 11 months, confined to his cell, and not permitted to receive fresh air, exercise or
participate in programming and other activities."  (Defs.' Req. Jud. Not. Ex. C.)

28

17

1   outdoor exercise for eight consecutive months.  (CD 280 at 57:1-5.)  As noted above, the longest

2   modified program Mitchell was subjected to lasted less than four months.  Even assuming

3   Mitchell was continuously on modified program from November 24, 2006 to April 25, 2007, this

4   denial of outdoor exercise was not the result of Defendants' "deliberate indifference."

5          In *Corona v. Knowles,* the plaintiffs were on modified program with no access to the

6   recreational yard for approximately five months, from May 31, 2006 to "late October" 2006.

7   *Corona v. Knowles,* No. 1:08-cv-00237-LJO-BAM, 2012 WL 4051966, at *9 (E.D. Cal. Sept. 14,

8   2012).  Southern Hispanic inmates were originally placed on modified program on May 31, 2006

9   following an assault on staff.  *Id.* at *1.  Five correctional officers were battered and their injuries

10  ranged from "superficial redness to a dislocated right wrist."  *Id.*  The Court described the

11  subsequent chain of events as follows:

12         Approximately one month later, prison officials began to gradually return Southern
           Hispanic inmates to normal programming.  However, this process was disrupted
13         when on July 31, 2006, a confidential informant advised prison staff that two metal
           sheets had been stolen; that inmates were fashioning weapons from the metal sheets;
14         and that inmates were planning to attack prison staff with those weapons. Because the
           weapon stock was later discovered primarily in the mattresses of Southern Hispanic
15         inmates, it was reasonable for prison officials to believe that Southern Hispanic
           inmates still posed a threat to staff safety.
16
           By August 21, 2006, prison officials were unable to substantiate the threats made
17         against prison staff. Nevertheless, Southern Hispanic inmates continued to pose
           security and safety issues throughout August and September.  The most notable of
18         these events included an attack on prison staff by Southern Hispanic inmates in
           Building 3 and information provided by a confidential informant indicating that
19         Southern Hispanic inmates intended to "rush" the program office once they were
           returned to normal programming. As a result, prison officials did not begin returning
20         Southern Hispanic inmates to normal programming until late October.

21  *Id.* at *9.  The court determined that the duration (five months) of the modified programming was

22  reasonable.  The court acknowledged that "[w]hen viewed in isolation these later incidents do not

23  appear to pose a particularly high threat to prison security.  However, these incidents cannot be

24  divorced from the context in which they took place."  *Id.* at *10.

25         The longest single modified program Mitchell was subjected to lasted less than four

26  months.  Like the situation in *Corona,* safety concerns were first presented by the ruthless

27  November 24, 2006 attack on two High Desert State Prison correctional officers.  (DUF 81; CD

28  263 at ¶ 28; CD 263-1 at 15-17.)  Approximately three weeks later, thirty Black inmates refused

18

1   staff orders to assume a prone position on the recreational yard, an area of the prison where staff

2   safety is most at risk due to the fact that large groups of inmates are able to congregate and

3   interact and staff to inmate ratios are very low.  (CD 263 at ¶ 30; CD 263-1 at 19-22.)  On

4   January 4, 2007, an inmate battered a correctional officer as he casually made his way to the

5   dining hall.  (DUF 90; CD 263 at ¶ 36; CD 263-1 at 24-28.)  Between January 6, 2007 and

6   January 21, 2007, prison staff received seven "kites" (notes) alleging future attacks on staff.  (CD

7   263 at ¶ 37(a).)  On March 23, 2007, an attempted murder occurred on Facility C's yard.  (*Id* at ¶

8   39.)  And these are only some of the violent events that transpired during this time period.  (*See*

9   CD 263 at ¶¶ 15-56; CD 263-1; CD 263-2; Corrected Ex. B (Foulk Decl.).)

10       The record shows that Defendants acted reasonably and "within the wide-ranging deference

11  afforded to them."  *See Corona,* 2012 WL 4051966, at *9.  Given the circumstances, it was

12  reasonable for prison officials to believe that inmates posed a real threat to staff safety, especially

13  during this period.  Any restrictions on programming, including access to the yard, were instituted

14  for the primary purpose of restoring institutional safety and security.  (CD 263 at ¶¶ 6, 56.)  They

15  were never meant to be punitive or otherwise implemented in bad faith.  (*Id.* at ¶ 6.)  Defendants'

16  actions were simply not the product of any "deliberate indifference" towards Mitchell.

17       Mitchell claims that Defendants failed to consider reasonable alternatives for providing him

18  outdoor exercise.  Specifically, Mitchell claims that Defendants should have rotated small groups

19  of inmates onto the main prison yards or utilized the prison's mini-concrete yards.  (CD 280 at

20  67:17-24.)  The problem with rotating small groups of inmates onto the main prison yard is that

21  without assessing the risk, determining what areas of the prison may be affected, and conducting

22  an investigation, prison staff cannot accurately identify which inmates are likely to be involved in

23  the violent incidents and threats of violence.  (CD 263 at ¶ 55.)  The central concern for prison

24  officials from September 12, 2006 to December 5, 2007 was staff safety.  (*See* CD 263 at ¶¶ 20-

25  56; CD 263-1 at 6-28; CD 263-2 at 2-23; Corrected Ex. B (Foulk Decl.).)  The mini-concrete

26  yards at High Desert State Prison were not utilized in large part due to the fact that there are no

27  prison officials to supervise the yards.  (CD 284-20 at 10.)  In *Corona,* the court held that

28  "[d]uring modified programming, the movement of inmates is typically done under escort of

19

1   correctional officers.  If the mini-concrete yards are utilized, then correctional officers would

2   presumably have to escort each inmate to the mini-concrete yards.  This may actually *increase*

3   staff exposure to inmates." *Corona*, at *10, n.4.  Allowing small groups of inmates to exercise on

4   the mini-concrete yards does not present a reasonable alternative when there are significant

5   concerns for staff safety.

