1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11   ROBERT MITCHELL, et al.,

No.  2:08-CV-01196

12           Plaintiffs,

13     v.

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

14   MATTHEW CATE, et al.,

15           Defendants.

16

17           This matter is before the Court pursuant to Defendants Cate, Kernan, McDonald,

18   Giurbino, Tilton, Felker, Wright, Foulk, Vanderville, Owen and Hellwig's (collectively

19   hereinafter referred to as "Defendants") Motion for Summary Judgment.  (ECF No. 253.)

20   Plaintiffs Mitchell, Abdullah, Quezada and Trujillo (collectively referred to as "Plaintiffs")

21   oppose Defendants' motion.  (*See* ECF No. 280.)  The Court has carefully considered the

22   arguments raised by both parties.  For the reasons set forth below, Defendants' Motion for

23   Summary Judgment is GRANTED IN PART and DENIED IN PART.

24       **I.     FACTUAL AND PROCEDURAL BACKGROUND**

25           Plaintiff Robert Mitchell ("Mitchell") initiated this case pro se on May 30, 2008, to

26   challenge, among other things, a series of allegedly race-based lockdowns to which he was

27   subjected to while imprisoned at High Desert State Prison ("HDSP") beginning on September 12,

28

1

2006.  (Compl., ECF No. 1 at 12−14.)[1]  In his complaint, Mitchell alleges that he filed administrative appeals concerning the lockdown policy as it was applied to him and, in response to his appeals, the prison staff informed Mitchell that it was the policy of the California Department of Corrections and Rehabilitation ("CDCR") that "when there is an incident involving any race, all inmates of that race are locked up."  (ECF No. 1 at 15.)  Mitchell further alleged that the CDCR policy utilized ethnic groups as a classification in segmenting the inmate population during the process of establishing a regular program following an incident.  (ECF No. 1 at 15.)  Mitchell alleged that he was subjected to cruel and unusual punishment in violation of his Eighth Amendment rights as a result of the lockdowns and that the lockdowns violated his rights to equal protection and due process.  (ECF No. 1 at 17, 30−31, 38−44.)  Mitchell further alleged that prison officials took adverse actions against him in response to his filing of grievances and lawsuits, constituting unlawful retaliation, obstruction of justice, denial of access to the courts, thereby violating his due process and equal protection rights.  (ECF No. 1 at 17−27, 32−37, 45−48.)  Lastly, Mitchell asserted state-law claims of negligence and intentional infliction of emotional distress.  (ECF No. 1 at 48−51.)

The case was originally assigned to District Court Judge John A. Mendez, but was reassigned to visiting Judge Richard A. Jones of the Western District of Washington in January 2009.  (ECF No. 7.)  During pretrial proceedings, the court appointed counsel for Mitchell for the limited purpose of assisting him in settlement negotiations with Defendants.  (ECF No. 60.)  Counsel for Mitchell subsequently agreed to provide continuing representation to Mitchell and sought to amend the complaint in order to transform the case into a class action challenging allegedly race-based lockdowns throughout California's men's prisons.  (ECF Nos. 70, 74.)  Judge Jones directed the transfer of the case back to a judge within the Eastern District of California, concluding that it was "far from ideal for a judge sitting in the Western District of Washington to consider presiding over an action challenging policies at all of California's prisons."  (ECF No. 82 at 1.)  The case accordingly was reassigned to Judge John A. Mendez and

---

[1]      Page numbers cited herein refer to those assigned by the Court's electronic docketing system and not those assigned by the parties.

1 Magistrate Judge Edmund F. Brennan, who granted the motion to amend on September 22, 2011.

2 (ECF No. 83.)  Mitchell filed the second amended complaint ("SAC") on September 23, 2011.

3 (ECF No. 84.)

4    The SAC changed the case in the following ways:

5    (1) Adding three plaintiffs to the claims for injunctive and declaratory relief

6 regarding CDCR's lockdown policies who seek to act, along with plaintiff, as representatives of a

7 class of "all prisoners who are now or will in the future be housed in a men's prison under the

8 jurisdiction of CDCR and who are now or will in the future be subject to CDCR's policy and

9 practice of implementing race-based lockdowns" and a similar class of prisoners who are or will

10 be "subject to CDCR's policy and practice of implementing excessively lengthy lockdowns."

11 (ECF No. 84 at 6);

12    (2) Adding Defendants CDCR Secretary Matthew Cate, CDCR Undersecretary of

13 Operations Scott Kernan, CDCR Chief Deputy Secretary for Adult Operations Terri McDonald,

14 and CDCR Director of the Division of Adult Institutions George Giurbino in their official

15 capacities to the injunctive and declaratory relief claims.  (ECF No. 84 at 4−5);

16    (3) Deleting the claims for retaliation, denial of access to courts, and obstruction of

17 justice;

18    (4) and deleting Defendants T. Barnard, R. Beamon, R. Blanthorn, C. Buckley, D.

19 Cade, T. Kimzey, D. Leiber, T. Lockwood, A. Masuret, J. Mayfield, J. McClure, and J. Walker.

20 (ECF No. 84.)

21    The case was further narrowed on Defendants' November 2, 2011, motion to

22 dismiss.  (ECF No. 92.)  The court dismissed Mitchell's Eighth and 14th Amendment claims

23 based on lockdowns that occurred before September 12, 2006 as unexhausted and limited his state

24 law damages claims to the period from February 28, 2007 through December 5, 2007.  (ECF Nos.

25 107, 114.)

26    On March 5, 2013, Plaintiffs filed a motion to certify class as well as a motion for

27 preliminary injunction.  (ECF Nos. 155, 156.)  On April 3, 2013, this case was assigned to the

28 undersigned.  (ECF No. 178.)  Subsequently, Plaintiffs filed a request for the district court to hear

1   its pending motions for class certification and injunctive relief pursuant to Eastern District of

2   California Local Rule 302(d).  (ECF No. 182.)  Before the Court had an opportunity to rule on

3   Plaintiffs' request, Defendants filed their motion for summary judgment.  (ECF No. 253.)

4           On August 5, 2013, the Court granted Plaintiffs request stating that "because

5   Plaintiffs' class certification and preliminary injunction motion, as well as Defendants' summary

6   judgment motion, are likely to require de novo review, this Court finds that judicial economy

7   would be best served by this Court retaining all future motions associated with this case."  (ECF

8   No. 278.)  Thus, this Court retained all matters associated with this case going forward and

9   addresses Defendants Motion for Summary Judgment below, prior to deciding Plaintiffs' motion

10  for class certification.  *See Saeger v. Pac. Life Ins. Co.*, 305 F. App'x 492, 493 (9th Cir. 2008)

11  ("We have previously held that, '[u]nder the proper circumstances—where it is more practicable

12  to do so and where the parties will not suffer significant prejudice—the district court has

13  discretion to rule on a motion for summary judgment before it decides the certification issue.'")

14  (quoting *Wright v. Schock*, 742 F.2d 541, 543–44 (9th Cir. 1984)).

15      **II.    STANDARD OF LAW**

16          Summary judgment is appropriate when the moving party demonstrates no

17  genuine issue as to any material fact exists, and therefore, the moving party is entitled to

18  judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

19  157 (1970).  Under summary judgment practice, the moving party always bears the initial

20  responsibility of informing the district court of the basis of its motion, and identifying those

21  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together

22  with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of

23  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party

24  will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may

25  properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and

26  admissions on file."  *Id.* at 324 (internal quotations omitted).  Indeed, summary judgment should

27  be entered against a party who does not make a showing sufficient to establish the existence of an

28  element essential to that party's case, and on which that party will bear the burden of proof at

1  trial.  *Id.* at 322.

2          If the moving party meets its initial responsibility, the burden then shifts to the

3  opposing party to establish that a genuine issue as to any material fact actually does exist.

4  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585−87 (1986); *First Nat'l*

5  *Bank v. Cities Serv. Co.*, 391 U.S. 253, 288−289 (1968).  In attempting to establish the existence

6  of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

7  required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

8  material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing

9  party must demonstrate that the fact in contention is material, i.e., a fact that might affect the

10  outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

11  (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12  return a verdict for the nonmoving party.  *Id.* at 251−52.

13          In the endeavor to establish the existence of a factual dispute, the opposing party

14  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

15  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

16  versions of the truth at trial."  *First Nat'l Bank*, 391 U.S. at 288−89.  Thus, the "purpose of

17  summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there

18  is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory

19  committee's note on 1963 amendments).

20          In resolving the summary judgment motion, the court examines the pleadings,

21  depositions, answers to interrogatories, and admissions on file, together with any applicable

22  affidavits.  Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305−06 (9th Cir.

23  1982).  The evidence of the opposing party is to be believed and all reasonable inferences that

24  may be drawn from the facts placed before the court must be drawn in favor of the opposing

25  party.  *Anderson*, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is

26  the opposing party's obligation to produce a factual predicate from which the inference may be

27  drawn.  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244−45 (E.D. Cal. 1985), *aff'd*,

28  810 F.2d 898 (9th Cir. 1987).  Finally, to demonstrate a genuine issue that necessitates a jury trial,

1   the opposing party "must do more than simply show that there is some metaphysical doubt as to

2   the material facts." *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not

3   lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

4   *Id.* at 587.

5       **III.   ANALYSIS**

6           Defendants present multiple arguments in support of their motion for summary

7   judgment.  The Court notes that the fifty-three pages discussing Defendants' mootness claims

8   seem to be intertwined with its arguments as to the constitutionality of Defendants' policy.  The

9   Court has attempted to identify the individual arguments and address each one separately.

10  Therefore, to the extent that Defendants' mootness arguments raise substantive constitutional

11  arguments, the constitutional arguments are not addressed in conjunction with Defendants'

12  mootness arguments.  Instead, the Court addresses these arguments as they are presented within

13  the section of Defendants' brief.  Accordingly, the Court first addresses the standard for mootness

14  and then addresses Defendants' mootness arguments concerning all Plaintiffs collectively,

15  followed by a discussion of Defendants' arguments as to each Plaintiff separately.

16      **A.  Defendants' Contention that Plaintiffs' Claims Are Moot**

17          Defendants make numerous arguments contending that Plaintiffs' claims are moot.

18  The "heavy burden" of persuading the court that the challenged conduct cannot reasonably be

19  expected to start up again lies with the party asserting mootness.  *Adarand Constructors, Inc. v.*

20  *Slater*, 528 US 216, 222 (2000).  "A case is moot when the issues presented are no longer 'live'

21  or the parties lack a legally cognizable interest in the outcome."  *City of Erie v. Pap's A.M.*, 529

22  U.S. 277, 287 (2000).  The mootness doctrine contains two requirements: that the underlying

23  issue be "live" and that the particular party pursuing it have a "legally cognizable interest in the

24  outcome."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v.*

25  *McCormack*, 395 U.S. 486, 496 (1969)); *see also* 1 Newberg on Class Actions § 2:9 (5th ed.).

26  The central issue in any mootness challenge is whether changes in the circumstances existing

27  when the action was filed have forestalled any meaningful relief.  *West v. Sec'y of Dept. of*

28  *Transp.*, 206 F.3d 920, 925 (9th Cir. 2000).  "[T]he question is not whether the precise relief

6

1    sought at the time the application for an injunction was filed is still available.  The question is

2    whether there can be *any* effective relief."  *Id.* at 925 (emphasis added; internal quotes omitted).

3    "Unless the prevailing party can obtain effective relief, any opinion as to the legality of the

4    challenged action would be advisory."  *City of Erie*, 529 U.S. at 287.

5           There are exceptions to the mootness doctrine, such as the "capable of repetition

6    doctrine" and the "class certification doctrine."  The "capable of repetition doctrine" applies

7    where the named plaintiff can make a reasonable showing that he will again be subjected to the

8    alleged illegality."  *Alvarez v. Smith* 558 US 87, 93 (2009).  This typically arises where the issues

9    involve events of such short duration that they are over by the time the matter gets to court—e.g.,

10   pregnancy, labor strikes or political campaigns.  *See Sosna v. Iowa*, 419 U.S. 393, 401 (1975).  It

11   must be shown that the challenged action was too short in duration to be fully litigated while in

12   existence and that there is a reasonable expectation that the plaintiff—or a class he or she

13   represents—will be subject to the same action again in the future.  *See Roe v. Wade*, 410 U.S.

14   113, 125 (1973); *United States v. Juvenile Male*, 131 S. Ct. 2860, 2865 (2011).

15          In contrast, the class certification doctrine allows a named plaintiff's claim which

16   has become moot after the district court has ruled on a motion for class certification, to not moot

17   the class action as a whole.  *Sosna*, 419 U.S. at 399−401; *see also U.S. Parole Comm'n v.*

18   *Geraghty*, 445 U.S. 388, 405−06 (1980) (holding that mooting of named plaintiff's claim after

19   denial of class certification did not moot plaintiffs' claims so as to prevent them from appealing

20   the adverse class determination).  The Supreme Court has never considered, and the lower courts

21   remain split, on the question of whether (and under what circumstances) the mooting of the

22   named plaintiff's claims before a decision has been made on class certification will moot the class

23   action. *E.g. Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1531–32 (2013); *Deposit*

24   *Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 329–30 (1980).