6       Finally, Mitchell's allegation that Defendants Tilton, Felker, Foulk, Wright, Owen, Hellwig,

7   and Vanderville were aware of his alleged medical need is unsubstantiated.  Mitchell's purported

8   need for "ambulation and daily exercise outside of his cell" is not documented in his prison

9   medical file, as he claims.  (CD 280 at 64:11-12.)  The medical chronos in Mitchell's file show

10  only that Mitchell walked with a cane and required a left ankle brace.  (CD 284-8 at 2.)  And

11  according to a May 10, 2005 "Disability Placement Program Verification" form, Mitchell had a

12  mobility impairment but could walk 100 yards without pause with or without an assistive device.

13  (CD 284-9 at 2.)  This form also documented Mitchell's need for a cane and ankle brace.  (CD

14  284-9 at 2.)  Mitchell's medical records also indicate that he received physical therapy

15  consultations during times when he was on modified program.  (CD 284-21 at 9-13.)  The

16  physical therapist provided Mitchell with a menu of foot exercises to select from; none of which

17  involved walking and almost all of which could be done in his cell.  (CD 284-21 at 9-13.)  The

18  "certain apparatus" Mitchell discusses in his opposition (CD 280 at 64:9-10) is nothing more than

19  an average stair, "a little like a curb."  (CD 284-19 at 20-21; CD 284-21 at 11.)  Mitchell

20  acknowledges that the physical therapist only suggested that he do "*some* of these exercises."

21  (Decl. Sullivan at ¶ 2 and Ex. A [Mitchell Dep. Excerpts] at 78:14-20) (emphasis added).

22      Mitchell claims to have notified Defendants Owen, Hellwig, and Vanderville of his

23  purported medically-prescribed need for outdoor exercise during his initial classification meeting

24  on March 23, 2006.  (CD 280 at 64:11-19.)  But according to the committee notes, Mitchell only

25  communicated to the committee that he "should be on a 270 yard."  (CD 285-1 at 2.)  During her

26  deposition, Defendant Owen confirmed that Mitchell spoke only once during the initial

27  classification committee hearing—to request placement on a 270-design yard.  (Decl. Sullivan at

28  ¶ 3 and Ex. B [Owen Dep. Excerpts] at 60:10-16, 61:13-14.)  According to Defendant Hellwig,

20

Defs.' Reply in Support of Mot. for Summ. J

*R. Mitchell v. Cate, et. al.*
Case No. 2:08-CV-01196-TLN-EFB

1    Mitchell never brought up mobility impairment or his need to walk around at the March 23, 2006

2    initial classification hearing.  (Decl. Sullivan at ¶ 4 and Ex. C [Hellwig Dep. Excerpts] at 35:20-

3    25, 36:1.)  Defendant Vanderville also testified that he was never aware that Mitchell needed

4    medical care in the form of outdoor exercise.  (CD 284-7 at 22.)  In fact, when questioned about

5    the issue regarding accommodation of Mitchell's alleged medical needs during a modified

6    program, Defendant Vanderville responded:  "I don't remember it because it never happened.

7    The issue was never brought up to me.  And if it had of (sic) been, I would have documented it."

8    (*Id.*)

9         Mitchell further claims that his administrative grievance (CDCR form 602) put Defendants

10   on notice of his alleged need to exercise outdoors during a lockdown or modified program.  (CD

11   280 at 64:20-21.)  However, Mitchell does not mention any medical issues in his administrative

12   grievance.  (CD 285-3 at 2-9.)  Also unsubstantiated is Mitchell's claim that he has "incurred

13   nerve damage and been diagnosed with Morton's Neuroma" "as a result of his inability to

14   properly exercise during the lockdowns."  (CD 280 at 65:4-6.)  But according to Plaintiffs' own

15   medical expert, Morton's Neuroma has "no connection" to modified programs.  (Decl. Sullivan at

16   ¶ 5 and Ex. D [Stern Dep. Excerpts] at 108:16-25.)

17        Defendants did not deprive Mitchell of outdoor exercise with the "deliberate indifference"

18   to his health or safety necessary to support an Eighth Amendment violation.  Accordingly,

19   Defendants are entitled to summary judgment on Mitchell's Eighth Amendment claim for

20   damages.

21   **VIII. DEFENDANTS DID NOT VIOLATE MITCHELL'S RIGHTS UNDER THE EQUAL
             PROTECTION CLAUSE.**

22

23        In opposition to Defendants' Equal Protection argument, Plaintiffs erroneously rely on

24   *Fisher v. University of Texas at Austin*, ___ U.S. ___, 133 S. Ct. 2411 (2013), which addressed

25   race-based decisions in higher education.  (CD 280 at 46:1-14.)  *Fisher* is inapt because life and

26   death decisions made in response to prison violence cannot reasonably be compared to decisions

27   intended to achieve diversity among the student body in college admissions procedures.  Indeed,

28   the Supreme Court instructs that equal protection challenges must be considered in their proper

                                        21

1   context.  *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) ("Context matters when reviewing race-

2   based governmental action under the Equal Protection Clause"), and (citing *Gomillion v.*

3   *Lightfoot*, 364 U.S. 339, 343–44 (1960) (admonishing that, "in dealing with claims under broad

4   provisions of the Constitution, which derive content by an interpretive process of inclusion and

5   exclusion, it is imperative that generalizations, based on and qualified by the concrete situations

6   that gave rise to them, must not be applied out of context in disregard of variant controlling

7   facts")).  In fact, Defendants' modified program policy is specifically designed to take context

8   into account since no two incidents are alike.  (*See e.g.,* CD 238 at ¶¶ 25-29, Ex. A.)  But

9   Plaintiffs would have this Court engage in a broad and generalized assessment of CDCR's

10  modified programs, without regard to the variables and nuances of each particular incident.