25          **i.      Defendants' Arguments Concerning All Plaintiffs**

26          Defendants seem to make two arguments that pertain to the alleged mootness of all

27   of the Plaintiffs' claims.  Accordingly, the Court addresses these claims first and then addresses

28   Defendants' claims as to each individual Plaintiff below.

1        a.  Decline in Prison Population

2            Defendants allege that the prison population has declined significantly since 2006,

3    and thus Plaintiffs are no longer subjected to the lengthy confinements that were prevalent at the

4    time the complaint was filed.  (ECF No. 254 at 23.)   The Court construes Defendants' briefing as

5    arguing that because of the decline in the prison population, Plaintiffs no longer suffer an injury,

6    and thus their claims are moot.  The Court finds this argument unavailing because Defendants do

7    not allege that the race-based lockdown policy is no longer employed.  Instead, Defendants argue

8    that the lockdowns are much shorter.  The fact that Plaintiffs' lockdowns are shorter does not

9    negate Plaintiffs' allegations that they are locked down for no other reason than race and that the

10   alleged policy is unconstitutional.  Moreover, the Eastern District of California has found as

11   recently as 2013 that California prisons are still suffering from populations over design capacity.

12   *See Coleman v. Brown*, 922 F. Supp. 2d 1004, 1012 (E.D. Cal. 2013) ( finding that the state failed

13   to establish it had achieved durable remedy to prison crowding that prevented the state from

14   providing inmates with the mental health and medical care required by Eighth Amendment, as

15   required for vacatur of order of three-judge panel of district court, which required the state to

16   reduce prison population to 137.5% of design capacity).  Therefore, this argument fails.

17       b.  The CDCR's New Policy

18           Defendants also argue that the CDCR has "implemented the 'Security Threat

19   Group Prevention, Identification, and Management' pilot program (STG pilot program)."  (ECF

20   No. 254 at 23.)  Defendants contend that "these measures, combined with new lockdown and

21   modified program protocols implemented in October 2012 have already resulted in a dramatic

22   decrease in the number and length of lockdowns and modified programs."  (ECF No. 254 at 23.)

23           Again, the Court construes Defendants' briefing to argue that Plaintiffs' case is

24   moot due to the CDCR's new policy.  Although the facts alleged by Defendants support

25   Defendants' contention that the CDCR is succeeding in implementing different policies, they do

26   not negate the fact that there are material issues of fact as to whether the previous race-based

27   policy is being used in conjunction with the new policy.  Furthermore, Plaintiffs have alleged that

28   the "new policy" utilizes the same race-based criteria that its predecessor employed.  (ECF Nos.

8

1  280 at 43; Pls.'s Statement of Disputed Facts, No. 283 at ¶¶ 118–20; ECF Nos. 158 & 158-3

2  (Evenson Decl., ¶ 6 & Ex. C) at 113:13–114:12, 184:12–185:13.)  As such, the Court finds that

3  summary judgment is not appropriate because material issues of fact exist concerning whether the

4  alleged unconstitutional race-based policy is still being utilized.  Thus, the Court turns to

5  Defendants' mootness claims as to the Plaintiffs individually.

6              **ii.      Defendants' Mootness Arguments as to Individual Plaintiffs**

7                    a.   Plaintiff Trujillo

8         Defendants argue that Plaintiff Trujillo ("Trujillo") has been released on parole,

9  and thus his claims are moot.  (ECF No. 254 at 21.)  This Court agrees.  "An inmate's release

10 from prison while his claims are pending generally will moot any claims for injunctive relief

11 relating to the prison's policies unless the suit has been certified as a class action."  *Dilley v.*

12 *Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995) (citing *Preiser v. Newkirk*, 422 U.S. 395, 402−03

13 (1975); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991); *Darring v. Kincheloe*, 783 F.2d

14 874, 876 (9th Cir. 1986)).  Plaintiffs contend that Trujillo's claim is not moot pursuant to the

15 Ninth Circuit's opinion in *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2009).  In *Rodriguez*, the

16 Ninth Circuit held that "mootness of the Petitioner's claim is not a basis for denial of class

17 certification, but rather is a basis for dismissal of Petitioner's action."  *Id.* at 1117.  There the

18 panel held "[b]ecause the district court did not dismiss Petitioner's action, but only denied class

19 certification, we see no reason to conclude it based its denial on a finding of mootness.  If it had

20 made such a finding, it would have been in error."  *Id.*  Thus, the Ninth Circuit held that mootness

21 would be an appropriate reason to dismiss a claim, but would not be an appropriate reason to

22 deny class certification.  *Id.*  As such, *Rodriguez* does not bar this Court from dismissing

23 Trujillo's claim.

24         Plaintiffs assert that although Trujillo was released on parole, he is still subject to

25 renewed detention, and thus his claims are not moot.  (ECF No. 280 at 38.)  However, Plaintiffs'

26 mere assertion does not demonstrate that Trujillo has a reasonable expectation that he will return

27 to prison and in turn be subjected to the policy at issue.  Accordingly, the blanket conclusion that

28 Trujillo may be subjected to the CDCR policy in the future is too speculative to prevent

mootness.  *See Dilley*, 64 F.3d at 1369; *Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985);

*see also Reimers v. Oregon*, 863 F.2d 630, 632 & n. 4 (9th Cir. 1988) (holding that plaintiff who

had been released from prison had no reasonable expectation of return because such return would

occur only if the plaintiff committed additional criminal acts).  Thus, the Court finds that

Trujillo's claim for injunctive relief is moot and, therefore, must be dismissed.

> b.  Plaintiff Abdullah

Defendants next argue that Plaintiff Abdullah's ("Abdullah") claims are moot

because the prison where he is incarcerated—California State Prison Solano—is presently under a

court order prohibiting the CDCR from imposing race-based lockdowns.  (ECF No. 254 at 22.)

The Court agrees with Defendants and finds that the decision in *In re Haro*, No. FCR282399

(Cal. Super. Ct., Jan. 18, 2013), moots Abdullah's request for injunctive relief.

In *Haro*, the Solano Superior Court held that the CDCR's lockdown policy could

not survive a strict scrutiny analysis, as required by the United States Supreme Court's decision in

*Johnson v. California*, 543 U.S. 499 (2005).  *In re Haro*, No. FCR282399 (Cal. Super. Ct., Jan.

18, 2013).  Thus, the court ordered the CDCR to:

> 1)  refrain from affording preferential treatment to inmates on the
> basis of ethnicity. Specifically, respondent shall not subject any
> inmate, including petitioner, to its "modified program" or any other
> version of "lockdown" based on that inmate's race or ethnic
> background alone.  While respondent, it [sic] its discretion, may
> lockdown all or part of the prison, and may release inmates from
> lockdown based upon individual behavior and upon informed
> predictions of individual behavior, it may not do so on the basis of
> ethnicity.  Specifically, any assumption about affiliation with,
> support of, or adherence to gang leadership used as a basis for
> imposition of a modified program must be based on the specific
> history, conduct and relationships of that inmate.
>
> (2) Respondent shall no longer subject petitioner or any other
> inmate to any of the six classifications currently being utilized for
> its modified program or any other lockdown program and shall
> either eliminate any general classification system or otherwise
> recreate a classification system that is not race-based but instead
> relies of [sic] specific, objective factors pertaining to an inmate's
> history, conduct and associations.
>
> At a minimum, any such classification system must:
>
> a. Preclude an inmate's inclusion in a specific classification based
> on his ethnic or geographic background alone.

b. Preclude classification (resulting in a lockdown or similar loss of privileges) to inmates who have no history of conduct or associations that establish that the inmate would in fact adhere to the dictates of that classification's leadership.

c. Preclude arbitrary classifications that unduly focus on certain ethnicities  (i.e. Hispanics) while wholly ignoring others (i.e. Asians).

d. Omit classifications such as "other" that do not in any meaningful manner affirmatively describe attributes of the inmate receiving such a classification.

*Id.*

The situation here is similar to the one faced by the Ninth Circuit in *Enrico's, Inc. v. Rice*, 730 F.2d 1250 (9th Cir. 1984).  In *Enrico*, a cafe owner filed an action for injunctive and declaratory relief against a price-posting procedure of California Department of Alcoholic Beverage Control.  While the case was pending before the district court, the California Court of Appeals for the First District issued its decision in *Lewis-Westco Co. v. Alcoholic Beverage Control Appeals Bd.*, 136 Cal. App. 3d 829 (1983), invalidating the price-posting scheme at issue as violative of the Sherman Act.  *Id.* at 840.  After the parties informed the district court of the decision in *Lewis-Westco*, the district court asked the parties whether they still wanted the district court to render a decision on their pending summary judgment motion.  The parties requested a ruling, and the district court granted summary judgment, finding that the price-posting procedure did not constitute per se violation of the Sherman Act.  The plaintiff appealed.

The Ninth Circuit held that in light of the California Court of Appeal's holding that the price-posting scheme was invalid and the department's subsequent cessation of its enforcement of the price-posting scheme, the appeal was moot for purposes of injunctive and declaratory relief.  *Enrico's*, 730 F.2d at 1254.  The same principle applies here.  The Solano Superior Court has already granted the injunctive relief sought by Abdullah.  Therefore, this Court finds that it cannot offer injunctive relief that the Solano Superior Court has already granted, and thus Abdullah's claim is moot.  *See id.*; *see also City of Erie*, 529 US at 287 (holding that "unless the prevailing party can obtain effective relief, any opinion as to the legality of the challenged action would be advisory").

11

1      Abdullah contends that his claim is not moot because, although the CDCR has

2  been ordered to stop and has made statements that it will comply, the CDCR's past conduct

3  reflects an indifference to such orders and implies that it will continue implementing the policy.

4  (ECF No. 280 at 39–41.)  This exact argument was found unpersuasive in *Enrico's*.  730 F.2d at

5  1253.  There, the Ninth Circuit stated "[i]n the case at bar we cannot see the threat of a real or

6  immediate injury to plaintiff that is necessary to demonstrate the existence of a case or

7  controversy.  Past wrongs are not enough for the grant of an injunction."  *Id.* (citing *City of Los*

8  *Angeles v. Lyons*, 461 U.S. 95, 103 (1983)).  As such, this Court also rejects this argument.

9      Additionally, to the extent that Abdullah contends that a federal decision is needed

10  to enforce the Superior Court's order, this argument contradicts established principles of comity.

11  "If the equitable relief requested requires intrusive follow-up into state court proceedings, it

12  constitutes 'a form of the monitoring of the operation of state court functions that is antipathetic

13  to established principles of comity.'"  *E.T. v. George*, 681 F. Supp. 2d 1151, 1162 (E.D. Cal.

14  2010) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 500 (1974)).  Thus, this Court declines

15  Plaintiffs' invitation to intervene in the California state court's decision.[2]

16          c.  Plaintiff Mitchell

17      Defendants contend that Plaintiff Mitchell's ("Mitchell") claim for injunctive relief

18  is moot because "since January 2012, Mitchell has been subjected to no more than five modified

19  programs at Folsom State Prison, all of which were exceedingly short."  (ECF No. 254 at 25.)

20  Defendants also contend that "[t]o the extent any of these modified programs affected a particular

21  racial group, they were narrowly tailored to further prison safety and security" and that "because

22  there is no reasonable expectation that Mitchell will be subjected to the same allegedly

23  unconstitutional conditions again, his claim for injunctive relief is moot."  (ECF No. 254 at 25.)

24  In support of their contention, Defendants list and provide a brief summary of the events

25  concerning the lockdowns that Mitchell was subjected to during 2012.