11       The Supreme Court also directs that context is critical to the application of the strict

12  scrutiny test: "In *Adarand Constructors, Inc. v. Peña*, we made clear that strict scrutiny must take

13  'relevant differences' into account.  515 U.S., at 228, 115 S. Ct. 2097.  Indeed, as we explained,

14  that is its 'fundamental purpose.'  *Ibid.*  Not every decision influenced by race is equally

15  objectionable, and strict scrutiny is designed to provide a framework for carefully examining the

16  importance and the sincerity of the reasons advanced by the governmental decisionmaker for the

17  use of race in that particular context."  *Grutter v. Bollinger*, 539 U.S. at 327-28 (internal

18  quotations omitted).  In prison-safety cases, as distinct from college-admissions cases, the

19  Supreme Court holds that, "in the absence of substantial evidence in the record to indicate that the

20  officials have exaggerated their response to these considerations, courts should ordinarily defer to

21  their expert judgment in such matters."  *Pell*, 417 U.S. at 827; *see also, Cutter v. Wilkinson*, 544

22  U.S. 709, 725 n.13 (2005).  Therefore, the strict scrutiny test must be applied in the context of

23  specific modified programs, and deference must be given to Defendants' expertise in matters of

24  prison safety.

25       Nor are Plaintiffs correct when they cite to the syllabus portion of the *Fisher* decision to

26  support their argument that Defendants are required to demonstrate that they "considered all non-

27  race-based alternatives and properly concluded that *no* less restrictive or race-neutral alternative

28  would accomplish the objective."  (CD 280 at 46:5-9.)  As the *Fisher* decision itself points out,

22

1    the syllabus portion of a reported decision "constitutes no part of the opinion of the Court but has

2    been prepared by the Reporter of Decisions for the convenience of the reader." *Fisher*, 133 S. Ct

3    2412 n.*, citing *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337.  Contrary to

4    Plaintiffs' argument, to the extent that *Fisher* applies in the prison context, that decision does not

5    require that Defendants "actually consider[] all non-race-based alternatives."  Instead, *Fisher*

6    specifically holds that "narrow tailoring does not require exhaustion of every conceivable race-

7    neutral alternative."  *Fisher*, 133 S. Ct. at 2420 (quoting *Grutter*, 539 U.S. at 339–40.)

8    Nevertheless, Defendants have provided evidence that, when reviewed in context, shows that all

9    of the modified programs and lockdowns at issue were narrowly tailored to serve the state's

10   compelling interest in prison safety.  *Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir.

11   2008) (*citing Cutter*, 544 U.S. at 725, n.13).

12       Evidence that Defendants' actions were driven by a discriminatory purpose is central to an

13   Equal Protection cause of action.  *Hartmann v. California Dept. of Corrections and*

14   *Rehabilitation*, 707 F.3d 1114, 1123 (9th Cir. 2013).  The Supreme Court has held that summary-

15   judgment is proper if the party opposing the motion "fails to make a showing sufficient to

16   establish the existence of an element essential to that party's case, and on which that party will

17   bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Plaintiffs

18   will carry the burden to establish discriminatory intent at trial.  "On an issue as to which the

19   nonmoving party will have the burden of proof, however, the movant can prevail merely by

20   pointing out that there is an absence of evidence to support the nonmoving party's case."

21   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at

22   323).

23       In their opposition, Plaintiffs spend much time discussing different ways in which

24   Defendants could have addressed the incidents of prison violence at issue in this case.  But they

25   fail entirely to offer any evidence to show that Defendants' actions, whether flawed or not, were

26   undertaken "with an intent or purpose to discriminate against the plaintiff based on membership

27   within a protected class."  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  It is not

28   enough for Plaintiffs to show that Defendants' actions had a racially disproportionate impact.

                                        23

1    *Washington v. Davis*, 426 U.S. at 239.  Defendants are entitled to summary judgment because

2    there is no evidence that Defendants' actions were done with a discriminatory purpose.

3          **A.   May and October 2007 Modified Programs.**

4          Plaintiffs assert that Defendants "omitted mention of at least two race-based lockdowns

5    that they imposed on" Mitchell.  (CD 280 at 47 n.14.)  This is untrue.  Both modified programs

6    are discussed in Defendants' moving papers.  (CD 254 at 39:5-18, 41:5-24.)  However, they were

7    not addressed in the Equal Protection argument because both modified programs were imposed

8    on all of the inmates in Facility C, not inmates of a particular racial group.

9          **B.   September 13, 2006 Modified Program.**

10         Plaintiffs argue that the imposition of the September 13, 2006 modified program violated

11   the Equal Protection Clause because evidence obtained during the investigation indicated that the

12   tier kite that triggered the modified program contained false information.  (CD 280 at 48:3-8.)

13   The Equal Protection Clause prohibits actions undertaken for a discriminatory purpose.  It does

14   not prohibit actions taken to safeguard the lives of inmates or prison staff, even when those

15   actions are mistaken or based on faulty information.  "'Discriminatory purpose' . . . implies more

16   than intent as a volition or intent as awareness of consequences.  It implies that the decision

17   maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not

18   merely 'in spite of,' its adverse effects upon an identifiable group.'" *Lee*, 205 F.3d at 687

19   (quoting *Feeney*, 442 U.S. at 279).  Whether Defendants could have responded differently is

20   irrelevant to an Equal Protection analysis, where as here, the undisputed evidence shows that

21   Defendants selected a course of action because it would ensure institutional safety; not because it

22   would have some adverse effect on Mitchell's racial group.

23         Plaintiffs have identified no evidence to show that Defendants imposed the September 13,

24   2006 modified program "because of its adverse effects on an identifiable group."  Defendants are

25   entitled to summary-judgment because there is no evidence that the September 13, 2006 modified

26   program was imposed for a discriminatory purpose in violation of the Equal Protection Clause.