26      Defendants' briefing seems to conflate the issue of mootness with their arguments

27

28  [2]      Because the Court dismisses Abdullah's claim, there is no need to address Defendants' other contentions that Abdullah was not subjected to excessively lengthy, race-based lockdowns or modified programs.

concerning whether the policy is unconstitutional.  In fact, Defendants use much of their eighty-eight page brief recounting specific lockdown events as they pertain to each of their arguments.  Because these arguments are inextricably intertwined in the briefing, the Court will briefly address Defendants' assertions as they pertain to their mootness arguments and will address in more detail Defendants' substantive arguments in later sections of this Order.  In doing so, the Court has attempted to provide an abridged version of the facts pertaining to specific lockdowns below:

### December 29, 2011 modified program at Folsom State Prison (FSP-11-12-019)

> On December 29, 2011, a riot involving 50 to 60 Black and White inmates took place in Folsom State Prison's #1 Dining Room. (DUF 17; see also Decl. Cahaya at ¶ 7 & Ex. A.) #1 Dining Room is a relatively small dining area, seating approximately 120 inmates. (Decl. Cahaya at ¶ 7.)  Therefore, almost half of the inmates in the #1 Dining Room for the evening meal were involved in this particular riot. (*Id.*)  Facing significant security risks, prison officials placed all Black and White inmates (and their cell partners) throughout the institution on modified program pending an investigation and Administrative Review. (*Id*; *see also* DUF 18, Cahaya Decl. Ex. A.) . . . Based on the investigation results and the inmate population's positive behavior and conduct, it was determined that all Black and White inmates (and their cell partners) in Housing Unit 1 could return to a complete normal program at 1:00 a.m. on January 5, 2012. (*Id.*)

(ECF NO. 254 at 25.)  Defendants stated that this incident was a "race riot" that necessitated a race-based lockdown.  (ECF No. 254 at 26.)  In further support of their contention that the policy is narrowly tailored, Defendants stated:

> [O]nly the involved racial groups were placed on modified program while prison staff investigated which inmates or disruptive groups were involved and whether future violence between the warring racial groups would continue if the modified program were lifted. By limiting the modified program to the involved racial groups, officials narrowly tailored the modified program to further prison safety and security.

(ECF No. 254 at 26.)

### February 25, 2012 modified program at Folsom State Prison (FSP-12-02-001)

> On February 25, 2012, Folsom State Prison officials implemented a modified program after an inmate battery with a weapon took place,

13

resulting in the inmate's death. (DUF 21.)   As a result of this incident, all 2,829 inmates in all housing units across the institution were placed on modified program pending an investigation and Administrative Review.   (*Id*; *see also* Decl. Cahayla at ¶ 9 & Ex. B.) . . . On February 27, 2012, only inmates in Housing Unit 2 and all White inmates throughout the institution remained on modified program. (DUF 23.)  On February 29, 2012, the modified program was narrowed to White inmates only. (DUF 24.)  By March 2, 2012, the circumstances surrounding the incident had been thoroughly investigated and addressed and all inmates were returned to a complete normal program. . . . because Mitchell lived in Housing Unit 1 at the time, the modified program would have only affected Mitchell for two days. (DUF 26, DUF 23; *see also* Decl. Cahayla at ¶ 9 & Ex. B.) A two-day denial of yard time is not unconstitutional. *See Hayward*, 629 F.2d at 603.  And for those two days, Mitchell was not locked down "solely on account of his race" because the modified program did not separate racial groups. It affected all inmates from all housing units at Folsom State Prison. (DUF 22.) Accordingly, modified program #FSP-12-02-001 did not violate Mitchell's Eighth or Fourteenth Amendment rights.

(ECF No. 254 at 26−27.)

### March 6, 2012 modified program at Folsom State Prison (FSP-12-03-003)

On March 6, 2012, approximately 100 Black inmates violently rioted on the main recreation yard at Folsom State Prison.  (DUF 27.) Only Black inmates were involved in the riot.  (Decl. Cahayla at ¶ 11.) Immediately after the riot, Folsom State Prison's warden initiated a modified program that affected all Black inmates to ensure their safety while correctional staff tried to determine why the riot happened and whether more violence among Black inmates was likely to occur.  (DUF 28; see also Decl. Cahayla at ¶ 11 & Ex. C.)   On March 7, 2012, less than twenty-four hours later, the modified program was amended so that it only impacted the three involved disruptive groups: the Crips, the Bloods, the Bay Area affiliates, and their cell partners.   (DUF 29.)   All other Black inmates were released to normal program. (Id.) Because Mitchell allegedly celled with a Blood during this time, this modified program ostensibly affected him.  (Decl. Sullivan at ¶ 9 and Ex. H [Mitchell Dep. Excerpts] at 98:6-10, 14-18.) . . . On March 20, 2012, the investigation revealed there was no further tension between the affected groups. (Decl. Cahayla at ¶ 11 & Ex. C.) Therefore, the modified program was terminated and all of the affected gang members and their cell partners in Housing Unit 1 returned to normal program. (Id; see also DUF 33.)  Modified program #FSP-12-03-003 lasted about two weeks.  (Decl. Cahayla at ¶ 11 & Ex. C.)

(ECF No. 27−28.)   Defendants contend that the two-week modified program was not

unconstitutional because "it was implemented in the narrowest degree possible to re-establish

14

prison security and to ensure the safety of inmates and staff. Only members from the Black

inmate population were involved in the large riot so inmates of other races were not placed on

modified program.  (ECF No. 28.)

### July 16, 2012 modified program at Folsom State Prison (FSPCUS-12-005)

On July 16, 2012, a riot occurred on the Folsom State Prison main yard basketball court involving 10-15 Black inmates affiliated with the Bay Area and Crip disruptive groups.  (DUF 34.)  Given the scale of the incident, a Code 3 alarm was announced over the institutional radio, requesting the immediate assistance of all available prison staff. (Decl. Cahayla at ¶ 13.)   All inmates affiliated with these disruptive groups and their cell partners were placed on modified program pending an investigation and Administrative Review. (Id; see also DUF 34.) This modified program affected 429 gang-affiliated Black inmates and their cell partners —35% of the Black inmate population at Folsom State Prison at the time. (Decl. Cahayla at ¶ 13.)

(ECF No. 254 at 29.)  Defendants again argue that this modified program was not

unconstitutional because it was "implemented in a narrowly tailored manner and under

circumstances in which such a measure was necessary to protect the safety of inmates and staff,"

and further that it "was not 'race based' because it only placed members of the Bay Area

Affiliates and the Crips gang on modified program, and not a racial group."  (ECF No. 254 at 30.)

### October 12, 2012 modified program at Folsom State Prison (FSP-CUS-12-010)

On October 12, 2012, a riot involving 9 inmates affiliated with the Blood disruptive group erupted on Folsom State Prison's main exercise yard.  (DUF 37.)  This modified program did not affect Mitchell because he previously testified that his cell partner affiliated with the Bloods moved shortly after the March 6, 2012 riot and he has not since been celled with an inmate affiliated with the Bloods.   (Decl. Sullivan at ¶ 9 & Ex. H [Mitchell Dep. Excerpts] at 99:21-23;100:2; 104:21-24; 105:11-21.)

(ECF No. 254 at 30.)

### October 16, 2012 modified program at Folsom State Prison (FSP-CUS-12-011)

On October 16, 2012, Folsom State Prison staff discovered numerous uncontrolled weapons in a Common Area.  (DUF 39.) Accordingly, all 2,456 inmates throughout the institution were placed on modified program pending an investigation and

1   Administrative Review.  (DUF 40; *see also* Decl. Cahayla at ¶ 18 &
    Ex. F.) . . . All inmates returned to normal program at 1:00 A.M. on
2   October 23, 2012, once prison staff verified that any unrest among
    general population inmates had subsided. (*Id*; *see also* DUF 41.)
3   Modified program #FSP-CUS-12-011 lasted about one week.
    (Decl. Cahayla at ¶ 18.)
4
    (ECF No. 254 at 30−31.)
5

6           In sum, Defendants seem to assert that Mitchell's claim is moot because the

7   lockdowns were narrowly tailored and thus did not violate Mitchell's constitutional rights.

8   Defendant's argument goes to the merits of Mitchell's claim and thus does not support

9   Defendant's assertion that Mitchell's claim is moot.  Moreover, Defendants' arguments

10  concerning the merits fail to allege that this policy is the least restrictive option, i.e. that

11  Defendants considered any alternatives to a race-based policy.  *See Wygant v. Jackson Bd. of*

12  *Educ.*, 476 U.S. 267, 280 (1986) ("Under strict scrutiny the means chosen to accomplish the

13  State's asserted purpose must be specifically and narrowly framed to accomplish that purpose.

14  Racial classifications are simply too pernicious to permit any but the most exact connection

15  between justification and classification.") (quotation marks and citations omitted); *see also*

16  *Crawford v. Lungren*, 96 F.3d 380, 386 (9th Cir. 1996) ("To pass constitutional muster, content-

17  based restrictions must be the least restrictive alternative available.") Although courts normally

18  apply deferential review standards to prison policies, the U.S. Supreme Court has consistently

19  refused to apply this standard where racial classification is at issue.  *See Johnson v. California*,

20  543 U.S. 499, 500 (2005).  Defendants have failed to show that the policy meets the strict scrutiny

21  standard.

22          Furthermore, Defendants' contention that they have implemented a new policy

23  does not suffice to moot Mitchell's claims because Mitchell has presented evidence that the

24  CDCR's policy of using racial classification to impose lockdowns has not been changed by the

25  new policy.  (*See* ECF No. 280 at 43 (citing Ex. C, ECF No. 158-3 at 184:1−6).)  Consequently,

26  because Defendants have not offered evidence that the race-based policy is now defunct, there is

27  nothing speculative about the likelihood that the policy will be utilized in the future.

28  Furthermore, the blanket statements offered by Defendant—"[t]he [new] policy states that

1    officials shall not target a specific racial or ethnic group unless it is necessary and narrowly

2    tailored to further a compelling government interest, such as restoring security and order after an

3    incident or protecting the health and safety of the inmates and staff" —employs the language used

4    in the legal standard for strict scrutiny, but fails to provide any evidence that the policy is actually

5    narrowly tailored.  (*See* ECF Nos. 297 at 21, 238 at ¶ 42.)  In fact Defendant's blanket statements

6    conflict with statements made in the declaration of Associate Director for the High Security

7    Mission at the CDCR Kelly Harrington.  She stated that in an emergency situation, the new policy

8    allows the Warden to "implement, on a short-term basis (typically up to two weeks), a modified

9    program or lockdown that separates inmates on the basis of race or ethnicity."  (ECF No. 238 at ¶

10   42.)  Thus, there is a material issue of fact as to whether the race-based policy at issue is currently

11   being applied or may be applied to Mitchell in the future.  Therefore, Mitchell's claims are not

12   moot.

13              d.   Plaintiff Quezada[3]

14              Defendants contend that Plaintiff Quezada's ("Quezada") claims are moot because

15   since 2012, Quezada has only been subjected to one modified program (lockdown), which

16   affected Facilities 4A1, 4A2, and 4B and was not based on ethnicity.  (ECF No. 254 at 31.)

17   Again, as discussed above, this argument fails because Defendants do not show that the CDCR no

18   longer utilizes a race-based lockdown policy.  The fact that Quezada had not been subjected to a

19   lockdown in 2012 does not negate the fact that Quezada was subjected to race-based lockdowns

20   in February 2010, December 2010 and January 2011.  (ECF No. 84 at ¶¶ 59−60.)  Nor does it

21   show that the lockdown policy is not still being utilized, and that Quezada is unlikely to continue

22   to be subjected to such lockdowns in the future.  Furthermore, Quezada disputes Defendants'

23   contention that the lockdown was not based on ethnicity.  Specifically, Quezada alleges that Kern

24   Valley State Prison imposed a lockdown on all prisoners who were racially classified as "Other"

25   after an incident involving a prisoner classified as "Asian Other."  (ECF No. 84 at ¶ 57.)

26   Quezada further alleges that this incident resulted in him being locked down solely based on his

27

28   [3]        Defendants' memorandum in support of summary judgment (ECF No. 254) refers to Plaintiff Quezada as
     "Quesada."

classification as "Hispanic Other." (ECF No. 84 at ¶¶ 56–57.) The lockdown allegedly lasted for 90 days, during which Quezada was "typically confined to his cell for 24-hours per day, deprived of outdoor exercise, and deprived of visits with his family." (ECF No. 84 at ¶¶ 57–60.) For the foregoing reasons, the Court finds that Defendants have not met their burden of showing that a live controversy no longer exists, and therefore, Quezada's claims are not moot. Consequently, the Court next addresses Defendants' arguments concerning their affirmative defenses.

## B. Defendants' § 1983 Affirmative Defenses

Defendants allege that they are entitled to summary judgment on numerous affirmative defense theories concerning specific Defendants. The Court addresses each claim individually below.

### i. Respondeat Superior

In this case at issue, Defendant Tilton ("Tilton") is the former Secretary of CDCR and is being sued in his individual capacity. (ECF No. 84 at ¶ 18.) Defendants contend that Tilton cannot be held liable for Mitchell's § 1983 claims because he was not involved in the implementation, modification, or termination of the modified programs at High Desert State Prison, and further that the doctrine of respondeat superior does not apply to § 1983 claims. (ECF No. 254 at 40.) In response, Plaintiffs argue that the record reflects that as Secretary of the CDCR Tilton was required to approve all lockdown or modified programs that:

> (1) [affected] all housing units/sub-facilities within a facility's security perimeter for more than 24 hours.
>
> (2) A lockdown or modified program of fewer than all housing units/sub-facilities within a facility's security perimeter is to exceed 72 hours.
>
> (3) The suspension of a facility's major program or operation is to exceed 72 hours; e.g., an academic or career technical education program, visiting program, yard operation, or dining room operation.