27         **C.   December 13, 2006 Modified Program.**

28         The December 13, 2006 modified program perfectly illustrates the reason that courts are

1    required to give deference to prison officials in matters of institutional safety and security. *Pell*,

2    417 U.S. at 827. The incident involved a large number of both affiliated and non-affiliated Black

3    inmates, and lasted for several hours. (DUF 84; CD 263 at ¶¶ 30-33.) Defendants' expertise, in

4    the context of the specific circumstances of the incident, led them to believe that there may be a

5    conspiracy among the Black inmates in Facility C to breach institutional security in order to

6    attack staff. (CD 263 at ¶ 33.) As a result, the Black inmates in Facility C were placed on a

7    modified program for approximately three weeks while an investigation was conducted. (*Id.*)

8    Plaintiffs have offered no evidence that the modified program was imposed for a discriminatory

9    purpose, rather than for the purpose of preserving institutional safety. In fact, the modified

10   program would have been lifted more quickly but for the receipt of information that indicated

11   further violence was being planned. (*Id.*)

12        Plaintiffs have failed to support their Equal Protection cause of action by presenting

13   evidence to indicate that Defendants' actions were motivated by a discriminatory purpose. The

14   Equal Protection Clause was not violated, and Defendants are entitled to summary-judgment.

15        **D.   January 4, 2007 Modified Program.**

16        On January 4, 2007, a Black inmate attacked a staff member, and Black inmates in the

17   dining hall began making comments that led staff to believe that they knew about the attack even

18   though they were not in a position to have witnessed it. (CD 263 at ¶ 36; DUF 90.) Defendants'

19   experience and expertise suggested a conspiracy among the Black inmates, and a modified

20   program was initiated while an investigation was conducted. (*Id.*) Within six days of the initial

21   modified program, all of Facility C was placed on a modified program when a padlock went

22   missing. (CD 263 at ¶ 37; DUF 91, 92.) During the investigation, staff received information

23   from numerous sources about plans for widespread disruption and attacks on staff. (CD 263 at ¶¶

24   38, 39.)

25        When the investigation was completed, an incremental unlock was initiated for the

26   affected inmate populations. (CD 263 at ¶ 38.) Even as this phased unlock was in effect, more

27   outbreaks of violence and threats of violence transpired on Facility C. (CD 263 at ¶ 39.) On

28   March 23, 2007, an attempted murder occurred on Facility C's Exercise Yard 2. (*Id.*) On March

25

1  27, 2007, the White inmate population on Facility C was placed on lockdown pending an

2  investigation into a possible threat to staff by the White inmate population.  (*Id.*)  On April 18,

3  2007, an inmate informed staff of yet another conspiracy to assault staff by the Black inmate

4  population on Facility C during the recreational yard activities on April 20, 2007.  (*Id.*)

5      Plaintiffs have presented no evidence to indicate that Defendants' actions were motivated

6  by a discriminatory purpose instead of by legitimate concerns for prison safety.  *Lee*, 205 F.3d at

7  687; *Pell*, 417 U.S. at 827.  In the context of the events occurring at that time, Defendants are

8  entitled to deference for their decision to impose several modified programs to preserve

9  institutional safety and protect lives.  Race-based decisions made in response to the "necessities

10  of prison security and discipline" do not violate the Fourteenth Amendment when they are

11  narrowly tailored to legitimate prison goals.  *Cruz*, 405 U.S. at 321; *Richardson*, 594 F.3d at 671-

12  72.  Defendants' motion for summary judgment should be granted.

13      **E.  August 1, 2007 Modified Program.**

14      Plaintiffs attempt to mislead the Court regarding an inmate's attack on acting Captain

15  Vanderville by characterizing a Unit Classification Committee as a "confrontational setting."

16  (CD 280 at 50:20-21.)  But there is nothing "confrontational" about a Unit Classification

17  Committee; a fact which made the attack all the more alarming.  On the same day, the

18  Administrative Segregation Unit Institutional Classification Committee received a call from an

19  inmate's family member asking why the Black population was on lockdown, even though no

20  lockdown or modified program was in place.  (CD 263 at ¶ 47.)  The unusual facts of the attack,

21  together with the phone call, and the totality of the circumstances over the preceding months

22  (which included threatened or actual attacks on staff by Black inmates), led officials to believe

23  that the attack on acting Captain Vanderville was potentially part of a conspiracy among Black

24  inmates to attack staff.  (CD 263 at ¶ 49.)  As a result, on August 1, 2007, all Black inmates in

25  Facility C were placed on a modified program.  (*Id.*)

26      Plaintiffs have offered no evidence to indicate that Defendants' actions were motivated by

27  an intent or purpose to discriminate against Mitchell because of his race.  *Hartmann*, 707 F.3d at

28  1123.  Summary-judgment is proper because Plaintiffs have "fail[ed] to make a showing

26

1    sufficient to establish the existence of an element essential to [their] case, and on which [they]

2    will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

3    **IX.   QUALIFIED IMMUNITY**

4        "Qualified immunity gives government officials breathing room to make reasonable but

5    mistaken judgments about open legal questions." *Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2085

6    (2011).  "When properly applied, it protects all but the plainly incompetent or those who

7    knowingly violate the law." *Id.*  "A Government official's conduct violates clearly established

8    law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that

9    every reasonable official would have understood that what he is doing violates that right." *Id.* at

10   2078.

11        **A.    Defendants Are Entitled to Qualified Immunity on Mitchell's Eighth
               Amendment Claim.**
12

13       As previously stated, Defendants did not act with deliberate indifference.  Accordingly,

14   their conduct could not have violated Mitchell's Eighth Amendment rights and they are entitled to

15   qualified immunity on this basis alone.  Furthermore, the right at issue was not clearly established

16   at the time.

17       In *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010), the Ninth Circuit held that prison

18   officials "are entitled to qualified immunity so long as a right to outdoor exercise in the midst of

19   severe ongoing prison violence was not clearly established at the time defendants acted."