Cal. Code Reg., tit. 15 § 3383(c). In addition, Plaintiffs cite to the CDCR's 2007 policy (ECF No. 158-9) and the deposition of the current CDCR Secretary, Jeffrey A. Beard (ECF No. 284-2) in support of their allegation that Tilton implemented the prison lockdowns. The CDCR's 2007

18

Policy states:

> Pursuant to the California Penal Code, the Secretary of the California Department of Corrections and Rehabilitation (CDCR) through the various institutions is charged with the incarceration of these individuals sentenced to state prison.  In keeping with this responsibility, the Secretary, through the individual Wardens and the Division of Adult Institutions (DAI), shall establish and maintain unlock procedural guidelines.

(ECF No. 158-9 at 1.)  Likewise, Mr. Beard testified that although the lockdown policy was put into place before he became Secretary, "by virtue of his position, [he] would then be responsible for all the policies."  (ECF No. 284-2 6:10−12.)  In response, Defendants argue that Plaintiffs' opposition relies on Tilton's supervisory status and that Plaintiffs cannot establish the causal link necessary for liability.  (ECF No. 297 at 23.)

> The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the plaintiff's alleged deprivation.  *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  Supervisory personnel are customarily not liable under § 1983 for the actions of their employees under a theory of respondeat superior.  Thus, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978); *Brooks v. Felker*, 2:08-CV-2512 KJM KJN, 2011 WL 4898189 (E.D. Cal. Oct. 13, 2011).  "Supervisors can be held liable for: (1) their own culpable action or inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the constitutional deprivation of

1    which a complaint is made; or (3) for conduct that showed a reckless or callous indifference to the

2    rights of others." *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (citing *Larez v. City*

3    *of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)).  Accordingly, to establish liability, Plaintiffs

4    must offer specific facts to satisfy one of the prongs.  Vague and conclusory allegations

5    concerning an official's involvement in civil rights violations are not sufficient.  *See Ivey v. Bd. of*

6    *Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

7            Defendants' primary argument is that *Brooks v. Felker*, 2011 WL 4898189, at *4,

8    held that the Secretary of the CDCR could not be held liable for a policy that violates inmates'

9    civil rights.  The Court finds that Defendants' reliance is misplaced.  In *Brooks*, the district court

10   denied a prisoner's request to amend his complaint to add the Secretary of the CDCR as a

11   defendant in his equal protection claim.  In making this determination, the district court

12   considered that Defendants had supplied a declaration stating that the Secretary had "no role in

13   the decision to implement, modify or terminate the lockdowns," and further found that the

14   "plaintiff failed to demonstrate diligence or good cause to add these defendants or proposed new

15   claims concerning CDCR regulations." *Id.* at *3−4.  Here, Plaintiffs have supplied the Court not

16   only with a policy stating that the Secretary must approve lockdowns, but also the testimony of

17   the current Secretary stating that he is responsible for all policies per his position.  In contrast,

18   Defendants have not provided evidence that Titlon was not involved in approving the lockdowns.

19   Thus, the Court finds that Tilton's involvement in the lockdowns constitutes a material issue of

20   fact and Defendants have not met their burden under *Celotex*.  477 U.S. at 323 (holding that

21   pursuant to summary judgment practice, the moving party always bears the initial responsibility

22   of demonstrating the absence of a genuine issue of material fact.)

23                    **ii.    Qualified Immunity**

24           Individual Defendants Felker, Vanderville, Owen, Hellwig, Titlon, Foulk, and

25   Wright[4] assert that qualified immunity bars Plaintiffs' § 1983 claims because Defendants did not

26   violate Plaintiffs' constitutional rights and further that there was no clearly established law

27   _____

28       [4]      Plaintiffs have sued Defendants Felker, Vanderville, Owen, Hellwig, Titlon, Foulk, and Wright in their
         individual capacity.  (*See* ECF No. 84 at ¶¶ 18–24.)

1   holding that their conduct was unconstituional at the time of the alleged violations.  (ECF No. 254

2   at 72−74.)  In response, Plaintiffs assert that Defendants did violate Plaintiffs' constitutional

3   rights and further that the policy at issue is governed by clearly established law established prior

4   to the time frame at issue.  (ECF No. 280 at 69.)  Since Plaintiffs' claims include both violations

5   of the Fourteenth and Eighth Amendment, the Court first addresses the legal standard for

6   qualified immunity and then addresses each alleged constitutional violation separately.

7           "Qualified immunity balances . . . the need to hold public officials accountable

8   when they exercise power irresponsibly and the need to shield officials from harassment,

9   distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555

10  U.S. 223, 231 (2009).  The doctrine of qualified immunity insulates government officials[5] from

11  civil damages in § 1983 litigation "insofar as their conduct does not violate clearly established

12  statutory or constitutional rights of which a reasonable person would have known."  *Pearson*, 555

13  U.S. at 231 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is an

14  affirmative defense; the burden of pleading it rests with the defendant.  *Crawford-El v. Britton*,

15  523 U.S. 574, 586−87 (1998) (citing *Gomez v. Toledo*, 446 U.S. 635, 639−41 (1980)).

16  Furthermore, because qualified immunity is "an immunity from suit rather than a mere defense to

17  liability . . . it is effectively lost if a case is erroneously permitted to go to trial."  *Pearson*, 555

18  U.S. at 231 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) [hereinafter *Forsyth*]).

19  Accordingly, the Supreme Court has repeatedly stressed the importance of resolving immunity

20  questions at the earliest possible stage in litigation.  *Id.* at 233−34 ("Because qualified immunity

21  protects government officials from suit as well as from liability, it is essential that qualified

22  immunity claims be resolved at the earliest possible stage of litigation.") (citing *Forsyth*, 472 U.S.

23  at 526).  In resolving the question of qualified immunity on a motion for summary judgment, the

24  _____

25  [5]      Qualified immunity protects only individuals, not municipalities or other governmental entities.
    *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993).  Because

26  defendants who are sued in their official capacity stand in the same shoes as the entity itself, qualified immunity does
    not apply.  *See, e.g., Hallstrom v. City of Garden City*, 991 F.2d 1473, 1482 (9th Cir. 1993) ("A municipality (and its

27  employees sued in their official capacities) may not assert a qualified immunity defense to liability under Section
    1983." (citing *Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *Kentucky v. Graham*, 473 U.S. 159, 165−68

28  (1985))).  Therefore, the Court considers only the claims against the defendants sued in their individual capacities.

court must view the facts in the light most favorable to the plaintiff (*see Schwenk v. Hartford*, 204 F. 3d 1187, 1198 (9th Cir. 2009), and can only grant the motion if defendants present evidence that would entitle them to a "directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).

The determination of qualified immunity requires a two-step test: (1) whether facts alleged, taken in the light most favorable to the injured party, show the defendants' conduct violated a constitutional right; and (2) whether the right was clearly established.  *Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc).  The first prong of the qualified immunity analysis is distinct from the inquiry on the merits of the constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Forsyth*, 472 U.S. at 527−28 (1985) ("A claim of immunity is conceptually distinct from the merits of the Plaintiff's claim that his rights have been violated.").

In deciding the second prong, the Court considers whether the contours of the right were sufficiently clear at the time that the action occurred so that a "reasonable official would understand that what he is doing violates that right." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The Supreme Court has referred to decisions of the Court of Appeals when enquiring whether a right is clearly established.  *See Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004); *Forsyth*, 472 U.S. at 533; *Davis v. Scherer*, 468 U.S. 183, 191−192 (1984).  "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640).   Thus, the Court makes a decision based on the reasonableness of an officer's understanding based on the applicable law.  *See id.*; *Boyd*, 374 F.3d at 781.   "However, a victim's constitutional rights may be clearly established in the absence of a case 'on all fours prohibiting [the] particular manifestation of unconstitutional conduct [at issue].'"  *Id.* (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)).  Where an officer's conduct "is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case

1    law is not required to show that the law is clearly established." *Id.* (quoting *Deorle*, 272 F.3d at

2    1286) (internal quotation marks omitted).

3           The Court decides in its discretion whether to address the first or second prong

4    first. *See Pearson*, 555 U.S. at 237.  However, if the Court initially addresses the first prong and

5    finds that no constitutional right was violated under the alleged facts, the inquiry ends and

6    defendants prevail. *Saucier*, 533 U.S. at 201.

7                    a.  Eighth Amendment Claim

8           Because the Court finds that the second prong of the two-part test is dispositive as

9    to Defendants' qualified immunity claim under the Eighth Amendment, the Court addresses the

10   second prong first.

11          The parties disagree as to whether a lack of exercise for extended periods of time

12   was a clearly established Eighth Amendment violation at the time of the underlying allegations.

13   Defendants cite *Norwood v. Cate*, No. 1:09-cv-0030-AWI-GBC, 2012 WL 3143928, at * 15

14   (E.D. Cal. Aug. 1, 2012), in support of its contention that the deprivation of exercise was not

15   clearly established as violating the Eighth Amendment throughout the 2006−2007 time period at

16   issue.[6]  In response, Plaintiffs contend that numerous Ninth Circuit opinions on point were

17   published prior to the alleged violations.  (ECF No. 280 at 71.)  Thus, this issue turns on whether

18   the deprivation of exercise was a clearly established Eighth Amendment violation throughout the

19   2006−2007 time period at issue.

20          "In the Ninth Circuit, we begin our inquiry by looking to binding precedent."

21   *Boyd*, 374 F.3d at 781; *see also Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985).  If the

22   right is clearly established by decisional authority of the Supreme Court or of this Circuit, our

23   inquiry should come to an end.  *See Boyd*, 374 F.3d at 781.  In 2009, the Ninth Circuit decided

24   *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010) (amended opinion) [hereinafter *Vance*], in

25   which the panel reversed the district court's denial of the defendant's motion for summary

26   _____

27   [6]        The Court notes that this case does discuss whether the denial of outdoor exercise has been clearly
     established as an Eighth Amendment violation.  However, this case was vacated by a subsequent opinion, *see
     Norwood v. Cate*, No. 1:09-cv-00330-AWI-SAB, 2013 WL 524270 (E.D. Cal. Feb. 11, 2013), and is thus not

28   properly citable.

                                                        23

judgment, finding that defendant officials were entitled to qualified immunity.  In *Vance*, a state

inmate brought a §1983 action, alleging that corrections officials violated the Eighth Amendment

by depriving him of outdoor exercise.  *Id.*  The prison initiated the lockdowns after a number of

serious inmate assaults on staff.  *Id.* at 1065.  During the lockdowns, inmates were confined to

their cells and normal programs were suspended while officials investigated the violence.  *Id.*

The case went to trial and a jury found that defendants violated Norwood's Eighth Amendment

right to outdoor exercise.  *Id.* at 1066.  Defendants appealed the verdict contending that the

district court erred in not providing defendants' proposed jury instruction.  *Id.*

The Ninth Circuit found that the trial court had erred in not giving the instruction,

but found that remanding for a new trial was unnecessary because defendants were entitled to

qualified immunity.  *Id.* at 1067−68.  In determining whether it would be clear to a reasonable

officer that denying outdoor exercise was unlawful in a situation where officers were trying to

curtail and prevent imminent violence, the Ninth Circuit held that "[t]he extraordinary violence

gripping the prison threatened staff and inmates alike, and there was a serious risk that gangs

would press unaffiliated inmates like Norwood into service [i.e., recruiting unaffiliated prisoners

to participate in prison riots]."  *Id.* at 1068.  Thus, the Ninth Circuit held that the officers acted

reasonably in implementing the lockdowns.  In doing so, the panel discussed *Allen v. Sakai*, 48

F.3d 1082 (9th Cir. 1995),[7] and petitioner's reliance on it in arguing that depriving him of

exercise violated his Eighth Amendment right:

> *Allen* does not hold that a prisoner's right to outdoor exercise is
> absolute and indefeasible, or that it trumps all other considerations.
> Plaintiffs in *Allen* survived summary judgment because prison
> officials there relied on "inconsequential logistical concerns" to
> justify denying outdoor exercise. Defendants here had substantial
> reasons for imposing the lockdowns: They were attempting to
> restore order during a series of brutal attacks, some lethal or nearly
> so.

*Id.* at 1068−69 (internal citations omitted).  Thus, the panel concluded that a reasonable officer

could have believed that the restriction of outdoor exercise was consistent with the Eighth

---

[7]    In *Allen*, the Ninth Circuit found that prison officials were not entitled to qualified immunity where they
denied prisoners exercise based on logistical issues.  *Allen* did not address whether such lockdowns would violate the
Eighth Amendment if imposed in response to incidents of violence within a prison.