20   *Norwood,* 591 F.3d at 1068.  There, plaintiff's outdoor exercise was restricted during four

21   separate extended lockdowns, ranging from two to four-and-a-half months each. *Id.* at 1065.

22   Prison staff locked down the prison after serious assaults by Black inmates and Crip gang

23   members on staff at California State Prison-Sacramento during a particularly violent period. *Id.*

24   The plaintiff was not a gang member and did not play a role in any of the staff assaults. *Id.*

25   Nonetheless, the Ninth Circuit concluded that the defendant-officials were entitled to qualified

26   immunity because a reasonable officer could have believed that restricting the plaintiff's outdoor

27   exercise in light of ongoing serious inmate violence was consistent with the Eighth Amendment,

28   as no authority clearly established otherwise. *Id.* at 1070.

27

1   A year after *Norwood*, the Ninth Circuit reached a similar conclusion in *Noble v. Adams*,

2   636 F.3d 525, 531 (9th Cir. 2011).  *Noble* holds "that it was not clearly established in 2002—*nor*

3   *is it established yet*—precisely how, according to the Constitution, or when a prison facility

4   housing problem inmates must return to normal operations, including outdoor exercise, during

5   and after a state of emergency called in response to a major riot."  *Id.* at 529 (emphasis added).

6   Like the defendants in *Norwood* and *Noble,* Defendants  Tilton, Felker, Wright, Vanderville,

7   Foulk, Owen and Hellwig are entitled to qualified immunity because a reasonable officer could

8   have believed that modified programs and lockdowns designed to ensure prison safety and

9   security following attempted murders, assaults on prison staff, inmate assaults, mass disturbances,

10  missing metal, and threats of continued violence were lawful at the time.  This is especially true

11  considering the legal framework at the time:

12  • On March 30, 2006 (five and a half months before the first modified program at issue
13    here), a California federal district court held that a nearly ten-month denial of outdoor
      exercise did not violate an inmate's Eighth Amendment rights.  *Jones v. Garcia*, 430 F.
14    Supp. 2d 1095 (S.D. Cal. Mar. 30, 2006);

15  • On September 28, 2006 (two weeks after the first modified program at issue here), a
      California federal district court held that a five-month denial of outdoor exercise did not
16    violate an inmate's Eighth Amendment rights.  *Hurd v. Garcia,* 454 F. Supp. 2d 1032
      (S.D. Cal. Sept. 28, 2006); and

17  • On October 27, 2006 (less than six weeks after the first modified program at issue here), a
18    California federal district court held that a nine-month denial of outdoor exercise did not
      violate an inmate's Eighth Amendment rights.  *Hayes v. Garcia,* 461 F. Supp. 2d 1198
19    (S.D. Cal. Oct. 27, 2006).

20  In each of these cases, prison officials were faced with similar types of violent behavior as

21  Defendants experienced on Facility C at High Desert State Prison:  inmate-on-inmate violence,

22  racial tensions, the discovery of inmate-manufactured weapons, and more.  *Jones*, 461 F. Supp.

23  2d at 1097-99; *Hurd*, 454 F. Supp. 2d at 1042-45; *Hayes*, 461 F. Supp. 2d at 1201-03.  And in

24  each of these cases, the court held that suspension of outdoor exercise was a reasonable and

25  necessary response to the violence.  *Id.*

26  The law was not clearly established in 2006 or 2007 concerning precisely how and when

27  prison officials must return a facility full of violent inmates to normal operations, including

28  outdoor exercise, after a major disturbance and during a period of escalating violence.  Because

28

1    Defendants acted reasonably, even if mistakenly, and because they did not knowingly violate the

2    Constitution, this Court should grant them qualified immunity on Mitchell's Eighth Amendment

3    claim.

4         **B.    Defendants are Entitled to Qualified Immunity on Mitchell's Fourteenth**
               **Amendment Claim.**
5

6         As has been established above, Plaintiffs cannot satisfy the first requirement of *Saucier*

7    because Defendants did not violate the Equal Protection Clause by acting with a discriminatory

8    purpose.  All of the modified programs were undertaken for the purpose of serving the state's

9    compelling interest in maintaining, preserving, and restoring institutional safety.  Whether

10   Defendants' decisions were always correct is irrelevant because qualified immunity applies, and

11   the suit for damages must be dismissed, even if the official's action was mistaken, so long as it

12   was objectively reasonable.  *Guerra v. Sutton*, 783 F.2d 1371, 1374 (9th Cir. 1986).  When

13   reviewed in context, Defendants' actions were objectively reasonable, and they are entitled to

14   qualified immunity.

15        Similarly, the evidence tips the scales in Defendants' favor under *Saucier*'s second criteria.

16   It would not be clear to a reasonable correctional official that imposing a modified program on

17   September 13, 2006 while they investigated a threat to a staff member would violate Plaintiff's

18   rights.  Likewise, it would not be clear to a reasonable correctional official that the December 13,

19   2006 modified program would violate Plaintiff's rights given that it appeared to be the beginning

20   of a widespread conspiracy to attack staff.  Nor would the circumstances of the January 4, 2007

21   modified program have caused a reasonable correctional official to believe that Plaintiffs' rights

22   were violated in light of the initial attack on staff, and all of the ensuing intelligence suggesting

23   that further attacks were planned.  Finally, it would not have been clear to a reasonable

24   correctional official that the August 1, 2007 modified program would have violated Plaintiff's

25   rights given the undisputed evidence that Defendants believed that the incidents that triggered the

26   modified program were part of a conspiracy to attack staff.

27        Defendants are entitled to qualified immunity because Plaintiff cannot establish the

28   existence of a constitutional violation, and because reasonable correctional officials would not

29

1    have believed that their conduct was unlawful in the situation confronted by these Defendants.