1   Amendment: "[c]ertainly, no authority clearly established the contrary." *Id.* at 1700.

2   Again in 2011, the Ninth Circuit was charged with determining whether it would

3   be clear to a reasonable officer that denying outdoor exercise was unlawful in the wake of violent

4   prison inmate conditions. *See Noble v. Adams*, 646 F.3d 1138 (9th Cir. 2011). In *Noble*, a

5   prisoner, who resided in the Substance Abuse Treatment Center ("SATF") at Corcoran State

6   Prison during 2002 and 2003, claimed that he suffered violation of his rights under the Eighth

7   Amendment when he was denied outdoor exercise pursuant to lockdown procedures precipitated

8   by prison riots. *Id.* The district court denied defendant officials' summary judgment motion on

9   the merits and their qualified immunity assertion as to part of the lockdown time frame. The

10  Ninth Circuit reversed the district court, holding that:

11          We conclude pursuant to what is now known as prong 2 of the
            *Saucier v. Katz* test, that it was not clearly established in 2002—***nor
12          is it established yet***—precisely how, according to the Constitution,
            or when a prison facility housing problem inmates must return to
13          normal operations, including outside exercise, during and after a
            state of emergency called in response to a major riot, here one in
14          which inmates attempted to murder staff.

15  *Noble*, 646 F.3d at 1142−43 (emphasis added) (internal citations omitted).

16          Here, the conduct complained of occurred in 2006 and 2007 in response to

17  numerous violent attacks or threats. As such, the conduct complained of falls within the time line

18  specified by the Ninth Circuit as not having clearly established law on point. Plaintiffs have not

19  presented, nor has this Court found, any case law that contradicts *Vance* and *Noble*.[8] Therefore,

20  the Court defers to prison officials' judgment so long as that judgment does not manifest either

21  deliberate indifference or an intent to inflict harm. *See Noble*, 646 F.3d at 1143; *Vance*, 591 F.3d

22  at 1069 (holding that prison officials are entitled to "wide-ranging deference"). Defendants have

23  ────────────────

24  [8]      The case law prior to *Vance* and *Noble* yields varying results and therefore does not provide a consensus.
    *Compare Jones v. Garcia*, 430 F. Supp. 2d 1095, 1102−03 (S.D. Cal. 2006) (finding no Eighth Amendment violation
25  where prisoner was denied outdoor exercise for ten months); *Hayes v. Garcia*, 461 F. Supp. 2d 1198, 1201, 1207−08
    (S.D. Cal. 2006) (same for nine-month denial of outdoor exercise); *Hurd v. Garcia*, 454 F. Supp. 2d 1032, 1042−45
26  (S.D. Cal. 2006) (same for five-month denial); *with Thomas v. Ponder*, 611 F.3d 1144, 1151−52 (9th Cir. 2010)
    ("Exercise is one of the most basic human necessities protected by the Eighth Amendment. Like food, it is 'a basic
    human need protected by the Eighth Amendment.'" (quoting *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996)));
27  *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (denial of outdoor exercise may give rise to Eighth
    Amendment violation even in response to emergency conditions); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir.
    1979) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is
28  extremely important to the psychological and physical well-being of the inmates.")

presented information concerning the numerous lockdowns and the events that precipitated them,[9] as well as the measures that were taken to investigate and return the inmates to normal conditions. Plaintiffs have not presented any evidence that supports a finding that the lockdowns were imposed because of officials' deliberate indifference or intent to inflict harm.  Thus, Defendants Felker, Vanderville, Owen, Hellwig, Titlon, Foulk, and Wright are entitled to qualified immunity as to Plaintiffs' Eighth Amendment claims.

### b. Fourteenth Amendment Claim

Throughout Defendants' briefing, Defendants assert that the race-based lockdown policy that was utilized does not violate Plaintiffs' equal protection rights under the Fourteenth Amendment.  Consequently, individual Defendants Felker, Vanderville, Owen, Hellwig, Titlon, Foulk, and Wright move for summary judgment as to Mitchell's Fourteenth Amendment Claim asserting that they are entitled to qualified immunity.

As referenced above, the determination as to whether one is entitled to qualified immunity requires a two-step test: (1) whether facts alleged, taken in the light most favorable to the injured party, show the defendants' conduct violated a constitutional right; and (2) whether the right was clearly established.  *Lacey*, 693 F.3d at 915.

### 1.  Whether a Constitutional Violation Occurred

Because the CDCR's policy at issue utilizes racial classification, Defendants must show that the policy passes strict scrutiny for qualified immunity to apply.  *Johnson*, 543 U.S. at 507.  "Under strict scrutiny the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose."  *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986).  The Supreme Court's opinion in *Cruz v. Beto*, 405 U.S. 319, 321 (1972), instructs lower courts that in certain instances a race-based policy may survive strict scrutiny, but to do so the policy must be shown to be a necessity.  For Defendants to show that the policy at issue is a necessity, they must show that there was not another viable option.  Thus, narrow tailoring "require[s] serious, good faith consideration of workable race-neutral alternatives that will achieve [the compelling government interest]."  *Grutter v. Bollinger*, 539 U.S. 306, 339

---

[9]    *Infra* Section III(B)(c).

1   (2003).

2          Here, Defendants have provided numerous pages of justifications for the policy at

3   issue, yet they have not shown that there is not a viable alternative.  Essentially, Defendants argue

4   that because there were viable reasons for the lockdowns, the modified programs meet the

5   narrowly tailored requirement under strict scrutiny analysis.  This argument does not satisfy the

6   strict scrutiny requirement because Defendants have made no showing as to whether race-neutral

7   alternatives were considered.

8          Defendants also argue in their reply brief that Plaintiffs cannot satisfy the first

9   prong under *Saucier* because Defendants did not act with a discriminatory purpose.  (ECF No.

10  297 at 38).  This contention runs afoul of established Ninth Circuit precedent.  The CDCR has

11  admitted to considering race as a factor in implementing its policy, thus discriminatory intent is

12  presumed.  *See Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) ("Plaintiff was not required

13  to prove discriminatory intent because "[t]he state admit[ted] considering race when it assign[ed]

14  inmates their cell mate.")  Thus, Defendants have not shown that a constitutional violation did not

15  in fact occur, and the Court must address the second prong of *Saucier*.

16              **2.  Clearly Established Law**

17         Although Defendants assert that they are entitled to qualified immunity, they do

18  not address clearly established law as it pertains to Mitchell's Fourteenth Amendment claim and

19  seemingly rely on their argument that a constitutional violation did not occur.  (*See* ECF No. 254

20  at 72–74.)  However, because Defendants have failed to show that no constitutional violation

21  occurred, the Court will address the second prong.

22         In 2005, the United States Supreme Court decided *Johnson v. California*, 543 U.S.

23  499 (2005), in which it held that strict scrutiny applies to prison policies utilizing racial

24  classification.  "The need for strict scrutiny is no less important here, where prison officials cite

25  racial violence as the reason for their policy.  As we have recognized in the past, racial

26  classifications 'threaten to stigmatize individuals by reason of their membership in a racial group

27  and to incite racial hostility.'"  *Johnson*, 543 U.S. at 507 (citing *Shaw v. Reno*, 509 U.S. 630, 643

28  (1993) (citing *City of Richmond v. J.A. Croson Co.*, 188 U.S. 469, 493 (1989) (plurality

27

1  opinion))).

2          The actions at issue occurred during 2006 and 2007.  Thus, the contours of the

3  right were sufficiently clear at the time that the action occurred so that a reasonable official would

4  understand that a policy that utilizes racial classifications violates a prisoner's equal protection

5  rights if it does not pass strict scrutiny–i.e., no viable alternative exists.  Consequently,

6  Defendants cannot establish that they are entitled to qualified immunity on Plaintiffs' Fourteenth

7  Amendment claims.

8              **iii.    Defendants' Lack of Authority**

9          Defendants also argue that Defendants Vanderville, Owen, Foulk, Wright and

10 Hellwig were not involved in the development or imposition of the modified programs that form

11 the basis of the complaint and thus are entitled to summary judgment.  (ECF No. 254 at 41–44.)

12 Because the Court has already determined that these Defendants are entitled to qualified

13 immunity on Plaintiffs' Eighth Amendment claim, the Court limits the following discussion to

14 Mitchell's Fourteenth Amendment claim.  For the convenience of the parties, the Court has

15 summarized the facts presented by Defendants concerning the referenced Defendants'

16 responsibilities and authority, pursuant to their positions, and subsequently addresses the

17 applicability of those facts to Defendants' argument.

18              a.  Defendants Owen and Hellwig[10]

19         Defendants contend that Owen and Hellwig both held the position of Correctional

20 Counselor I at High Desert State Prison, and that their employment responsibilities primarily

21 included collecting data concerning whether inmates were properly classified by a classification

22 committee for a job, school, or security designation.  (Decl. of J. Owen in Supp. of Defs.' Mot.

23 SJ, ECF No. 264 at ¶ 2; Decl. of D. Hellwig in Supp. of Defs.' Mot. SJ, ECF No. 259 at ¶ 2.)

24 Additionally, both Owens and Hellwig stated in their declarations that they were not involved in

25 the decision-making process to implement, continue, or discontinue a modified program and

26 further that they had no authority to order, authorize, or recommend that a modified program be

27

28 _____

[10]        Due to Defendants Owen and Hellwig being employed in the same position, the Court addresses
Defendants' contention as to Owen and Hellwig's authority together.

1    imposed.  (ECF Nos. 264 at ¶ 3; 259 at ¶ 3.)

2            Plaintiffs counter that Owen and Hellwig enforced the policies and thus are liable.

3    (ECF No. 280 at 77 (citing *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183

4    (9th Cir. 2007); *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1072 (9th Cir. 2012);

5    *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999); *Thomas v. Baca*, No. CV 04-

6    1493, 2006 WL 2547321 (D. Ariz. Aug. 31, 2006) (denying summary judgment for officer who

7    claimed she lacked ultimate authority to grant cell reassignment because "she obviously had the

8    ability to refer Plaintiff's request to her supervisor"); *McClary v. Coughlin*, 87 F. Supp.2d 205,

9    215 (W.D.N.Y. 2000) ("Personal involvement does not hinge on who has the ultimate authority

10   for constitutionally offensive decisions."); *Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir.

11   1989) (holding that sufficient personal involvement was found where defendant did not have

12   ultimate authority, but his recommendation ultimately led to unconstitutional action by another).)

13           The Court finds that the aforementioned cases cited by Plaintiff strongly support

14   Plaintiffs' position.  Further, the Ninth Circuit has clearly held that § 1983 liability can be

15   established not only by "some kind of direct personal participation in the deprivation, but also by

16   setting in motion a series of acts by others which the actor knows or reasonably should know

17   would cause others to inflict the constitutional  injury." *Johnson v. Duffy*, 588 F.2d 740, 743–44

18   (9th Cir. 1978).  In contrast, Defendants cannot offer any legal support that Owen and Hellwig's

19   lack of authority bars liability.  In fact, Defendants do not cite one case in support of their

20   contention.  Instead, Defendants seem to argue that Plaintiffs' Second Amended Complaint does

21   not sufficiently allege that Owen and Hellwig "set acts into motion that they knew, or should have

22   known, would have resulted in harm to Mr. Mitchell."  (ECF No 297 at 23.)  Thus, Defendants

23   assert that Plaintiffs' opposition presents new arguments and the Court, therefore, should not

24   entertain this argument.  Defendants' argument is meritless.  The Second Amended Complaint

25   states:

26

27           Vanderville, Foulk, Owen and Hellwig were responsible for
             implementing these lockdowns, pursuant to a policy and practice
28           implemented by Defendant Tilton. . . . Defendants Felker, Wright,

1
2
3
4

> Vanderville, Foulk, Owen and Hellwig were aware of Mr. Mitchell's medical need to exercise, but nonetheless kept Mr. Mitchell on lockdown from May 2006 through December 2007, preventing him from exercising as required.  As a result, Mr. Mitchell suffered physical injuries including muscle atrophy, loss of bone density, swelling to the left leg, hip and ankle, and severe pain.

5
6

(ECF No. 84 ¶ 50−51.)  The Court finds that implementing policies can reasonably be interpreted

7
8

as encompassing "putting things into motion."  As such, a genuine factual dispute exists as to

Owen and Hellwig's involvement in executing the policy, and Defendants' motion for summary

judgment as to Owen and Hellwig is thus denied.

9

        b.  <u>Vanderville</u>

10
11

        Mitchell alleges that Vanderville "implemented, ratified and approved race-based

and excessively lengthy lockdowns."  (ECF No. 84 at ¶¶ 50, 89).  Defendants argue that because

12
13

Vanderville did not have decision making authority, Vanderville is not liabile.  (ECF No. 254 at

42.)  In support, Defendants allege that Vanderville was employed at High Desert state Prison as

14
15

a Supervising Correctional Counselor II, from May 2006 to December 2007.  (Decl. of D.