2    **X.    DEFENDANTS DID NOT ENGAGE IN CONDUCT THAT WAS "NEGLIGENT,"
3            "RECKLESS," "OUTRAGEOUS," "ATROCIOUS," OR "UTTERLY INTOLERABLE."**

4            **A.    Defendants Never Intended to Cause Emotional Injury to Mitchell.**

5            Mitchell claims that Defendants Tilton, Felker, Wright, Vanderville, Foulk, Owen, and

6    Hellwig "intentionally implemented race-based lockdowns" and that their conduct was

7    "outrageous" and "made with reckless disregard of the probability that Mitchell would suffer

8    emotional distress as a result."  (CD 84 at ¶ 95.)  Defendants have already shown that Defendants

9    Tilton, Wright, Vanderville, Foulk, Owen, and Hellwig did not implement lockdowns and

10   modified programs.  Defendants have also demonstrated that they never knew about Mitchell's

11   alleged medical condition requiring outdoor exercise.  Besides, the evidence certainly does not

12   suggest that Defendant Tilton (or any other prison official) acted intentionally, that he acted

13   recklessly, or that his actions were otherwise so outrageous in character, and so extreme in degree,

14   as to go "beyond all bounds of decency."  B. Witkin, 5 Summary of California Law: Torts § 404

15   (9th ed. 1988).  Inaction by a defendant does not constitute "extreme and outrageous behavior" for

16   purposes of intentional infliction of emotional distress unless the defendant intends to cause

17   injury to the plaintiff through the inaction.  *Lucas v. City of Visalia,* No. 1:09–CV–1015 AWI

18   DLB, 2010 WL 1444667 at *8 (E.D. Cal. April 12, 2010).

19           In *Davidson v. City of Westminster*, police officers staked out a Laundromat in an effort to

20   potentially arrest a man suspected of stabbing three women.  *Davidson v. City of Westminster*, 32

21   Cal.3d 197, 200 (1982).  The officers observed a man entering the facility "who closely

22   resembled" the suspect.  At this time, the officers knew that the plaintiff was in the Laundromat.

23   Unfortunately, the officers did not warn the plaintiff of the man's presence and, eventually, the

24   plaintiff was stabbed by the man.  Although the court acknowledged that the officers' plan to

25   apprehend the attacker was not their "finest hour" and that they may have engaged in "poor police

26   practices," the court dismissed the plaintiff's intentional infliction of emotional distress claim

27   because she did not allege "that the officers acted (or failed to act) as they did for the purpose of

28   causing emotional injury."  *Id.* at 210.  The court held that even if the officers acted with

1    "reckless disregard of the potential harm", as a matter of law, "the officers' conduct did not rise to

2    the level of outrageous conduct 'so extreme as to exceed all bounds of that usually tolerated in a

3    civilized community.'"  *Id.*

4         During the relevant time period (September 2006 to December 2007), Facility C at High

5    Desert State Prison was an extremely dangerous place and institutional safety and security was

6    touch and go, to say the least.  (CD 263 at ¶¶ 40, 55; CD 263-1 at 6-28; CD 263-2 at 2-23;

7    Corrected Ex. B (Foulk Decl).)  Mitchell's claim that Defendants' conduct was "extreme"

8    because they "lock[ed] down Mr. Mitchell on the basis of his race for more than eight months"

9    (CD 280 at 85:20-22) is:  (1) not accurate; and (2) purposefully fails to mention the numerous

10   outbreaks of violence on Facility C at the time, including attempted murders, staff assaults,

11   inmate assaults, mass disturbances, the discovery of inmate- manufactured weapons, and the

12   discovery of missing metal (CD 263 at ¶¶ 15-56; CD 263-1; CD 263-2; Corrected Ex. B (Foulk

13   Decl)).

14        Courts have held that when prison official's actions are motivated by concerns for safety

15   and security, the Equal Protection Clause is not violated merely because those actions have a

16   racially disproportionate impact.  *Washington v. Davis*, 426 U.S. at  239.  Moreover, prison

17   officials have a right and a duty to take the steps necessary to re-establish order in the face of

18   inmate violence.  *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982).  Mitchell was placed on

19   modified program at High Desert State Prison in 2006 and 2007 to ensure his safety and the

20   safety of other inmates and staff.  (CD 263 at ¶ 56.)  And while Mitchell may not necessarily have

21   been suspected of "doing something wrong" (CD 280 at 84:20), this does not avoid the fact that

22   his fellow inmates were all too involved in frequent and malicious acts of violence.  The

23   undisputed facts show that prison officials implemented the 2006 and 2007 modified programs at

24   High Desert State Prison for the purpose of restoring institutional safety and security.  They were

25   never meant to be punitive or otherwise implemented in bad faith.  (CD 263 at ¶ 6.)

26        Based on the record, a "civilized community" could not find Defendants' response to this

27   violence "atrocious" or "utterly intolerable."  *Alcorn v. Anbro Eng., Inc.*, 2 Cal.3d 493, 499

28   (1970).  Indeed, the Restatement of Torts instructs that "[i]t has not been enough that the

31

1    defendant has acted with intent which is tortious or even criminal, or that he has intended to

2    inflict emotional distress, or even that this conduct has been characterized by 'malice,' or a degree

3    of aggravation that would entitle the plaintiff to punitive damages for another tort." Restatement

4    (Second) of Torts § 46, comment d. Accordingly, Mitchell's claim for intentional infliction of

5    emotional distress must fail.

6       **B.**    **Defendants Did Not Act Negligently.**

7          **1.**    **Mitchell Fails to State a Cause of Action Against Defendants Wright, Owen, and Hellwig.**

8

9    Mitchell's complaint is silent as to any assertion that Defendants Wright, Owen, or Hellwig

10   owed him a duty of care. (*See* CD 84 at ¶ 101.) Neither Defendants, nor the Court, should be

11   required to read between the lines in order to ascertain which defendants are being sued for

12   negligence and which are not. Mitchell inexcusably fails to set forth "facts sufficient to establish

13   every element" of his negligence cause of action. *Rakestraw v. Cal. Physicians' Service,* 81 Cal.