Vanderville in Supp. of Defs.' Mot. for SJ, ECF No. 268 at ¶ 2.)  Vanderville was responsible for

16
17

supervising Correctional Counselor I positions on "C" Facility, responding to inmate grievances

(CDC Form 602s) when necessary, assisting the Facility Captain for various assigned tasks, and

18
19

ensuring the overall safety and security of the institution.  (ECF No. 268 at ¶ 2.)  In addition to his

role as CC-II, Vanderville occasionally served as an acting Facility Captain for purposes of Unit

20
21

Classification Committee (UCC) hearings during the relevant period.  (ECF No. 268 at ¶ 3.)

UCC hearings are held to determine initial and subsequent program assignments, changes, and

22
23

transfers for inmates and are composed of three members chaired by staff at the level of Facility

Captain or Correctional Captain. (ECF No. 268 at ¶ 3.)  Additionally, because Vanderville held

24
25

the same supervising rank as a Facility Captain, he occasionally filled in for the Facility Captain

for purposes of UCC hearings.  (ECF No. 268 at ¶ 3.)

26
27

        Defendants argue that Vanderville is not liable because he lacks decision making

authority.  (*See* ECF No. 254 at 42.)  Defendants' position seems to ignore that Vanderville can

28

1   be held liable for the implementation of a policy even though he had no decision making

2   authority as to its implementation.  *See Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d

3   1175, 1183 (9th Cir. 2007) ("[A] person subjects another to the deprivation of a constitutional

4   right, within the meaning of § 1983, "if he does an affirmative act, participates in another's

5   affirmative act, or omits to perform an act which he is legally required to do that causes the

6   deprivation of which complaint is made" (quotations omitted)); *Karl v. City of Mountlake*

7   *Terrace*, 678 F.3d 1062, 1072 (9th Cir. 2012); *Gilbrook v. City of Westminster*, 177 F.3d 839, 854

8   (9th Cir. 1999) ("A subordinate officer who is not the final decision maker can still be liable

9   under § 1983 if he set[s] in motion a series of acts by others which the actor knows or reasonably

10   should know would cause others to inflict the constitutional injury." (internal quotations

11   omitted)).  Mitchell has alleged that Vanderville received Mitchell's grievances and did nothing

12   to rectify the situation.  (ECF No. 280 at 52.)  Defendants have not offered any evidence to negate

13   Mitchell's assertions.  Thus, Defendants have not met their burden of showing that there is not a

14   material issue of fact concerning Vanderville's involvement and liability in the alleged § 1983

15   violations, and Defendants' motion for summary judgment as to the claims against Vanderville

16   must be denied.

17               c.   Wright and Foulk

18               Like Vanderville, Plaintiffs allege that both Foulk and Wright "implemented,

19   ratified and approved race-based and excessively lengthy lockdowns in violation of Mr.

20   Mitchell's Fourteenth Amendment right to Equal Protection."  (ECF No. 84 at ¶ 89.)  Defendants

21   state that Foulk and Wright were employed as Facility Captains at High Desert State Prison

22   during the relevant time period of September 12, 2006 to December 2007.  (ECF No. 254 at 44;

23   Decl. Foulk, ECF No. 263 at ¶ 1; Wright Dep. Excerpts, ECF No. 267-1 at 42–43.)  Foulk

24   managed operations on Facility "C" while Wright managed operations on Facility "D." (ECF No.

25   254 at 44; ECF No. 263 at ¶ 1; ECF No. 267-1 at 42–43.)  In addition to his role as Faculty "D"

26   Captain, Wright also briefly served as an Acting Associate Warden responsible for overseeing

27   Complex 2 (Facilities "C" and "D") at High Desert State Prison from September 2006 to January

28   2007.  (ECF No. 267-1 at 44–45.)

Again Defendants argue that Foulk and Wright cannot be held liable because "[f]acility Captains and Acting Associate Wardens . . . do not have any decision-making authority to make adjustments to or terminate the lockdowns or modified programs. . . that authority rests solely with the Warden."  (ECF No. 254 at 44 (citing ECF No. 238 at ¶¶ 7−8, 35).)

As discussed above, a lack of decision making authority does not necessarily shield a defendant from liability in a § 1983 action if a defendant implemented or imposed an unconstitutional policy.  *See Karl*, 678 F.3d at 1072; *Preschooler II*, 479 F.3d at 1183; *Gilbrook v. City of Westminster*, 177 F.3d at 854.  As such, there exists a material issue of fact as to whether Wright or Foulk's actions make them liable for the alleged constitutional violations.  Consequently, Defendants' motion for summary judgment as to the claims against Wright and Foulk are hereby denied.  Further, because Plaintiffs' Eighth Amendment claims against Defendants Cate, Kernan, McDonald, and Giurbino[11], as well as Plaintiffs' Fourteenth Amendment claims, have survived Defendants' affirmative defenses, the Court addresses Defendants' arguments as to the merits below.

## C.  **Defendants' Contention that the CDCR's Policy  Did Not Violate Plaintiffs' Eighth and Fourteenth Amendment Rights**

In Defendants' Points and Authority for Summary Judgment, Defendants only specifically address the facts surrounding Mitchell as to this contention.  (*See* ECF No. 254 at 39–71.)  Consequently, the Court finds that Defendants' statements do not suffice to show that Quezada's rights were not violated[12] and will thus address the specific allegations concerning Mitchell below.

### i.  **Mitchell's Eighth Amendment Claim**

Pursuant to 42 U.S.C. section 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

---

[11]      Defendants Cate, Kernan, McDonald, and Giurbino were all sued in their official capacity.  (*See* ECF No. 84 at ¶¶ 14–17.)

[12]      Because the Court finds that both Abdullah and Trujillo's claims are moot, the Court declines to address Defendants' contentions concerning these Plaintiffs.

32

1  privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

2  in an action at law, suit in equity, or other proper proceeding for redress."  Section 1983 confers

3  no substantive rights itself, but rather, "provides remedies for deprivations of rights established

4  elsewhere."  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).  In the instant action,

5  Mitchell alleges that the CDCR, through implementation of its policy, violated his Eight

6  Amendment right to be free from cruel and unusual punishment.

7          The Supreme Court has defined the Eighth Amendment standard as having both

8  objective and subjective components.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "A prison

9  official violates the Eighth Amendment only when two requirements are met.  First, the

10  deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission

11  must result in the denial of 'the minimal civilized measure of life's necessities.'"  *Id.* (citations

12  omitted).  "The second requirement follows from the principle that 'only the unnecessary and

13  wanton infliction of pain implicates the Eighth Amendment.'"  *Id.* (citing *Wilson v. Seiter*, 501

14  U.S., 294, 297 (1991).  "To violate the Cruel and Unusual Punishments Clause, a prison official

15  must have a 'sufficiently culpable state of mind.'  In prison-conditions cases that state of mind is

16  one of 'deliberate indifference' to inmate health or safety."  *Id.* (quotations and citations omitted).

17  Thus, in order for Defendants to succeed, they must show that Plaintiff cannot meet one of the

18  two requirements.

19          Defendants allege that Mitchell's claim fails because the CDCR did not subject

20  Mitchell to conditions that objectively amount to cruel and unusual punishment, and further that

21  the less-than-four-month deprivation of outdoor exercise that he was subjected to does not

22  amount to an Eighth Amendment violation.  The Court addresses each of these contentions

23  separately.

24          a.  Objective Requirement: Sufficiently Serious Deprivation

25          "Under the objective requirement, the prison official's acts or omissions must

26  deprive an inmate of the minimal civilized measure of life's necessities."  *Hayes v. Garcia*, 461 F.

27  Supp. 2d 1198, 1205 (9th Cir. 2006) (quoting *Farmer*, 511 U.S. at 834).  Defendants contend that

28  the CDCR policy did not violate Mitchell's Eighth Amendment right because denial of exercise

1   will ordinarily only constitute a substantial deprivation and thus be "sufficiently serious" if it is

2   for an extended period of time.  (ECF No. 254 at 47.)  Defendants argue that Mitchell's longest

3   lockdown time period lasted for a period of less than four months.  (ECF No. 254 at 56—57.)

4   Defendants further allege that in *Hayes*, 461 F. Supp. 2d at 1207—08, the Ninth Circuit held that

5   a nine-month deprivation of exercise did not violate a prisoner's rights.  Thus, Defendants assert

6   that the less-than-four months-time period that Mitchell was subjected to does not objectively

7   violate Mitchell's Eight Amendment rights.  (ECF No. 254 at 57.)

8        Plaintiffs argue that the numerous implemented lockdowns overlapped, which

9   resulted in Mitchell being deprived of exercise for 553 days over a 624-day period, and that

10   Mitchell was not in fact released from lockdown when Defendants allege he was released.  (ECF

11   No. 280 at 53; ECF No. 283 at ¶ 150; ECF No. 285 at ¶¶ 6–14.).)  In response, Defendants assert

12   that Plaintiffs have no support for their contentions and that Mitchell's Declaration is self-serving

13   and not sufficient to raise a triable issue of fact.  (ECF No. 297 at 24.)

14        The Court finds that the majority of evidence presented by both sides is in the form

15   of declarations by interested parties and thus finds that it is inappropriate for the Court to make a

16   credibility determination at this juncture in the litigation.  *See Anderson*, 477 U.S. at 249 (holding

17   that the judge's function at the summary judgment stage is not to weigh the evidence and

18   determine the truth of the matter, but only to determine whether there is a genuine issue for trial).

19   Moreover, the Court declines Defendants' invitation to decide that Mitchell's Eighth Amendment

20   claim fails as a matter of law in light of Ninth Circuit precedent.

21        The Court finds that Defendants' reliance on *Hayes* is misplaced because the Ninth

22   Circuit's decision in *Hayes* was dependent on the fact that the plaintiff was not medically affected

23   by the alleged deprivation, and that the plaintiff complained of not being able to exercise <u>outdoors</u>

24   but was able to exercise indoors during the lockdown period.  Thus, Mitchell's claim is

25   distinguishable from *Hayes* on two grounds.  First, in contrast to *Hayes*, Mitchell alleges that the

26   lack of exercise caused him physical harm.  Second, Mitchell did not have the option of outdoor

27   or indoor exercise during the lockdown periods.  Furthermore, the Ninth Circuit has repeatedly

28   held that lockdown conditions may constitute cruel and unusual punishment under the Eighth

34

1    Amendment.  *See Thomas v. Ponder*, 611 F.3d 1144, 1151–52 (9th Cir. 2010) ("Exercise is one

2    of the most basic human necessities protected by the Eighth Amendment.  Like food, it is 'a basic

3    human need protected by the Eighth Amendment.'" (quoting *Keenan v. Hall*, 83 F.3d 1083, 1091

4    (9th Cir. 1996))); *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir.1980) (holding that denial of

5    outdoor exercise may give rise to Eighth Amendment violation even in response to emergency

6    conditions); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) ("There is substantial

7    agreement among the cases in this area that some form of regular outdoor exercise is extremely

8    important to the psychological and physical well-being of the inmates.").

9         In *Allen v. Sakai*, 48 F.3d 1082, 1087–88 (9th Cir. 1994), the Ninth Circuit

10   affirmed a trial court's finding that a prisoner's allegations that during a six-week period he had

11   been allowed only 45 minutes of outdoor exercise per week survived defendant's motion for

12   summary judgment.  The Ninth Circuit stated that the prisoner "has met the objective requirement

13   of the Eighth Amendment analysis by alleging the deprivation of what this court has defined as a

14   basic human need."  *Id.* at 1088.  Similarly, in *Lopez v. Smith*, 203 F.3d 1122, 1132–33 (9th Cir.

15   2000), the Ninth Circuit held that Lopez had met the Eighth Amendment's objective requirement

16   where he alleged that during the six-and-one-half weeks following his injury he was denied all

17   access to outdoor exercise.

18        In sum, even if Mitchell's longest lockdown was approximately four months as

19   alleged by Defendants, a four-month deprivation may meet the objective standard articulated by

20   the Ninth Circuit.  This finding in no way reflects the Court's opinion as to whether the

21   lockdowns at issue constitute an Eighth Amendment violation in the context in which they were

22   implemented.  The Court reserves judgment as to those facts for trial.  The Court only finds that

23   Defendants have not met their burden of showing that as a matter of law Mitchell cannot succeed

24   in this prong.

25              b.  Subjective Requirement: Deliberate Indifference

26        Defendants next contend that Plaintiffs cannot meet the deliberate indifference

27   standard required to establish an Eighth Amendment violation.  "[D]eliberate indifference entails

28   something more than mere negligence, the cases are also clear that it is satisfied by something

35

1   less than acts or omissions for the very purpose of causing harm or with knowledge that harm will

2   result." *Farmer*, 511 U.S. at 835.  "Showing 'deliberate indifference,' involves a two part

3   inquiry.  First, the inmate must show that the prison officials were aware of a 'substantial risk of

4   serious harm' to an inmate's health or safety."  *Thomas*, 611 F.3d at 1150.  Substantial risk of

5   serious harm may be established by the inmate showing that the risk posed by the deprivation is

6   obvious.  *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew

7   of a substantial risk [to a prisoner's health] from the very fact that the risk was obvious.").