14   App. 4th 39, 43 (2000). Accordingly, Mitchell cannot state a cause of action against Defendants

15   Wright, Owen, and Hellwig for negligence.[3]

16          **2.**    **Defendants Tilton, Felker, Foulk, and Vanderville Did Not Breach A Duty of Care.**

17

18    Admittedly, under California law, an inmate who is solely dependent on his jailers, due to

19   his incarceration, for things such as necessary medical care or physical safety may be owed a

20   legal duty. *See Lawson v. Superior Court* 180 Cal.App.4th 1372, 1389-90 (2010) (duty owed to

21   provide necessary medical care where inmate "solely dependent" on prison for care); *Girarldo v.*

22   *Dept. of Corrections and Rehabilitation* 168 Cal.App.4th 231, 246-51 (2008) (duty owed to place

23   transgender inmate in safe housing assignment to protect from assault by other inmates). That

24   type of situation, however, is not presented here. In contrast, if prison officials had <u>not</u> imposed

25         [3] In his opposition, Mitchell suggests that "the complaint can be easily corrected" and that

26   the Court must give him an opportunity to amend. (CD 280 at 88, n.34.) This reasoning completely discounts Federal Rule of Civil Procedure 16(b)(4) which states that a pretrial

27   scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Court discussed this rule at length in its order granting Plaintiffs' motion to

28   file a second amended complaint. (CD 83.)

1    modified programs that separated racial groups or race-based gangs, they may have been found

2    negligent for failing to ensure inmate safety.

3        Mitchell makes the fleeting allegation that Defendants were negligent by " implementing

4    excessively lengthy and race-based lockdowns." (CD 84 at ¶ 100.)  As noted previously,

5    Defendants Tilton, Vanderville, and Foulk, did not "implement" lockdowns and modified

6    programs and, therefore, cannot have breached this duty that Mitchell describes.  Moreover, the

7    evidence does not show that Defendants knew about Mitchell's alleged "need to exercise for his

8    health."  (CD 280 at 89:6-8.)  What the evidence does show is that Mitchell has always had the

9    ability to walk and move in his cell and that he received all accommodations noted on his

10   "Disability Placement Program Verification" form while at High Desert State Prison.  (Decl.

11   Sullivan at ¶ 2 and Ex. A [Mitchell Dep. Excerpts] at 18:6, 49:20-25.)  Additionally, Mitchell's

12   medical records indicate that Mitchell received physical therapy consultations during times when

13   he was on modified program.  (CD 284-21 at 9-13.)  The physical therapist provided Mitchell

14   with a menu of foot exercises to select from; none of which involved walking and almost all of

15   which could be done in his cell.  (CD 284-21 at 9-13.)  Even Mitchell has admitted that the

16   physical therapist only asked him to do "some of these exercises." (Decl. Sullivan at ¶ 2 and Ex.

17   A [Mitchell Dep. Excerpts] at 78:14-20.)

18       Not only has Mitchell failed to satisfy the heightened pleading requirement necessary to

19   maintain a negligence cause of action against Defendants, he also fails to demonstrate that

20   Defendants knew of and ignored his supposed need to "exercise for his health."  Defendants are

21   entitled to summary judgment.

22           **3.    Mitchell Fails to Show Requisite Causation.**

23       "'[A]bstract negligence,' without proof of a causal connection to the injury suffered, will

24   not support a finding of liability." *Dixon v. City of Livermore*, 127 Cal.App.4th 32, 42-43 (2005)

25   (quoting *Noble v. Los Angeles Dodgers, Inc.,* 168 Cal.App.3d 912, 918 (1985)).  In an action for

26   damages resulting from negligence, plaintiff is required to plead and prove a causal connection

27   between the defendant's actions and plaintiff's alleged injury. *Brown v. Critchfield*, 100

28   Cal.App.3d 858, 866 (1980).  And the proof of causation must be made by substantial evidence,

33

1    because "evidence which leaves the determination of these essential facts in the realm of mere

2    speculation and conjecture is insufficient." *Leslie G. v. Perry & Associates*, 43 Cal.App.4th 472,

3    484 (1996).

4         Mitchell claims that "Defendants' actions caused [him] to suffer physical and emotional

5    injury." (CD 84 at ¶ 103.)  Defendants are entitled to judgment because Mitchell has not

6    produced competent evidence proving that Defendants' actions or inactions were either the actual

7    or the proximate cause of his physical and emotional injuries.  In fact, as previously noted,

8    Plaintiffs' own medical expert testified that Morton's Neuroma has "no connection" to modified

9    programs.  (Decl. Sullivan at ¶ 5 and Ex. D [Stern Dep. Excerpts] at 108:16-25.)

10        Defendants are entitled to judgment as a matter of law because Mitchell has not and cannot

11   establish a causal connection between Defendants' conduct, and the physical and emotional

12   injuries he claims to have suffered as a result of the High Desert State Prison modified programs.

13   **XI.  DEFENDANTS FELKER, WRIGHT AND FOULK ARE ENTITLED TO DISCRETIONARY
          ACT IMMUNITY BECAUSE THEY ENGAGE IN THE CONSCIOUS BALANCING OF RISKS
14        AND ADVANTAGES WHEN MAKING DECISIONS REGARDING MODIFIED PROGRAMS
          AND LOCKDOWNS.**

15

16        Plaintiffs argue that the Court cannot consider Defendants' claim of discretionary act

17   immunity in this motion for summary judgment because it previously held that determination of

18   discretionary act immunity involves "questions of fact that cannot be properly resolved on a

19   motion to dismiss." (CD 280 89:26-90:10.)  This is exactly what makes determination of

20   discretionary act immunity appropriate in connection with Defendants' motion for summary

21   judgment.