8   "Second, the inmate must show that the prison officials had no 'reasonable' justification for the

9   deprivation, in spite of that risk."  *Thomas*, 611 F.3d at 1150.

10          Defendants do not allege in their summary judgment motion that they were

11  unaware that the lockdowns posed a substantial risk of serious harm to Mitchell.  Instead,

12  Defendants argue that Plaintiffs cannot establish the second prong of the subjective requirement

13  because Defendants had a reasonable justification for implementing modified programs, i.e.,

14  safety of employees and other inmates.  (ECF No. 254 at 57–62.)  However, in Defendants' reply,

15  Defendants allege that they were not aware of Mitchell's medical needs.  (ECF No. 297 at 29–

16  30.)

17          As to whether Defendants had knowledge of Mitchell's medical needs, the Court

18  finds that there are material issues of fact precluding summary judgment.  The deposition of

19  Michael Wright establishes that Mitchell's medical records indicated that Mitchell was prescribed

20  certain leg exercises.  (ECF No. 284-12 at 12–15.)  There is a question as to how much of

21  Mitchell's medical file was available in his central file which both Daniel Vanderville and Julie

22  Owen testified that they had access to.[13]  (ECF Nos. 284-7 at 11; 284-10 at 8.)  Furthermore,

23  Defendant Wright testified that although Mitchell's central file may not include Mitchell's

24  medical documents from other institutions, he believed that High Desert would have a complete

25  medical file including documents in which doctors documented Mitchell's prescribed leg

26  _____

[13]     Defendants Vanderville and Owen are entitled to qualified immunity as to Michell's Eighth Amendment
27  claim.  (*infra*, Section B(ii).)  However, their statements as to the availability of Mitchell's medical records support
    Mitchell's contentions as to the availability of these files concerning Defendants Cates, Kernan, McDonald, and
28  Giurbano, who are sued in their official capacity.

36

1    exercises.  (ECF No. 284-12 at 15.)  Thus, in evaluating the evidence in the light most favorable

2    to Plaintiffs, Defendants have not shown that Plaintiffs are incapable of establishing that

3    Defendants had knowledge of Mitchell's medical condition and needs, and therefore material

4    questions of fact exist.

5            The second prong of the subjective analysis requires this Court to determine

6    whether Defendants had a reasonable justification for the deprivation in spite of the risk that the

7    lockdown conditions would cause Mitchell damage.  *Thomas*, 611 F.3d at 1150.  Defendants

8    contend that the risk was reasonable due to: (1) the violent incidents that caused Defendants to

9    implement the modified program; (2) the possibility that further violence would occur; and (3) to

10   protect the safety of the inmates.   In arguing that Defendants' actions were reasonable,

11   Defendants again provide this Court with the details of numerous lockdowns that occurred over

12   the time frame concerning this suit.  Read generously, this prison record may support Defendants'

13   assertion that they denied Mitchell access to the exercise yard for his own protection.  However, it

14   is not sufficient by itself to support a grant of summary judgment.   *See Lopez v. Smith*, 203 F.3d

15   1122, 1133 (9th Cir. 2000) (holding that denial of a prisoner's yard access for his own protection

16   does not explain defendant's refusal to offer some alternative opportunity for exercise.)  Thus,

17   even if Defendants have shown that Mitchell was denied yard access for his own protection, it

18   does not explain why he was not given some other opportunity to exercise.  *See id.*; *Thomas*, 611

19   F.3d at 1155 ("The district court's conclusion that the prison officials' policy was "reasonable" is

20   also highly questionable in light of the absence of any evidence in the record that the prison

21   officials considered whether there were any alternative means of providing Thomas out-of-cell

22   exercise.").

23           Mitchell testified that he complained in writing about the lack of exercise to his

24   correctional counselor but that nothing changed.  (ECF No. 284-19 at 16–18.)  Viewing the

25   evidence in the light most favorable to Plaintiffs, there is a genuine issue of fact as to whether

26   Defendants considered any alternative means to the lockdowns.  Thus, this Court cannot

27   determine whether the lockdown was reasonable or whether Defendants' conduct was

28   deliberately indifferent to Mitchell's need for outdoor exercise.  Accordingly, the grant of

1   summary judgment as to Mitchell's Eighth Amendment claims as to Defendants sued in their

2   official capacity is denied.

3                    **ii.  Mitchell's Fourteenth Amendment Claim**

4                    Again, Defendants broadly assert that the named Plaintiffs' rights were not

5   violated because the "modified programs at issue were imposed in response to violent incidents

6   and were narrowly tailored to ensure and preserve institutional safety and security."  (ECF No.

7   254 at 39.)  Defendants contend that the modified programs that were implemented between May

8   of 2006 and December 2007 did not implicate Mitchell's Equal Protection rights.  (ECF No. 254

9   at 70.)  Essentially, Defendants argue that because there were viable reasons for the lockdowns,

10  the modified programs meet the narrowly tailored criteria required under strict scrutiny.  In

11  support of their contention that Mitchell's Fourteenth Amendment rights were not violated,

12  Defendants cite the United States Supreme Court's decision in *Cruz v. Beto*, 405 U.S. 319 (1972).

13  "Race-based decisions made in response to the 'necessities of prison security and discipline' do

14  not violate the Fourteenth Amendment when they are narrowly tailored to legitimate prison

15  goals."  (ECF No. 254 at 70 (quoting *Cruz*, 405 U.S. at 321).)  In addition, Defendants allege that

16  Plaintiffs are required to allege facts showing that Defendants acted with intent or purpose to

17  discriminate based upon membership in a protected class and that Plaintiffs have failed to show

18  such intent.  (ECF No. 254 at 70−71 (quoting *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707

19  F.3d 1114, 1123 (9th Cir. 2013)).)  The Court finds that Defendants' reliance on these cases is

20  misplaced.

21                   Defendants have acknowledged that strict scrutiny applies to Defendants' policy

22  because it applies racial classification in determining who is subjected to modified programs.

23  (*See* ECF No. 254 at 63 (citing *Johnson*, 543 U.S. at 505).)  Therefore, the burden is shifted to

24  Defendants to show that the policy meets strict scrutiny.  *Id.* at 506 ("Under strict scrutiny, the

25  government has the burden of proving that racial classifications are narrowly tailored measures

26  that further compelling governmental interests."); *see also Adarand Constructors, Inc. v. Peña*,

27  515 U.S. 200, 227 (1995).  "Under strict scrutiny the means chosen to accomplish the State's

28  asserted purpose must be specifically and narrowly framed to accomplish that purpose."  *Wygant*

38

1   *v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986).  As previously discussed,[14] a race-based

2   policy may survive strict scrutiny, but to do so the policy must be shown to be a necessity.  *See*

3   *Cruz*, 405 U.S. at 321.

4             For Defendants to show that the policy at issue is a necessity, they must show that

5   there was not another viable option.  Here, Defendants have provided numerous pages of

6   justifications,[15] yet, as previously addressed,[16] have not alleged that there is not a viable

7   alternative.  As such, this Court cannot say that Defendants have met their burden at this juncture.

8   *See Fisher v. Univ. of Tex. at Austin*, __ U.S.__, 133 S. Ct. 2411, 2420 (2013) ("The reviewing

9   court must ultimately be satisfied that no workable race-neutral alternatives would produce [the

10  desired result].")[17]  Thus, Defendants' motion for summary judgment as to Mitchell's Fourteenth

11  Amendment claim is denied.

12            **D.  Other Constitutional Claims Not Fully Briefed in the SAC**

13            In Defendants' Points and Authorities in Support of Summary Judgment,

14  Defendants briefly address a number of additional constitutional claims that are mentioned within

15  Plaintiffs' Second Amended Complaint, but are not explicitly claimed or briefed.  (ECF No. 254.)

16  The Court addresses each of these contentions separately below.

---

[14]       *See* Section III(B)(3)(b)(2) of this Order.
[15]       *Supra* Section III(A)(ii)(c).
[16]       *Supra* Sections III(A)(ii)(c), III(B)(ii)(b), III(C)(ii).
[17]       Defendants contend that Plaintiffs' reliance on *Fisher* is misplaced because *Fisher* concerned a university's diversity admission policy and here Defendants are involved in decisions involving imminent danger and safety concerns.  (ECF No. 297 at 31−32.)  The Court agrees that the strict scrutiny analysis concerning this policy must be made in context to the policy's use.  However, Defendants have not provided nor is the Court aware of any case law supporting the contention that a policy can survive strict scrutiny where defendants are unable to show that they considered any alternatives.

**i.      Eighth Amendment: Deliberate Indifference to Medical Needs**

In Defendants' briefing, they note that "Named Plaintiffs do not explicitly bring an Eighth Amendment deliberate-indifference-to-medical-needs claim."  (ECF No. 254 at 74.) Defendants argue that if it is Plaintiffs' intention to seek equitable relief for alleged inadequate medical or mental health care, they would be barred pursuant to *Brown v. Plata*, No. 3:01-cv-01351-THE (N.D. Cal.) and *Coleman v. Schwarzenegger*, No. 2:09-cv-00520 LKK JFM (E.D. Cal.).  (ECF No. 254 at 75.)

*Plata* is a class action of inmates in California state prisons with serious medical conditions.  *See generally, Plata*, No. 3:01-cv-01351-THE (N.D. Cal.).  Coleman is a federal class action lawsuit alleging unconstitutional mental health care by the CDCR.  *See generally, Coleman*, No. 2:09-cv-00520 LKK JFM (E.D. Cal.). The Coleman class includes all inmates with "serious mental disorders" who are or will be confined within the CDCR.  *Coleman*, Case No. 2:09-cv-00520 LKK JFM (E.D. Cal.).  In Plaintiffs' opposition, they state that they are not seeking an injunction regarding the provision of medical and mental health care.  (ECF No. 280 at 81.)  As such, this issue is moot and the Court need not address it further.

**ii.      First Amendment Rights**

In the SAC, Plaintiffs state that during lockdowns, prisoners are unable to visit with or telephone their families or participate in basic prison programs, such as religious services, education programs, and drug and alcohol treatment programs.  (ECF No. 84 at ¶¶ 36, 44, 51, 60.) Defendants contend that arguments concerning these issues should not be entertained by the Court because many of these allegations fail to state a claim, and the named Plaintiffs have not pleaded these claims with any degree of specificity.  (ECF No. 254 at 76–78.)  In response, Plaintiffs argue that just because they do not seek separate relief for each of the deprivations, they are not rendered irrelevant.  Plaintiffs further allege that these deprivations are directly related to the alleged harm caused by Defendants' lockdowns.  (ECF No. 280 at 81.)

Because the allegations at issue are not pleaded as separate causes of action and Plaintiffs do not seek relief as to these alleged deprivations, the Court grants Defendants' motion in so far as it finds that awarding relief as to these allegations would be inappropriate.  *See*

1  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (holding that a plaintiff must give the defendant

2  fair notice of what the claim is and the grounds upon which it rests).  However, the Court notes

3  that the alleged deprivations may be relevant to determining whether the lockdowns amounted to

4  cruel and unusual behavior under the Eighth Amendment and thus declines Defendants' invitation

5  to completely disregard Plaintiffs' allegations in such context.  Furthermore, to the extent that

6  Plaintiffs are trying to allege that each of these deprivations constitutes an Eighth Amendment

7  violation, the Court has already found that Defendants are entitled to qualified immunity on this

8  claim.  As such, further discussion of this matter is unwarranted.

9                    **E.  Intentional Infliction of Emotional Distress**

10                  Under California law, recovery for intentional infliction of emotional distress

11  ("IIED") requires a showing of: (1) extreme and outrageous conduct by the defendant; (2) with

12  the intention of causing, or reckless disregard of the probability of causing, emotional distress; (3)

13  which actually and proximately causes; (4) the plaintiff's severe or extreme emotional distress.

14  *See Christensen v. Superior Court*, 54 Cal.3d 868, 903 (1991); *Inland Mediation Bd. v. City of*

15  *Pomona*, 158 F. Supp. 2d 1120, 1156 (C.D. Cal. 2001).  Defendants contend that Mitchell's IIED

16  claim fails because Mitchell has not specifically stated "what Defendants Tilton, Felker, Wright,

17  Vanderville, Foulk, Owen, and Hellwig did to cause him emotional harm, short of his general

18  allegation that Defendants . . . implemented lengthy race-based lockdowns." (ECF No. 254 at

19  79.)  More specifically, Defendants contend that nothing in Mitchell's Second Amended

20  Complaint describes or otherwise realistically alleges "outrageous conduct" and thus Mitchell's

21  claim fails.  (ECF No. 254 at 79.)  In opposition, Plaintiffs assert

22               Where "reasonable minds may differ" about whether a Defendants'
              conduct was extreme and outrageous, the Court may not decide the
23            matter on summary judgment; in such circumstances it is for the
              jury . . . to determine whether, in the particular case, the conduct
24            has been sufficiently extreme and outrageous to result in liability.