22        The Law of the Case Doctrine applies after a court decides a rule of law. *Arizona v.

23   California*, 460 U.S. 605, 618 (1983).  In its order on Defendants' motion to dismiss, this Court

24   specifically found that it could not decide the question of discretionary act immunity.  (ECF 107,

25   114.)  As a result, the Law of the Case Doctrine does not apply to Defendants' renewed assertion

26   of discretionary act immunity.  Moreover, as the Supreme Court pointed out: "Under law of the

27   case doctrine, as now most commonly understood, it is not improper for a court to depart from a

28   prior holding if convinced that it is clearly erroneous and would work a manifest injustice."

34

1    *Arizona*, 460 U.S. at 619 (citing, *White v. Murtha*, 377 F.2d 428, 431–432 (5th Cir. 1967)).  So

2    even if the Court had decided the question of discretionary act immunity in connection with

3    Defendants' motion to dismiss, it is not precluded from reconsidering the matter in connection

4    with Defendants' motion for summary judgment.

5          As this Court previously held, "[i]mmunity applies only to 'deliberate and considered

6    policy decisions, in which a conscious balancing of risks and advantages . . . took place.'"

7    *Mitchell v. Felker*, No. 2:08-cv-1196 TLN EFB P, 2012 WL 2521827 at *11 (E.D. Cal., June 28,

8    2012) (quoting *Caldwell v. Montoya*, 10 Cal.4th 972, 981, (1995)).  Like a decision to call in the

9    National Guard to quell a civil disturbance (*Susman v. City of Los Angeles*, 269 Cal.App.2d 803

10   (1969)), there can be no doubt that discretionary immunity applies to the conscious balancing of

11   risks and advantages that Defendants Felker, Wright, and Foulk engage in when managing prison

12   violence.

13         As a prison warden, Defendant Felker's decision to impose or terminate a modified

14   program in response to violent incidents and unrest among inmates is a discretionary act, not

15   ministerial.  In fact, the Ninth Circuit has described such a decision as: (1) "delicate," (2)

16   requiring expertise in prison administration, and (3) requiring a careful balance of the obligation

17   to provide for prisoner and staff safety against prisoners' rights.  *Noble v. Adams*, 646 F.3d 1138,

18   1143-44 (9th Cir. 2011); *Norwood v. Vance*, 591 F.3d 1062, 1066, 1069-70 (9th Cir. 2010).

19   Accordingly, Defendant Felker is entitled to immunity under Government Code § 820.2.

20         Even though Defendants Wright and Foulk did not have decision-making authority to make

21   adjustments to or terminate the lockdowns or modified programs (Decl. Foulk at ¶ 8), they are

22   nonetheless entitled to discretionary act immunity.  As Facility Captains and Associate Wardens,

23   they participated in the decision-making process and made recommendations for changes in

24   programming based on relevant intelligence collected during the course of the investigation.  (*Id.*)

25   When making a recommendation to the prison's warden, Facility Captains and Associate

26   Wardens exercise tremendous discretion to ensure the safety and security of the prison, its staff,

27   and inmates.  These recommendations are based on experience and require consideration of a

28   number of complicated factors.  *Noble*, 646 F.3d at 1143-44; *Norwood*, 591 F.3d at 1066, 1069-

                                              35

1    70.  Because any recommendations made by Defendants Wright and Foulk required "personal

2    deliberation, decision, and judgment," they are also entitled to discretionary act immunity under

3    Government Code § 820.2.  *See McCorkle v. City of Los Angeles*, 70 Cal. 2d 252, 260-61 (1969)

4    (quoting *Morgan v. County of Yuba*, 230 Cal. App. 2d 938, 942-43 (1964)).

5                                          **CONCLUSION**

6        Given that none of the Plaintiffs face a threat of immediate and irreparable harm, their

7    claims for injunctive relief are moot.  Furthermore, Defendants Tilton, Wright, Foulk, Owen,

8    Hellwig, Vanderville cannot be held liable for damages because they did not implement, ratify, or

9    approve "race-based and excessively lengthy lockdowns," as Mitchell alleges in his second

10   amended complaint.  And an opposition to a summary-judgment motion is not the place for him

11   to raise new claims against these Defendants.

12       Defendants are entitled to summary judgment as a matter of law with regard to Mitchell's

13   Eighth and Fourteenth Amendment claims because they did not act with deliberate indifference

14   and the modified programs Mitchell experienced were narrowly tailored to further institutional

15   safety and security.  Alternatively, Defendants are entitled to qualified immunity because the law

16   was anything but clearly established at the time.

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

                                          36

1      Finally, Defendants are entitled to judgment in their favor with regard to Mitchell's state-

2   law claims for the following reasons:  (1) Mitchell fails to claim that Defendants Wright, Owen,

3   or Hellwig owed him a duty of care; (2) none of the Defendants breached a duty of care to

4   Mitchell; and (3) Defendants' response to the numerous outbreaks of violence on Facility C does

5   not go "beyond all bounds of decency."

6      For these reasons, Defendants are entitled to summary judgment as a matter of law.

7   Dated:  August 21, 2013                          Respectfully Submitted,

8                                                    KAMALA D. HARRIS
                                                     Attorney General of California
9                                                    DAMON G. MCCLAIN
                                                     Supervising Deputy Attorney General
10

11                                                   /s/ Erin Sullivan

12                                                   ERIN SULLIVAN
                                                     Deputy Attorney General
13                                                   *Attorneys for Defendants M. Cate, S.
                                                     Kernan, T. McDonald, G. Giurbino, J.
14                                                   Tilton, T. Felker, M. Wright, F. Foulk, D.
                                                     Vanderville, J. Owen, and
15  SA2011300596                                     D. Hellwig*
    20722588.doc
16

17

18

19

20

21

22

23

24

25

26

27

28

37

*R. Mitchell v. Cate, et. al.*
                                                     Case No. 2:08-CV-01196-TLN-EFB