25  (ECF No. 280 at 83.)  Because the parties' dispute only encompasses the extreme and outrageous

26  conduct requirement, the Court limits its inquiry as to whether Plaintiffs' allegations rise to the

27  level of extreme and outrageous conduct.

28                  In California, outrageous conduct has been defined as conduct which is "beyond

                                                    41

all bounds of decency; ordinary rude or insulting behavior is not enough to justify an award of damages." B. Witkin, 5 Summary of California Law: Torts § 451 (10th ed. 2005). To support a claim for intentional infliction of emotional distress, the conduct must be more than "intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen*, 54 Cal. 3d at 903.

Defendants contend that Plaintiffs have failed to allege a specific tortious act. This argument is not well taken. As previously discussed, Plaintiffs have sufficiently pleaded that Defendants implemented the policy— i.e. executed the policy. Furthermore, Plaintiffs have pleaded that Mitchell informed Defendants Owen and Hellwig of his medical condition and further filed grievances concerning this matter that were personally received by Vanderville. (ECF No. 280 at 52.) Thus, Defendants may be liable for failing to offer Mitchell alternative opportunities to exercise if such inaction is found to be outrageous. *See Davidson v. City of Westminister*, 32 Cal. 3d 197, 210 (1982) (A failure to act may support an IIED claim if the inaction is "so extreme as to exceed all bounds of that usually tolerated in a civilized community.") Both parties have acknowledged that there are no cases directly on point. While Plaintiffs have presented numerous cases in which courts have found a material issue of fact due to racially motivated conduct, none of these cases involve policies implemented in prisons where the motivation is safety. (*See* ECF No. 280 at 85 (citing *Robinson v. Hewlett Packard Corp.*, 183 Cal. App. 3d 1108, 1130 (1986) (evidence that a supervisor intentionally insulted an employee based on his race was sufficient to raise a triable issue of material fact with respect to outrageousness); *Agarwal v. Johnson*, 25 Cal.3d. 932, 947 (1979), *disapproved on other grounds by White v. Ultramar, Inc.*, 21 Cal. 4th 563 (1999) (evidence that a racial epithet was used against and humiliated an employee was enough to support a finding of outrageousness); *Alcorn v. Anbro Engineering, Inc.*, 2 Cal. 3d 493, 496−498 (1970) (supervisor shouting racially insulting comments, terminating employment and humiliating Plaintiff was enough to support a finding of outrageous conduct)).)

"When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party." *See Matsushita Elec.*

42

1  *Indus. Co.*, 475 U.S. at 587.  The Court finds that it is difficult to determine whether the factual

2  allegations presented by Plaintiffs are outrageous enough to support plaintiffs' claim without

3  making a credibility determination and thus finds that this matter should be presented to a jury.

4  *See Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120, 1157 (C.D. Cal. 2001)

5  (holding that where reasonable minds may differ as to whether conduct transcended the bounds of

6  behavior usually tolerated in a civilized society, the jury is allowed to consider whether the

7  conduct is "outrageous").  Furthermore, Defendants' briefing fails to foreclose the possibility that

8  Plaintiffs could present evidence to support their contention that Defendants' conduct meets the

9  "outrageous" requirement.  As such, Defendants motion for summary judgment as to Plaintiffs'

10  IIED claim is hereby denied.

11  **F.  Negligence and Negligent Infliction of Emotional Distress**

12  To establish a cause of action for negligence, Mitchell must show that each

13  defendant: (1) owed him a duty of care; (2) breached that duty; (3) and the breach proximately

14  caused; (4) Mitchell's injuries.  *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072 (1992); *Merrill*

15  *v. Navegar, Inc.*, 26 Cal. 4th 465, 477 (2001); *see also Corales v. Bennett*, 567 F.3d 554, 572 (9th

16  Cir. 2009).  In addition, "any complaint for damages in any civil action brought against a publicly

17  elected or appointed state or local officer, in his or her individual capacity, where the alleged

18  injury is proximately caused by the officer acting under color of law, shall allege with

19  particularity sufficient material facts to establish individual liability of the publicly elected or

20  appointed state of local officer and the plaintiff's right to recover there from."  Cal. Gov. Code §

21  951 (West 2010).  Thus, because Defendants Tilton, Felker, Wright, Vanderville, Foulk, Owen,

22  and Hellwig are being sued for actions they allegedly took when employed at High Desert State

23  Prison, Plaintiffs must identify "facts sufficient to establish every element of each cause of

24  action."  *Rakestraw v. Cal. Physicians' Serv.*, 81 Cal. App. 4th 39, 43 (2000).

25  Defendants seek summary judgment on Mitchell's claims for negligence and

26  negligent infliction of emotional distress ("NIED") contending that Plaintiffs have failed to

27  satisfy the heightened pleading standard (ECF No. 254 at 80) and that Defendants Tilton, Felker,

28  Wright, Vanderville, Foulk, Owen, and Hellwig did not owe Mitchell a duty of care.  (ECF No.

1   254 at 82.)

2          In Defendants' motion for summary judgment, they contend that Defendants do

3   not owe Mitchell a duty of care.  However, in their subsequent reply they admit that under

4   California law, an inmate who is solely dependent on his jailers due to his incarceration may be

5   owed a legal duty.  (ECF No. 297 at 41.)  Based on this recent admission, Defendants then

6   unconvincingly allege that such duty does not attach here and proceed to present arguments not

7   raised in their initial motion concerning whether Plaintiffs can show causation.

8          First, the Court notes that Plaintiffs' assertion that a jailer has a relationship with a

9   prisoner that creates a duty of care is correct.  *See Johnson v. Cate*, No. 1:10-CV-00803-AWI-

10  MJS, 2012 WL 1910086, at *5 (E.D. Cal. May 25, 2012), *report and recommendation adopted in

11  part*, No. 1:10-CV-0803-AWI-MJS, 2012 WL 3637917 (E.D. Cal. Aug. 21, 2012) (citing *Lawson

12  v. Superior Court*, 180 Cal. App. 4th 1372, 1389 (2010)).  Therefore, by alleging that Mitchell is

13  incarcerated and that Defendants were employed in supervising him within the prison system,

14  Plaintiffs have established a duty of care.  Thus, Defendants' contention that Plaintiffs have not

15  pled sufficient facts concerning a duty of care fails.

16         Furthermore, to the effect that Defendants raise new arguments concerning

17  causation in their reply brief, the Court finds such arguments inappropriate.  *See United States v.

18  Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (noting that courts generally decline to consider

19  arguments raised for the first time in a reply brief).  However, even if this Court were to entertain

20  such arguments, Defendants' contention that Mitchell had sufficient room within his cell to

21  complete the necessary exercises for his medical condition is a material issue of fact and thus is

22  not appropriate for summary judgment.  As such, Defendants' motion for summary judgment as

23  to Plaintiffs' negligence and NIED claims is denied.

24                    **G.  Discretionary Act Immunity**

25         Lastly, Defendants contend that Felker, Wright and Foulk are immune from

26  Mitchell's state law claims pursuant to California Government Code § 820.2.  (ECF No. 70.)  The

27  Code states "a public employee is not liable for an injury resulting from his act or omission where

28  the act or omission was the result of the exercise of the discretion vested in him, whether or not

44

1    such discretion be abused." Cal. Gov't Code § 820.2.  The California Code defines an employee

2    as "an officer, judicial officer as defined in Section 327 of the Elections Code, employee, or

3    servant, whether or not compensated, but does not include an independent contractor."  Cal.

4    Gov't Code § 810.2.  Accordingly, Felker, Wright and Foulk are entitled to immunity under §

5    820.2 if a "fair reading" of the complaint reveals allegations that they "made an actual, conscious,

6    and considered collective policy decision."  *Mitchell v. Felker*, No. 2:08-CV-1196 JAM EFB,

7    2012 WL 2521827, at *11 (E.D. Cal. June 28, 2012), *report and recommendation adopted*, No.

8    2:08-CV-1196 JAM EFB, 2012 WL 3070084, at *1 (E.D. Cal. July 27, 2012) (quoting *Caldwell

9    v. Montoya*, 10 Cal. 4th 972, 981 (1995).  "Immunity applies only to 'deliberate and considered

10   policy decisions, in which a conscious balancing of risks and advantages ... took place.'

11   Operational acts that merely 'implement a basic policy *already formulated*' do not receive

12   immunity."  *Id.* (quoting *Caldwell*, 10 Cal. 4th at 981) (emphasis added).

13           In deciding whether an act is a policy or operational decision, the California

14   Supreme Court has looked to whether a decision was "in the nature of a 'basic policy decision'

15   made at the 'planning' stage of City's operations" or whether it "fell within the category of

16   routine duties incident to the normal operations of the office."  *Barner v. Leeds*, 24 Cal. 4th 676,

17   685 (2000); *see also Sanborn v. Chronicle Pub. Co.*, 18 Cal.3d 406, 415 (1976).  "The scope of

18   the discretionary act immunity 'should be no greater than is required to give legislative and

19   executive policymakers sufficient breathing space in which to perform their vital policymaking

20   functions.'"  *Barner*, 24 Cal. 4th at 685 (quoting *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d

21   425, 445 (1976)); *see also AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 639−40 (9th

22   Cir. 2012).  An "employee's normal job duties are not determinative; the burden rests with

23   government defendants to demonstrate that they are entitled to § 820.2 immunity for a specific

24   policy decision made by an employee who consciously balanced the decision's risks and

25   benefits."  *AE ex rel. Hernandez*, 666 F.3d at 640.

26           These arguments have previously been raised by Defendants and subsequently

27   rejected by this Court.  *See Mitchell v. Felker*, 2012 WL 2521827, at *11.  This Court stands by

28   its original determination that whether Felker, Wright and Foulk made "deliberate and considered

1   policy decisions" with respect to the alleged lockdowns are questions of fact.  Defendants'

2   blanket assertions that Felker's decisions were discretionary within California Government Code

3   § 820.2 because they involved personal deliberation does not demonstrate that the actions

4   conform with the legal meaning of discretion as defined by the California Supreme Court.

5   Furthermore, the fact that the Ninth Circuit has described a similar deliberation as delicate, and

6   requiring expertise in prison administration, and a careful balance of the obligation to provide for

7   prisoner and staff safety against prisoners' rights, *see Noble*, 646 F.3d at 1143−44, does not

8   suffice to usher Felker's decision here within the California Supreme Court's definition of a

9   discretionary act.  Consequently, Defendants have not met their burden of showing that Felker is

10  immune.

11         Furthermore, Defendants' argument that Wright and Foulk also enjoy immunity

12  because "they participated in the decision-making process and made recommendations for

13  changes in programming based on relevant intelligence collected during the course of the

14  investigation" also fails to distinguish their involvement from "routine duties incident to the

15  normal operations of the office," and thus not immune as a discretionary act.  *See Barnes*, 24 Cal.

16  4th at 685.  As such, Defendants' motion for summary judgment pursuant to California

17  Government Code § 820.2 as to Felker, Wright and Foulk on Mitchell's state law claims is

18  denied.

19      **IV.   CONCLUSION**

20         For the foregoing reasons Defendants' motion for summary judgment is

21  GRANTED IN PART AND DENIED IN PART.  The Court hereby orders:

22         1.   Plaintiff Trujillo's claim for declaratory and injunctive relief is MOOT and is

23              thus DISMISSED;

24         2.   Plaintiff Abdullah's claim for declaratory and injunctive relief is MOOT and is

25              thus DISMISSED;

26         3.   Defendants' motion to dismiss Plaintiff Mitchell and Quezada's claims as

27              moot is DENIED;

28         4.   Defendants Felker, Vanderville, Owen, Hellwig, Tilton, Foulk and Wright are

1    entitled to qualified immunity as to Plaintiffs' Eighth Amendment claims, and

2    thus their motion for summary judgment as to Plaintiffs' Eighth Amendment

3    claims is GRANTED;

4     5.   Defendants Felker, Vanderville, Owen, Hellwig, Tilton, Foulk and Wright are

5    not entitled to qualified immunity as to Plaintiffs' Fourteenth Amendment

6    claims, and thus their motion for summary judgment as to Plaintiffs'

7    Fourteenth Amendment claims is DENIED;

8     6.   Defendants' summary judgment motion as to Mitchell's IIED claim is

9    DENIED; and

10     7.   Defendants' summary judgment motion as to Mitchell's negligence and NIED

11    claim is DENIED.

12   IT IS SO ORDERED.

13

14   Dated: February 7, 2014

15

16

17

18   _____
     Troy L. Nunley
     United States District Judge

19

20

21

22

23

24

25

26

27

28

47